Page 1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                WEST PALM BEACH DIVISION
 3                     CASE NO.  9:24-cv-80713-RLR
 4
      SCOTT L. and ELENA SHLEIFER,
 5
           Plaintiffs,
 6    vs.
 7    UNITED STATES OF AMERICA,
 8         Defendant.
      _____/
 9
10
11
12
13           DEPOSITION OF SCOTT L. SHLEIFER
14              TAKEN BY THE DEFENDANT
15
16    DATE:  March 10, 2025
17    TIME:  3:50 p.m. to 5:57 p.m.
18
19
20
21                        _   _   _
22
23
      Job No. CS7226751
24
25
```

Scott L. Shleifer                                        March 10, 2025

                                                        Page 2

 1                            I-N-D-E-X

 2     March 10, 2025

 3     Scott L. Shleifer

 4                          DIRECT   CROSS   REDIRECT   RECROSS

 5     By Ms. King             4

 6

 7

 8                          EXHIBITS

 9     Identified

10     Defendant's Exhibit 19 (Shleifer 5-6)              20

11     Defendant's Exhibit 20 (Shleifer 314-320)          30

12     Defendant's Exhibit 21 (Shleifer 1-2)              42

13     Defendant's Exhibit 22 (Shleifer 3-4)              54

14     Defendant's Exhibit 23 (SLS Travel flight log)     55

15     Defendant's Exhibit 24 (Ablamsky 233-235)          59

16     Defendant's Exhibit 25 (TGM 9-18)                  69

17     Defendant's Exhibit 26 (Shleifer 212-217)          79

18

19

20

21     Letter to Scott L. Shleifer

22     Errata Sheets (to be forwarded upon completion)

23

24

25

Scott L. Shleifer                                         March 10, 2025

                                                    Page 3

 1          The deposition of witness, SCOTT L. SHLEIFER,

 2     in the above-entitled and numbered cause was taken

 3     before me, Gina C. Veeneman, Notary Public for the

 4     State of Florida at Large, at 777 South Flagler

 5     Drive, Suite 500 East, West Palm Beach, Florida, on

 6     Monday, the 10th day of March, 2025, pursuant to

 7     Notice in said cause for the taking of said

 8     deposition on behalf of the Defendant.

 9

10

                    APPEARING ON BEHALF OF THE PLAINTIFF:

11

                         KEVIN M. FLYNN, ESQ.

12                       Kostelanetz, LLP

                         7 World Trade Center

13                       250 Greenwich Street, 34th Floor

                         New York, NY 10007

14

                    APPEARING ON BEHALF OF THE DEFENDANT:

15

                         AMANDA J. KING, ESQ.

16                       AND

                         HANA BILICKI, ESQ. (Via telephone)

17                       U.S. Department of Justice

                         Tax Division

18                       P.O. Box 14198

                         Washington, DC 20044

19

20

21

22

23

24

25

Scott L. Shleifer                                    March 10, 2025

                                                    Page 4

1      THEREUPON:

2                     SCOTT L. SHLEIFER

3      having been first duly sworn by me, was examined and

4      testified as follows:

5                THE WITNESS:  I do.

6                     DIRECT EXAMINATION

7      BY MS. KING:

8           Q.   All right.  We are here today in the

9      matter of Scott and Elena Shleifer verse the United

10     States and as an action in the United States

11     District Court for the Southern District of Florida.

12     My name is Amanda King, and I represent the United

13     States.  The date is March 10th, 2025 and the

14     deposition is taking place at Gunster, located at

15     777 South Flagler Drive, Suite 500 East, West Palm

16     Beach, Florida.  And then I'm going to have everyone

17     in the room announce themselves, for the record.

18                MR. FLYNN:  Kevin Flynn, and I'm Scott

19          Shleifer's attorney.

20                THE WITNESS:  I'm Scott Shleifer.

21                MS. KING:  And, Hana, do you want to

22          announce yourself, for the record?

23                MS. BILICKI:  Hana Bilicki, for the United

24          States, listening telephonically.

25

Scott L. Shleifer                                      March 10, 2025

```
 1    BY MS. KING:
 2         Q.   And then the rest of the questions are now
 3    for you.  Have you ever had your deposition taken
 4    before?
 5         A.   I don't really know, exactly, what the
 6    definition of a deposition is.  Not in a -- Not in a
 7    tax matter, no, but I have -- I don't know, like,
 8    what the definition of a deposition is.
 9         Q.   We'll just go with this.  You're under
10    oath, as if you would be a witness in court, do you
11    understand that?
12         A.   Yep.
13         Q.   Okay.  So this deposition is being
14    recorded stenographically, which means by a court
15    reporter.  The court reporter will be taking your
16    testimony down, word for word.  Please provide
17    verbal answers to my questions, so that she can take
18    down the answers.  If you do not hear a question,
19    please say so and I'll repeat it.  If you don't
20    understand a question, please say so and I'll
21    happily rephrase it.  This should not take too long.
22    If you need to take a break, please let me know and
23    I'll be happy to allow you to take a break, so long
24    as there's no question pending.  If there is a
25    question pending, we can talk about how to handle
```

Scott L. Shleifer                                          March 10, 2025

Page 6

1    that, moving forward.  This deposition is being

2    taken pursuant to the Federal Rules of Civil

3    Procedure and what that means for us is that all

4    objections, except as to form, are reserved.  And if

5    your counsel objects, obviously, listen to him.  If

6    he tells you not to answer, we can have those

7    discussions, at that point.

8            MR. FLYNN:  Could I just say --

9            MS. KING:  Yeah.

10           MR. FLYNN:  I may object, but you normally

11       will have to still answer the question.  It

12       really just goes down on the record.

13           THE WITNESS:  Great.

14           MR. FLYNN:  Okay.

15   BY MS. KING:

16       Q.   I'm not going to overstep him.  Do you

17   understand the instructions I've just given you?

18       A.   Yes.

19       Q.   And three embarrassing questions, we just

20   have to get on the record.  Are you on any

21   medications that prevent you from understanding and

22   answering my questions today?

23       A.   No.

24       Q.   And have you consumed any substance today,

25   such as alcohol, that would impair your ability to

Scott L. Shleifer                                         March 10, 2025

Page 7

1    respond to my questions accurately or truthfully?

2         A.   No.

3         Q.   And then what did you do to prepare for

4    your deposition today?  And don't tell me physically

5    about the conversations.

6         A.   I had a Zoom last week with Kevin.

7         Q.   Okay.

8         A.   And I have a family office, and John

9    Cramer runs it.  And so we had a Zoom last week

10   sometime.

11            MR. FLYNN:  Yep.  Last week.

12            THE WITNESS:  We had a Zoom last week and

13        during -- Did you want me to tell you what

14        happened during the Zoom?

15   BY MS. KING:

16        Q.   Nope.  No.  That's fine.

17            MR. FLYNN:  Not the conversation --

18            THE WITNESS:  So we had a Zoom last week

19        and then John and I spoke in the last hour.  In

20        the last hour.

21   BY MS. KING:

22        Q.   What I don't want is attorney/client

23   information.  You said family office.  What do you

24   mean by that?

25        A.   We -- You know, we have a -- Like we have

Scott L. Shleifer                                           March 10, 2025

Page 8

1    to pay our taxes.  Like we have -- Me and my family

2    have responsibilities, as proud American citizens,

3    and we have some like -- We have to pay our taxes.

4    We have to, you know, pay our bills on time.  We

5    have -- You know, we travel on, you know, like a

6    private jet or in private jets and so we need people

7    to help us track -- Well, you know, procure it and

8    then track, you know, what hours are

9    business-related, what hours are personal, and then

10   we also have some capital and they help us manage

11   that.

12          Q.    And who is John Cramer?

13          A.    John Cramer is -- I don't know what his

14   title is, but he and his wife, Rebecca, sort of

15   run -- It used to be called Visium.  I think the

16   name has since been changed, but it's now called

17   Vinitas.

18          Q.   You answered two of my questions already.

19          A.   And, you know, to my knowledge -- Yeah.

20   Yeah.  And to my knowledge, you know, Visium and

21   Vinitas have -- You know, I think they have one

22   client.

23          Q.   Other than you or just you?

24          A.    No.  I think they just have one client.

25   Today, they have one client.

Scott L. Shleifer                                        March 10, 2025

1          Q.   And what about in 2014?

2          A.   In 2014, they -- It was a long time ago,

3    so if this answer is not accurate, let me know, but

4    they had -- I believe they had two clients.

5          Q.   And that actually is a good segue.  I know

6    2014 was a long time ago.  I can't tell you what I

7    did in 2014.  If you do not remember something, I'll

8    try to make sure I do anything I can to jog your

9    memory.  If you don't, "I don't know.  I don't

10   remember," is okay.  We have documents for those

11   things.  We just need to get what you do remember on

12   the record today.  Is Mr. Cramer an attorney or is

13   he -- Do you know what he is, by profession?

14         A.   (Witness shakes head).

15         Q.   Okay.  That's fine.  If we subpoena

16   people, such as attorneys, we have to know that

17   ahead of time.  And I'm not subpoenaing him.  I just

18   want to make sure I have that information ahead of

19   time.  Just a few background questions.  Not too

20   many.  Where did you go to school?

21         A.   At what like -- College?

22         Q.   After high school.

23         A.   The University of Pennsylvania.  The

24   Wharton Undergraduate School of Business.

25         Q.   And what was your Major there?

Scott L. Shleifer                                    March 10, 2025

                                                        Page 10

1          A.    Finance and entrepreneurial management.  I

2     had two Majors.

3          Q.    Did you take make it to the library?

4          A.    I did.

5          Q.    Because it was beautiful.

6          A.    I did.

7          Q.    Okay.  I was going to say.

8          A.    I agree.  I made it there a lot.  So,

9     yeah.

10         Q.    And then did you go anywhere after you

11    went to Wharton?

12         A.    No.  School-wise, no.

13         Q.    Okay.  And do you have any professional

14    certificates?

15         A.    Not to my knowledge.

16         Q.    What do you currently do for work?

17         A.    I am currently a partner at Tiger Global.

18         Q.    And is that the same title that you held

19    in 2014?

20         A.    I don't know what my formal title is, so I

21    don't know, but my role is different at the firm

22    than it was in 2014.  But I don't know what my title

23    is.

24         Q.    What would your -- I don't want to ask

25    about now.  I want to focus on 2014.  What was your

Scott L. Shleifer                                    March 10, 2025

Page 11

1    role in 2014 with the firm?

2          A.    In 2014 I was one of the people who was

3    helping us manage a private equity business.   So

4    Tiger Global has a series of funds that have been

5    base raised, starting in 2003, when my partner Chase

6    and I co-founded like a fund that had $76 million.

7    And during 2014 I was kind of one of call it

8    three-ish senior, senior partners, helping run that

9    business.   And so run that business meant -- By a

10   time perspective, it meant trying to find companies

11   that we could invest in, that were private, like not

12   publicly traded on like the NASDAQ or S & P 500,

13   that we thought were going to be really good

14   businesses, that would make profit, and that owning

15   shares in them would help our investors make money.

16   And so we specialized or we spent the vast majority

17   of our time and capital invested investing in

18   emerging markets, including China, Russia, Brazil

19   and Argentina.   And so during 2014, for example, I

20   ended up flying about 280 hours on a private jet for

21   work.

22         Q.    Okay.

23         A.    I actually don't have the exact number for

24   personal, but it was much smaller.   And I believe I

25   did one or two trips to China and then I think it

 1    was either five or six trips to, combined, Brazil

 2    and Argentina.  And then I think I did one trip to

 3    Russia.  And I was going to those places to meet

 4    with companies, some that we were already

 5    shareholders in and some that we were thinking about

 6    investing in and doing our research.  And so my job

 7    was to help us get smart on how the businesses were

 8    doing, were the management teams great, and should

 9    we buy shares?  Should we keep the shares that we

10    had?  If we were already an investor, how was the

11    investment going?  You know, was it going kind of

12    green?  You know, good, medium or bad?  And that

13    was -- So like that's like the investing side.

14    Then, in addition, I was one of the people helping

15    to raise capital, you know, hire people and manage

16    them.  Yeah.

17         Q.    First, let me go back.  You said -- Was it

18    Chase?

19         A.    Uh-huh.

20         Q.    And what Chase's last name?

21         A.    Chase Coleman.

22         Q.    Okay.

23         A.    His full legal name, I think is --

24         Q.    Chase -- Mr. Coleman is fine.  I saw his

25    name on one of the other documents, so I just wanted

Page 13

1    to make sure that was the same person.  And what was

2    Chase's involvement with everything?

3          A.    Well, he founded Tiger Global.

4          Q.    Okay.

5          A.    And he was involved in everything.  He was

6    involved in the investing, the running of the

7    business.  Oh, by the way, that was just my private

8    equity hat.

9          Q.    Okay.  Oh, I'm sorry.

10         A.    In addition, we have -- At the time I

11   don't know whether we had one or two, we had a hedge

12   fund, and I was a partner in that, also.  And so I

13   was also doing research on publicly traded

14   companies.

15         Q.    And what kind of research were you doing

16   for the publicly traded companies?

17         A.    Similar.  Kind of the same research.  Is

18   it a good management team?  How big is the industry?

19   Ultimately, we were trying to figure out how much

20   net profit would a company generate and then like

21   was that a lot, relative to the current price or

22   market cap of the company, or not?

23         Q.    And I did some work in my LM program on

24   hedge funds and private equity, so just a question

25   now for your clients.  Do you have clients that

Scott L. Shleifer                                                 March 10, 2025

Page 14

1    invest and that's how you decide to use their money,
2    or is it money that Tiger Global had, to begin with?
3         A.   Well, me and the other partners at the
4    firm also invest our own capital into our funds, but
5    the vast majority of the capital is from other
6    people, university endowments and, you know, wealthy
7    individuals.  Yeah.
8         Q.   Okay.  I wasn't sure if that was -- I was
9    trying to understand like the funding source.  And
10   then in 2014, going back to the private equity, how
11   many individuals did you work with to manage those
12   funds at Tiger Global?
13        A.   I don't know.  I mean, I can give you a
14   it's probably less than.
15        Q.   Yeah.  I'll take that.
16        A.   Probably fewer -- Well, there were many
17   job roles at Tiger Global.  So we have accountants.
18   We have a legal team.  We have a marketing team.
19   And then, you know, we have the investment research
20   team.  But we also have people who support the
21   research team.  So like how many investment
22   professionals were supporting the private equity
23   business or how many total employees?
24        Q.   Yeah.  If you can go investors, first, and
25   then total.

Page 15

1          A.   I don't recall.

2          Q.   Okay.  Would you say -- Just a ballpark.

3     Would you say it's more than 10 or less than 10?

4          A.   It was a long time ago.  I mean, now I'm

5     just like guessing.  More than 10.

6          Q.   Okay.

7          A.   Like more than 10, fewer than 100.  You

8     know, between 10 and 100.  I think there's an

9     extremely high probability that if you were to audit

10    employment records from 2014, it would be between,

11    you know, 10 and 100.

12         Q.   I'm happy to take that one.

13         A.   But I just do not recall how many

14    employees we had then.

15         Q.   Did you have anybody who reported directly

16    to you?

17         A.   Yes.

18         Q.   And do you remember who that was, for

19    2014?

20         A.   There were a bunch and I don't recall the

21    exact team that was -- that was working on the

22    private equity business then.

23         Q.   I have a few names, which I'll go through

24    later, but one that I have on a title document I saw

25    was, I believe, it's Margot Landau?

Scott L. Shleifer                                            March 10, 2025

1        A.   Yeah.  Margot was my -- She was my

2    executive assistant.  Yeah.  She was my EA.

3        Q.   And how long did she work for you?

4        A.   I don't recall.

5        Q.   Is she still there with you?

6        A.   She's not.

7        Q.   Okay.

8        A.   She's awesome.

9        Q.   That's always the worst.  And then, of

10   course, the --

11       A.   No.  She is awesome.

12       Q.   All right.  We're going to jump right into

13   the purchase of the aircraft.  So when we talk about

14   the aircraft, unless we say otherwise, can we agree

15   that we're talking about the Global 6000, with

16   serial number 9598, that was delivered on November

17   3rd, 2014, by NetJets?

18       A.   Yep.

19       Q.   Was this your first aircraft fractional

20   interest purchase?

21       A.   It was not.  It was my third.

22       Q.   And when did you get the -- When did you

23   purchase the first two?

24       A.   I don't know, or, I'm sorry, I do not

25   recall.

Scott L. Shleifer                                    March 10, 2025

Page 17

1        Q.    Was it within 10 years before that?

2        A.    Highly likely.   Oh, well, I'm 47.   So 11

3    years ago I would have been 36.   Yeah.   I believe

4    that I started working with NetJets when I was in my

5    late 20s.   So, yes.

6        Q.    Okay.   That's a great way to do math.   I

7    can appreciate that one.   Okay.   And did you always

8    purchase your aircraft interest in NetJets?

9        A.    During what timeframe?

10       Q.    You said you had three aircraft purchases?

11       A.    Oh, yeah.   Yeah.

12       Q.    Okay.   Did you ever purchase any other

13   aircraft, outside of the three interests with

14   NetJets?

15       A.    During what time period?

16       Q.    Any.

17       A.    Yes.

18       Q.    Okay.   And any in 2014, or since then?

19       A.    Yes.

20       Q.    Okay.   And I know this is a stretch.   In

21   2014 how many aircraft did you own an interest in?

22       A.    I don't recall.

23       Q.    We have some documents later.   I will go

24   through those and if they help clear up, we'll try

25   to narrow that down at that point.   So I'll put a

Scott L. Shieffer                                               March 10, 2025

Page 18

1       pin in that one for later.

2               A.    Uh-huh.

3               Q.    And for the aircraft at issue in this

4       case, how did you come about to purchase that one?

5       Where did that decision come from?

6               A.    The process that we had, and when I say

7       "we," I'm largely referring to me and John Cramer,

8       we were sort of the team that was -- We looked at

9       how many hours -- We typically were work looking at

10      the last year, or I think it was the last year-ish,

11      how many hours had I traveled for work and how much

12      had I traveled personally, and then how many hours

13      did that mean that I needed.  And then we were just

14      debating -- Well, we were looking at should we buy,

15      you know, like a whole plane or should we -- I mean,

16      the kind of two primary options were to either buy a

17      whole plane or do something like NetJets, where you

18      buy fractional stake in a plane.

19              Q.    And I don't want to assume, so I'm going

20      to ask the next question.  How did you determine the

21      factual interest that you purchased?

22              A.    It was tied to hours.  And so we were

23      setting an expectation for how many hours did we

24      expect to fly in the next whatever the period of the

25      purchase was.  I don't even -- I don't recall how

Scott L. Shleifer                                        March 10, 2025

Page 19

1    long, but we were making a guestimate of how many

2    hours per year would I need to -- would I need, and

3    the primary use case was business.

4         Q.   And I don't want to put words in your

5    mouth, so correct me if I'm wrong.  You said you

6    looked at them for hours.  Was that for business and

7    for personal usage?

8         A.   Yep.  Yep.  And our process was that we

9    would make a guestimate for both, based on what we

10   had done, you know, and what we expected, going

11   forward.  And that plane, in particular, you know,

12   the reason that we needed -- and I'm sure you're

13   familiar or you might be familiar -- you know, a

14   Global 6000 is like a long-haul plane.  And it is --

15   In my opinion, it was far better suited for my

16   business needs than for my personal needs, because,

17   yeah, in 2014 I think we had like three little kids.

18   And so we did not often venture out very far with

19   them.  But a Global 6000 is perfect if you're going

20   to -- If you live in New York City and you're going

21   to Beijing, Shanghai, Moscow, Buenos Aires, Rio-Sao

22   Paulo, Amsterdam, which were all places that I flew

23   for business in 2014, you need kind of something

24   that can fly long distances.  Whereas, if you're

25   vacationing in like Florida and you live, you know,

Scott L. Shleifer                                    March 10, 2025

Page 20

1    in New York City, you could have something that is

2    much smaller.

3          Q.   Do you remember how you paid for your

4    interest with that -- for that aircraft?

5          A.   Yes.

6          Q.   How was that?

7          A.   I believe money from my bank account.

8          Q.   Okay.  I'm going to pull --

9          A.   Oh, I think it was actually multiple ways.

10         Q.   Okay.

11         A.   I think it was mostly money from my bank

12   account and then I think it was partly like other

13   shares of -- or other like assets that I had with

14   NetJets that -- other shares that I had with

15   NetJets, where I was receiving value for an existing

16   stake or lease.

17         Q.   Uh-huh.

18         A.   And then I believe the majority of it was

19   just like money from a bank account.

20         Q.   I'm going to hand you what's been marked

21   as Exhibit 19.

22         (Thereupon, Defendant's Exhibit No. 19 was

23   marked, for identification).

24   BY MS. KING:

25         Q.   If that sounds off, it's because I'm

Page 21

1    following up from Mr. Ablamsky's deposition, where

2    we did --

3              MR. FLYNN:  Okay.  Got it.  You're picking

4         up from there?

5              MS. KING:  Yes.  A nice orderly number

6         path.

7              MR. FLYNN:  Okay.

8    BY MS. KING:

9         Q.   And then these are yours.  I'll give a

10   copy to your counsel, as well.  When you're done

11   with your copies, I'm just going to have you give

12   them all to the court reporter, because they're the

13   official ones.

14        A.   Uh-huh.

15             MR. FLYNN:  Thank you.

16   BY MS. KING:

17        Q.   So I handed you what's mark as Exhibit 19,

18   otherwise identified as Shleifer 5 through 6.  Do

19   you remember -- Do you recognize this document?

20        A.   Yes.

21        Q.   And what is this?

22             MR. FLYNN:  Take your time, Scott, and

23        look at it.

24             THE WITNESS:  It looks like a bank

25        statement.

Scott L. Shleifer

March 10, 2025

Page 22

BY MS. KING:

    Q.   And on the top it says statement from November 1st, 2014 through November 30, 2014.  Do you see that?

    A.   Yep.

    Q.   And it says that it's a bank statement for SLS Travel, LLC.  Do you see that, as well?

    A.   I do.

    Q.   Is this your account, through SLS Travel?

    A.   I don't know who technically like owns the account, but I believe SLS Travel is -- I'm Scott Louis Shleifer, so I believe that this is an entity that I own and control.  And I believe that we set it up to own whatever stakes in planes that we had.

    Q.   Do you know who had access to this account in 2014?

    A.   I don't recall.

    Q.   Do you remember if you had access to this account in 2014?

    A.   I don't recall.

    Q.   And don't speculate.  Would this -- It says Visitas Partners here, so would it be safe to assume that this would have been an account that Mr. Cramer would have had access to?

    A.   Yes.  Yes.  Like it is likely -- I don't

Scott L. Shleifer                                                        March 10, 2025

                                                                        Page 23

1      recall.  Like other than having seen, you know,

2      like -- Likely that me and John would have been --

3      would have had access to this.

4           Q.   Okay.  And we'll go on and move to talk

5      about SLS Travel.  And I know you don't recall a lot

6      about that, but do you remember when SLS Travel was

7      created?

8           A.   I don't.  No.

9           Q.   And just so you know, I'll ask a bunch of

10     questions.  If you say, "I don't know," it's okay.

11     I just need to make the record as clear as possible.

12          A.   Yep.

13          Q.   It's annoying, but we'll get through it.

14     I promise.  Do you know when SLS Travel was created?

15          A.   I don't.

16          Q.   Do you remember having any part of SLS

17     Travel's creation?

18               MR. FLYNN:  Objection, just as to form.

19               THE WITNESS:  I don't recall.

20               MS. KING:  I have to move this over,

21          because Hana can hear him, but she can't hear

22          you.

23               MR. FLYNN:  Got it.  Okay.

24     BY MS. KING:

25          Q.   Do you know what the Federal tax

Scott L. Shleifer                                              March 10, 2025

                                                                Page 24

1      classification of SLS was in 2014?

2              A.   I don't.

3              Q.   Do you know what the business address of

4      SLS Travel was in 2014?

5              A.   I don't.

6              Q.   Do you know what address is 895 Park

7      Avenue, Apartment 14C, New York, New York?

8              A.   Uh-huh.

9              Q.   And what's at that address?

10             A.   That was an apartment that we used to own

11     and we -- I believe that we owned it in 2014, and

12     that is where -- That is where me and my family

13     lived in 2014.

14             Q.   I was going to assume that was it the

15     family, but I just wanted to make sure.

16             A.   Yep.  Yep.  That's where me and my family

17     worked -- sorry -- lived.

18             Q.   And just to confirm or follow up with one

19     more question -- You've answered some of these, so

20     this will take me a second to sort of go through.

21     We talked about some of your travels and you were

22     saying that you went to Beijing.  Did Tiger Global

23     Management require you to travel for work?

24             A.   Yeah.  Like I had to add value or else --

25     Like I had to add value or else I would be fired.

Scott L. Shleifer                                        March 10, 2025

Page 25

1    And so, yes, part of my job was traveling and doing

2    research on companies that would -- companies that

3    would be great, well, existing investments, as well

4    as potential new investments.

5         Q.   And to just dig a little deeper on that,

6    what did you do when you were on business-related

7    travel for your --

8         A.   Go to meetings.  So we would go to --

9         Q.   I'm trying to ask you questions, without

10   getting too much into like -- I don't want to get

11   into like the private business that you're -- I'm

12   trying to get as much information as I need, without

13   going into the more --

14        A.   It took -- Business trips took, you know,

15   many kind of what I think were normal forms, where I

16   was doing diligence.  So, oftentimes, I was going to

17   company's offices, where their chief executive

18   officer and chief financial officer were based.  And

19   there were some investments, like I believe a trip

20   to China, where we were invested in a company that

21   is sort of like the Amazon of China, it's called JD,

22   and I believe I was in Beijing, meeting with some

23   existing and prospective investment opportunities,

24   and then I flew to Shanghai to go to a warehouse, a

25   new warehouse they were building, that they thought

Scott L. Shleifer                                    March 10, 2025

Page 26

1    was going to lower their cost of production and

2    allow them to provide better value to consumers in

3    China, and make money.  And so sometimes it was, you

4    know, visiting like what a company did.  Like if it

5    was an Amazon of China, going and walking their

6    warehouses and like learning about the business, by

7    seeing it.  And so it was often meetings at a

8    company's offices, due diligence visits to whatever

9    the company did.  Yeah.  And then like you're

10   staying at a hotel and you're sleeping somewhere and

11   then you're doing it for however many days you're

12   there.

13        Q.   And did you book your own travel?

14        A.   Nope.

15        Q.   Who did that?

16        A.   Margot Landau, or whoever my EA was, which

17   I believe was Margot Landau and I think Tiger Global

18   works with a travel agent, so I don't know who

19   was -- Like, yeah, I just -- I was usually

20   communicating my EA.

21        Q.   And when you say communicating, with

22   Margot, how would you do that?  What form would that

23   take?

24        A.   Multiple formats, likely.  It included

25   in-person conversations, phone conversations,

Scott L. Shleifer                                    March 10, 2025

Page 27

1    emails, and texts, probably.

2         Q.   Do you have any of the emails or text

3    conversations from 2014, scheduling the travel at

4    issue in this case for November?

5         A.   Not to my knowledge.

6         Q.   Okay.  Did you look for those when we sent

7    discovery in this case?

8         A.   I don't know.

9         Q.   Okay.  If you go back and you have this

10   wild hair to look those up and you find them, and

11   you want to send them to us before --

12              MR. FLYNN:  Before Friday?

13   BY MS. KING:

14        Q.   -- Friday, it's responsive discovery, and

15   that would be great.  But if you don't, the world

16   will spin on.  Going back to Tiger Global

17   Management, what role did you play in its formation?

18        A.   None.

19        Q.   Okay.

20        A.   Yeah.  I was the third analyst hired.  I

21   think it was in the second year of the funds

22   existence, they hired me as an analyst.

23        Q.   When did you meet Mr. Coleman?

24        A.   I'm met him in early 2002-ish.  I think my

25   -- I think --

1        Q.   Yeah.
2        A.   I believe my start date, I think it was
3    July, 2002.
4        Q.   Okay.
5        A.   I just "ish", February, March, April, 2002
6    is likely when I met Chase.
7        Q.   Do you know how many partners there were
8    when Tiger Global was formed?
9        A.   No.
10       Q.   Do you know how many partners there are
11   now?
12       A.   Nope.
13       Q.   Do you remember any of the other partners
14   in 2014?
15       A.   Yes.
16       Q.   Who?
17       A.   Chase, Feroz Dewan, me.  I don't know who
18   else were partners.  I don't know who else were
19   partners then.
20       Q.   That's fine.  In 2014, do you remember if
21   you had a partnership ownership?
22       A.   What do you mean?
23       Q.   I always think of it in like the law firm
24   context, where you have to buy in to become a
25   partner in the firm.  Did you have to do anything

Scott L. Shleifer                                                    March 10, 2025

1    like that in 2014 for Tiger Global, or before that?

2            A.    I don't recall.

3            Q.    Did we -- My biggest thing is trying not

4    to put words in your mouth, about what you said

5    earlier.  Did you say that you were a partner now?

6            A.    Yes.

7            Q.    Okay.  Do you remember when you became a

8    partner?

9            A.    No.

10           Q.    Okay.  Where was Tiger Global Management's

11   offices located at in 2014?

12           A.    So we've been in our new offices -- I

13   don't know when we moved, but there are only two

14   offices that we've ever had.  There was one at 101

15   Park Avenue, on 40th and Park, and then 9 West 57th,

16   on 57th, between 5th and 6th.  I don't remember what

17   year we moved.

18           Q.    And I believe --

19           A.    But it was one of those two.  I just don't

20   remember.

21           Q.    That's fine.  So there was two offices.

22   You said that and that's not a material fact.  I'm

23   just trying to look at narrowing the scope here.

24   Did the partnership -- At that time, do you remember

25   if they owned the spaces or if they rented them?

Page 30

1          A.   We have always rented our spaces, to my

2     knowledge.

3          Q.   And who would pay the rent for the spaces

4     for Tiger Global Management?

5          A.   I don't know.  I could guess, because it

6     was never my responsibility.

7          Q.   Okay.

8          A.   I would guess that the management company

9     did.  Actually, I just don't know.  So I would just

10    say, I don't know.

11              MR. FLYNN:  That's fine.  Absolutely.

12    BY MS. KING:

13         Q.   That's okay.  And you said it wasn't your

14    responsibility, and that's all I was asking for, so

15    -- All right.  I'm handing you what's been marked as

16    Exhibit Number 20, which Shleifer 314 through 320.

17         (Thereupon, Defendant's Exhibit No. 20 was

18    marked, for identification).

19              MR. FLYNN:  Thank you.

20    BY MS. KING:

21         Q.   If you want to take a moment and look over

22    that, I'm going to ask you the same foundational

23    questions for this document and every one, moving

24    forward --

25         A.   Great.

1      Q.   -- which will be, when you're ready, do

2    you recognize this, and, if so, what is it?

3      A.   I recognize it and it's an operating

4    agreement of Tiger Global Management, LLC.

5      Q.   Okay.  And did you have any role in

6    creating this agreement?

7      A.   I do not recall.

8      Q.   Do you know if there was any amendments

9    made to this agreement?

10      A.   I do not know.

11      Q.   Okay.  All right.  You can go ahead and

12    pass that on.  In 2014, who did you report to?

13          MR. FLYNN:  Objection.  I think that was

14        asked and answered.  But, please, Scott, you

15        may answer.

16          THE WITNESS:  Chase Coleman and our LPs.

17    BY MS. KING:

18      Q.   What is an LP?

19      A.   Like our customers, the investors in our

20    funds.

21      Q.   And this is the nitty-gritty, but just so

22    we can understand more about the operations --

23      A.   Oh, and sort of my other partners, too.

24    Like it's a -- Yeah.  It was a -- Well, how did I

25    feel?  I felt like I reported to everyone who worked

Page 32

1     at Tiger Global and our investors.

2            Q.   Like I said, nitty-gritty, so what you can

3     remember would be great.  If not, same format as

4     before, just let me know whether or not.  What

5     supplies did you need to do your job in 2014?

6                 MR. FLYNN:  Objection, as to vague, but if

7            you can answer, Scott.

8                 THE WITNESS:  We needed great research.

9     BY MS. KING:

10           Q.   Okay.

11           A.   Like we needed great research.  We needed

12    to have a really good opinion about was a company a

13    good company or a bad company, in terms of, you

14    know, its ability to make net profit and have a high

15    return on capital?  Was it managed big good ethical

16    people or not?  You know, how talented were those

17    people at, you know, building a company?

18           Q.   Uh-huh.

19           A.    And everything that goes into that.  And

20    so like the supplies that I -- And I think this is a

21    general answer, as opposed to one that is specific,

22    just anyone who's in investing, you need to be able

23    to learn a lot about a company.  So we did that a

24    lot of ways, including visiting the company, doing

25    financial modeling, you know, receiving balance

Scott L. Shleifer                                                March 10, 2025

Page 33

1    sheets, income statements, statements of cash flows,

2    from historical periods.

3         Q.   With the financial modeling, what kind of

4    software did you use for that?

5         A.   Microsoft Office is really great.  It's

6    really great.  You know, Excel is great.  Word is

7    great.  PowerPoint is great.  Email is great.

8    There, you know, any email, but Microsoft -- I don't

9    even know what -- Yeah.

10        Q.   And breaking it down on more of a level

11   even simpler than the great explanation you just

12   gave me, what kind of tools?  So did you need a cell

13   phone to connect to business in 2014?

14        A.   Yes.

15        Q.   And then how was that paid for?

16        A.   I believe it was paid for by the company,

17   by Tiger Global.

18        Q.   Did you have a work computer in 2014?

19        A.   Yes.

20        Q.   And who paid for that?

21        A.   Tiger Global.

22        Q.   And did you have any subscriptions to

23   publications in 2014?

24        A.   Probably.

25        Q.   And I won't ask a follow-up question,

Scott L. Shleifer                                    March 10, 2025

Page 34

1    because that was a strong "Probably."  Do you have

2    an understanding of how those things would have been

3    paid for by Tiger Global Management?

4         A.   I don't.  I don't know.  I don't recall

5    who paid for what.

6         Q.   One of the things that I saw in the

7    documents was referred to as deal fees.  Do you know

8    what deal fees are referring to?

9         A.   No.

10        Q.   I will pull the document later, and we'll

11   go through.  Were there any other expenses that you

12   incurred that you were required to, by nature of

13   your position with Tiger?

14             MR. FLYNN:  Objection.  Overbroad, but if

15        you can answer, Scott, please do.

16             THE WITNESS:  When you say expenses, you

17        mean like what expenses did I ring up as a

18        professional?

19   BY MS. KING:

20        Q.   Yes.

21        A.   Yeah.  We invested in research.  So, yeah.

22   We invested in research.  We hired consulting

23   companies.  We -- Yeah.  So like research,

24   definitely.  You know, I believe we worked with

25   lawyers.  Like we worked with a law firm to help us

Scott L. Shleifer                                           March 10, 2025

Page 35

1      do diligence on companies and also if we were going

2      to buy shares or sell shares, we needed lawyers to

3      help us do that.

4           Q.   And who would pay for the lawyers and the

5      research fees and all of that?

6           A.   I don't recall.

7           Q.   What expenses did you, personally, incur

8      in 2014 for your work through Tiger Global

9      Management?

10          A.   Well, I believe that we were -- there were

11     a couple of partners who had the resources to use

12     private jets, and we were doing that and we were

13     like -- I believe I paid for my private jet and then

14     we kept track of what hours were business related

15     and what hours were personal, and then we would

16     deduct what was business related and not deduct what

17     was personal.

18          Q.   When you said a few of us had the

19     resources to use private jets, what did you mean by

20     that?

21          A.   I don't believe that I -- Well, I just --

22     I think that other people at Tiger Global also

23     had -- or maybe one person.  I don't know.  I think

24     it was maybe just -- I don't -- I'm not going to

25     speak for anyone else at Tiger Global, but my deal

Page 36

1    with Tiger Global was that I was going to pay for

2    that cost, personally.  And I believe it was

3    because -- And I don't even know when this

4    conversation or conversations occurred, but I think

5    many of us thought it would be difficult to have a

6    travel policy and like decide who would be able to

7    have a company paid for private jet, who wouldn't,

8    how many hours would we procure, how many planes,

9    and so at some point instead of doing -- instead of

10   having Tiger Global -- And this is, by the way, in

11   2014 and before --

12        Q.   Of course.

13        A.     -- and things could have changed, you

14   know, in the last 11-ish years, but that it was

15   decided that if you wanted to fly -- Like if I

16   wanted to fly private, I could pay for it and I --

17   and then I don't recall whether or not -- It's

18   possible that I was reimbursed for like commercial

19   travel costs.  I don't know if that was the case or

20   not, but I believe we tried to have a policy to just

21   say we have a policy, you can either fly coach, or

22   business or first.  I believe there was like a

23   policy and who could do what, but it did not include

24   private jets.  And if you wanted a private jet, you

25   paid for it yourself and then your team had to be

Scott L. Shleifer                                                        March 10, 2025

1    responsible for, you know, how much is business, how

2    much was personal.

3         Q.   I'm going to go back and break that answer

4    with two other questions to follow up.  You said,

5    "My deal was" that you would pay for it.  What do

6    you mean by your deal?

7         A.   I just knew what was expected of me.  I

8    actually did not -- I don't know what the other

9    partners did.  I think -- Like I could guess.

10        Q.   I only care about you.

11        A.   Yeah.  I just knew that my agreement with

12   my partners was that I would pay for all my private

13   airplane travel, on my own.

14        Q.   And did you have that in any like kind of

15   written deal?  Was it verbal?  What was that reduced

16   to?

17        A.   I don't know.  I don't know.  I mean, I

18   perceived it as like a -- I don't know if there was

19   documentation supporting that, but I know that that

20   is what I did --

21        Q.   Uh-huh.

22        A.   -- because of what I understood to be like

23   the deal that I had agreed on with my partners.

24        Q.   And you -- The second thing you said later

25   was "My team."  And who are you referring to when

Scott L. Shleifer                                    March 10, 2025

Page 38

1    you say "My team"?

2         A.   I don't -- I don't --

3         Q.   Well, when you said "My team would handle

4    what was business and what was personal," who was

5    the team there?

6         A.   Oh.  That team would have included me,

7    Margot, John.  I think those probably would have

8    been -- Oh, and probably -- maybe John Ablamsky.  I

9    don't know.  Well, yeah, certainly John Ablamsky

10   because, to my knowledge, I'm not an accountant and

11   I don't believe Margot is an accountant and I don't

12   know if John Cramer is an accountant or not.

13             MR. FLYNN:  I'm sorry.  When you said

14        John, you meant John Cramer, right?

15             THE WITNESS:  I initially meant John

16        Cramer.  There is also John Ablamsky, who is

17        the person who's been doing my taxes for a long

18        time.

19   BY MS. KING:

20        Q.   And how long has Mr. Ablamsky been doing

21   your taxes for?

22        A.   I don't know.

23        Q.   That was not a material question.  Just

24   thought I would ask.  And just to confirm that I

25   understood your testimony, you said you don't know

Scott L. Shleifer                                      March 10, 2025

Page 39

1    what the agreement was regarding private jets and

2    the other partners, is that correct?

3         A.    I don't.   I can tell you what my

4    understanding was.   I do not know what -- Like I

5    certainly don't -- I don't believe I ever saw

6    documents.   I don't recall any of that.   It was my

7    understanding that whoever wanted to fly private had

8    the same deal as me.

9         Q.    Okay.

10        A.    And that they were going to pay for it,

11   themselves, and then deal with deductions, based on

12   the law.

13        Q.    Going back to 2014, if you were to seek a

14   reimbursement for any of the private jet expenses,

15   who would you have sought that reimbursement from,

16   at Tiger?

17             MR. FLYNN:   Objection, because he

18        testified that he did not do that.

19             THE WITNESS:   I don't recall.

20   BY MS. KING:

21        Q.    Okay.   Through your position with Tiger

22   Global Management, did you have a corporate debit,

23   credit or charge card?

24        A.    Yes.

25        Q.    And did you have one in 2014?

Scott L. Shleifer                                    March 10, 2025

                                                   Page 40

1          A.    Yes.

2          Q.    What was that used for?  Generally, is

3    fine.

4          A.    Like hotels and incidentals, like food.

5          Q.    Did you have any limits as to what you

6    could use that corporate card for?

7          A.    Well, like, yeah.  It had to be business

8    related.

9          Q.    Was there a dollar amount?

10         A.    I don't recall.

11         Q.    Why did you use your business -- Strike

12   that.  I'm going to hand you what's been marked as

13   Government's --

14         A.    By the way, am I allowed to like make a

15   tiny minor edit to something I said earlier?

16         Q.    I would rather -- Yes.

17               MR. FLYNN:  Yes.

18   BY MS. KING:

19         Q.    Please do that now and not later, because

20   I'll get mad at you later.

21         A.    So I think you asked me a question about

22   how did I pay for something and I think I used the

23   word "I," but, actually, I think I just wired money

24   to an LLC.  So if I wire like resources to a limited

25   liability company that I control, does that count as

Scott L. Shleifer                                       March 10, 2025

Page 41

1       "I"?

2             Q.    We can --

3                   MR. FLYNN:   It does.   It does.

4                   THE WITNESS:   Okay.   Great.   Because you

5       asked me how did I like pay for a plane and I

6       said like, "I wired money and had some other,

7       you know, share assets probably at NetJets."

8       It was, technically, I just wired money

9       probably to an entity that I controlled.   That

10      entity wired it.

11      BY MS. KING:

12            Q.    And that is what happens.   That one I

13      understood.

14            A.    Perfect.

15                  MR. FLYNN:   That's a good clarification.

16      BY MS. KING:

17            Q.    Yes.   Wonderful clarification.

18            A.    Great.   Continue.

19            Q.    And, please, if there are questions that

20      you have or something that you remember, let me know

21      now.   That way I can ask follow-ups.

22            A.    Great.   I will.   Right.

23            Q.    I get cranky when I can't.

24            A.    Got it.

25            Q.    What I was asking before was more-so

Scott L. Shleifer                                                    March 10, 2025

Page 42

```
 1    what -- If there were things that you paid for and
 2    Tiger Global -- like how was that reimbursement or
 3    anything done?  Did any kind of reimbursements
 4    happen in 2014?  Like did you pay out of pocket for
 5    anything, and then seek reimbursement?
 6           A.    I don't know.  I don't recall.
 7           Q.    Okay.  Do you know why -- We talked about
 8    the wire.  Do you know why you paid for the plane
 9    through an LLC, versus paying it directly to
10    NetJets, through you, as a individual?
11           A.    LLCs, I believe, have a couple of
12    advantages.  The first being that they are limited
13    liability, and the second, I forget.  There was a
14    reason.  There was a reason we did it, and I don't
15    recall exactly why.  But, generally, it would be
16    John Cramer recommending something that sounds
17    smart, so me just saying, yes, and then living with
18    the result.
19           Q.    Okay.  I'm going to hand you what's marked
20    as Exhibit 21.  It's Shleifer 1 through 2.
21           (Thereupon, Defendant's Exhibit No. 21 was
22    marked, for identification).
23               MS. KING:  And I'll give a copy to
24        counsel.
25               MR. FLYNN:  This is Exhibit 21?
```

Scott L. Shleifer                                                    March 10, 2025

Page 43

1              MS. KING:   21.   Yes.

2              MR. FLYNN:   Okay.

3    BY MS. KING:

4        Q.   Okay.  Take a moment to look at this.  It

5    is a two-sided document.  Once you've had a moment,

6    if you can let me know if you recognize this

7    document, and, if so, what it is.

8        A.   I recognize this document.  It looks like

9    flight logs for a period between November, 2014 and

10   November, 2019.

11       Q.   Okay.

12       A.   And then there's like some bills.  It's

13   like an invoice, so it looks like there's a bill

14   that was to be paid.  And then on the back, flight

15   activity from November 1st, 2014 to November 30th,

16   2014.

17       Q.   Okay.  And going to the front it had -- It

18   says tail number N145QS.  And that's the aircraft at

19   issue in this case, correct?

20       A.   I don't know what N145QS is, but that is

21   what this document says.

22       Q.   Okay.

23       A.   I do not recall what exact -- Other then

24   that this document says it was a Global 6000.

25       Q.   And if you'd turn over to the back side,

Scott L. Shleifer                                                    March 10, 2025

Page 44

1    I'm going to go through the flights here.   You'll

2    see on the top that it says, on the left-hand side,

3    smaller font, what I'm assuming is reservation

4    number, and it says "Personal" underneath.   I know

5    that we are talking about business flights, so I'm

6    going to go through and make sure that we have your

7    testimony as to which were personal and which were

8    business.   So the first flight that we have here is

9    from Teterboro to Liberia.

10            A.   Personal.

11            Q.   Personal.   And then from Liberia back over

12   to Teterboro?

13            A.   Well, actually, gosh.   I think it was

14   personal.   I think it was personal, but we

15   actually -- Tiger Global did go to this hotel in

16   Costa Rica.   If I could see like who the passengers

17   were, but I'm guessing that this was -- What were

18   the dates?

19            Q.   This is November --

20            A.   Oh, this looks like Thanksgiving

21   weekend-ish.   Okay.   Call it personal.   Yeah.   We

22   did not do this trip -- Okay.   Thanksgiving weekend,

23   personal.

24            Q.   Yes.   I have a document later that looks

25   like it was your family on there, so we'll stick

Scott L. Shleifer                                    March 10, 2025

Page 45

1    with personal.

2           A.   Personal.  We actually -- The hotel --

3    Aside, the hotel that we stayed at was one that we

4    did a Tiger Global retreat at.

5           Q.   Okay.

6           A.   And then -- Well, actually, maybe it

7    wasn't.  You know what?  Strike that.  Strike that.

8    It looks like a personal trip.

9           Q.   Okay.  There's the next reservation number

10   is round trip between Teterboro and Augusta, for

11   November 4th and 5th.

12          A.   Personal.

13          Q.   Personal.  Okay.  And then after that is

14   reservation number 6817508, which is Teterboro to

15   Anchorage, Anchorage to Beijing, Beijing to

16   Shanghai, Shanghai to Anchorage, Anchorage to

17   Teterboro.

18          A.   Business.

19          Q.   Okay.  And we talked about these flights,

20   but let's break it down more.  There was a flight

21   from Beijing to Shanghai.  Why did you go from

22   Beijing to Shanghai?

23          A.   Business.  I don't know the exact meetings

24   that -- Like I don't know like all the meetings that

25   I had in Beijing and all the meetings that I had in

Scott L. Shleifer                                            March 10, 2025

Page 46

1     Shanghai, but I believe that primary or one of the

2     primary purposes of my trip there was the firm's

3     largest investment in late 2014 was a company called

4     JD.  It's sort of like the Amazon of China, and we

5     had invested about a little over $200 million into

6     the company and it went public in mid 2014.  And in

7     2015 we ended up distributing a little over

8     $6 billion.  And so it was the largest winner -- It

9     is the largest -- To my knowledge, the largest

10    winner in the history of our firm, by a lot.  But

11    we've also had investments that did not work out.

12    And so in late 2014 this was like the firm's biggest

13    investment, by I don't recall what percentage of our

14    like assets under management it was, but it was a

15    lot.  Because, you know, our $200-ish million

16    investment had ballooned.  The company performed

17    really, really well and it had ballooned in value to

18    billions, just our stake.  And it had gone public on

19    I don't even know what U.S. exchange it was.  Either

20    New York Stock Exchange or NASDAQ.  I don't know

21    which one.  And so and a huge part of the investment

22    research, because it's like a low margin business,

23    it's kind of like Amazon or like any retailer, where

24    like their profit margins aren't like 50 or

25    60 percent.  They could be a half a percent, one

Scott L. Shleifer                                                    March 10, 2025

Page 47

1    percent, two percent, negative two percent.  And so

2    one of the primary areas of diligence that we did on

3    JD for a long time is like their cost structure.

4    And to my knowledge -- They had opened up a new or

5    were opening up a new warehouse in Shanghai, that

6    they thought was going to be like better then --

7    like a lower cost of productions than all the other

8    ones that they had, and that that was going to be

9    their model for their future distribution centers

10   and warehouses.  And so I wanted to go see it.  And

11   so -- And I believe that the CEO of the company,

12   Richard Liu, gave me a tour of it, you know, when I

13   was in Shanghai.  And I don't recall whether I -- I

14   don't recall whether I met with anyone from JD when

15   I was in Beijing, but I believe that a couple of JD

16   executives rode on the plane with me, from Beijing

17   to Shanghai and then I believe that they came with

18   me and also did that facility tour with me, and then

19   the CEO, Richard Liu.  He was the CEO, at the time.

20   I don't think he's the CEO of JD today.

21        Q.   We've been going for 45 minutes.  I saw

22   you look at your phone.  We can take a break, if you

23   have something you need to tend to, quickly.

24        A.   Nope.

25        Q.   Okay.  And just to tie the loop, I know we

Scott L. Shleifer                                                            March 10, 2025

Page 48

1          talked this earlier, but to confirm, for the

2          business flights here that we have, the Teterboro

3          round trip home, from November 20th through the

4          24th, do you remember how you booked these flights?

5          Like who booked them for you, or did you booked

6          them, personally?

7                   A.   I don't recall, did I ask Margot?  How did

8          I communicate with her?

9                   Q.   Uh-huh.

10                  A.   I don't recall.

11                  Q.   Okay.  The downside of having one person

12         here is we're not passing notes, but I have to like

13         type my thoughts out, so I apologize if I look away,

14         but it's to keep it going.  Regarding this set of

15         trips, here, do you recall if you have any email

16         correspondence related to this trip, at all, for

17         2014?  Not to get into the logistics of the company,

18         but as far as like arranging, setting up the

19         meetings, and what you were going to be doing, who

20         you were going to be with and who you were going to

21         see?

22                  A.   I don't recall.  I don't know.

23                  Q.   Did you correspond via email with others

24         at Tiger Global regarding taking this trip in 2014?

25                       MR. FLYNN:  Objection.  Asked and

Scott L. Shleifer                                    March 10, 2025

Page 49

1           answered, but go ahead.

2                   THE WITNESS:  I don't recall.

3       BY MS. KING:

4           Q.    And then I know we talked about this

5       earlier, do you have the same email address now with

6       Tiger Global, as you had in 2014?

7           A.    Yes.

8           Q.    So the same goes if you think about this

9       later, and you go home and you find other documents,

10      before Friday, regarding these flights, please

11      forward them to our counsel.  Did you have an

12      itinerary for this trip, that you received?

13          A.    I don't -- I don't recall.

14          Q.    Okay.  Did you keep a calendar in 2014,

15      that would have included these trips on it?

16          A.    I did not.

17          Q.    Who would have kept a calendar for you?

18                  MR. FLYNN:  Objection.  Assumes a fact.

19      BY MS. KING:

20          Q.    If someone were to keep a calendar for

21      you, who would that have been?

22          A.    Margot or whoever I -- I think Margot was

23      my EA during that period.  So, yes, Margot.

24          Q.    Do you remember where you stayed when you

25      were at Beijing and Shanghai?

1          A.    No.

2          Q.    Do you remember if you stayed in a hotel?

3          A.    It was a four-night trip.  I must have

4     stayed in a hotel.  To my recollection, the two

5     hotels that I stayed at most often were the Grand

6     Hyatt in Beijing and maybe the Rosewood in Beijing.

7     I just -- I don't remember which one I was staying

8     at then.

9          Q.    Assuming if you did stay at a hotel, how

10    would you have paid for that?

11         A.    I don't recall.

12         Q.    Okay.  And senseless question, but just to

13    kind of go through it, did you have meals when you

14    were in Beijing and Shanghai?

15         A.    Yes.  I have never had a four-day period

16    or five-day period where I did not eat.

17         Q.    Fasting is not on the docket?

18         A.    No.  No.

19         Q.    And then how did you pay for meals when

20    you were on travel?

21         A.    I don't recall.

22         Q.    Okay.  Did you coordinate with JD.com

23    before going out to Shanghai?

24         A.    Yeah.

25         Q.    Do you have any email correspondence of

Page 51

1    that?

2          A.    I don't know.

3          Q.    As I told you, I'm going to exhaust

4    everything to make sure I can get through whatever,

5    jog, if I can, any memories from 11 years ago.  All

6    right.

7          A.    But I remember this was an important trip.

8    It was an important trip, because it was the firm's

9    most important investment.  And I believe I met with

10   other companies when I was there, but, yeah, like,

11   you know, not all meetings -- In investing, like not

12   all investments matter the same, because some are --

13   you know, our stake is worth very little and some,

14   our stake was worth a lot.  JD was really important,

15   at this time.

16         Q.    Do you have a typical practice or did you

17   have a typical practice, in 2014, of how you kept

18   track of your travel, et cetera?

19         A.    Kept track, I don't recall.  But like, for

20   example, like this is keeping track, right?

21              MR. FLYNN:  Yes.

22              THE WITNESS:  Like a document like this,

23         with a company like NetJets.  Like, for

24         example, I have a lot of confidence that like

25         NetJets has an incentive to operate on honestly

Scott L. Shleifer                                    March 10, 2025

Page 52

1          and ethically.  And so to my knowledge, you

2          can't get on or get off of a plane without

3          records being kept by NetJets, the airport that

4          you land at, like I believe -- You know, like

5          you need a passport, you need a visa.  Like

6          there's a lot of documentation that exists that

7          would prove -- I'm sure would prove that we

8          were in, you know, Costa Rica, Liberia and that

9          would prove, you know, that I went to, you

10         know, to these places on these days.

11   BY MS. KING:

12         Q.   And, for the record, when he said he was

13   referring to this, he was referring to Exhibit

14   Number 21.

15         A.   So like this, so I am very confident that

16   records were created, in part because I had to pay

17   them.  Like, you know, I had to pay.  It's an

18   economic transaction that required payment by me,

19   and has tax implications, because of the amazing tax

20   laws of the greatest country of the world, in my

21   opinion.

22         Q.   I think what I was trying to understand

23   was if you -- Like I keep everything -- Well, I'm a

24   little neurotic, which I love to put that on the

25   record, but I have a Microsoft Office calendar and I

Page 53

1    have a physical calendar.  I was trying to see if

2    you had like a practice like that, where you would

3    say like, "I kept all my meetings in -- You know, I

4    use Microsoft Outlook.  I had, you know, a

5    day-timer," and I'm old, so I say day-timer, or

6    something like that.  Like I didn't know if you had

7    anything like that in 2014, where you would have

8    kept it.

9              MR. FLYNN:  Objection.  Asked and

10        answered.  But, Scott, certainly, if you can

11        respond.

12             THE WITNESS:  I had Microsoft Outlook in

13        2014.  The calendar function, I don't remember

14        what the split was.  You know, maybe at some

15        point during the year I actually entered

16        anything, but the vast majority of the entries

17        would have been my EA, would have been Margot.

18   BY MS. KING:

19        Q.   Okay.

20        A.   The vast majority to like, you know,

21   rounds to all.

22        Q.   Yeah.

23        A.   So I just -- I have -- Yeah.  During that

24   period I was not keeping my own calendar.

25        Q.   Okay.  I'm going to hand you what is

Scott L. Shleifer                                                March 10, 2025

1   marked as Exhibit 22.  It's Shleifer 3 through 4.

2   This one is not printed two-sided.  And a copy to

3   opposing counsel, as well.

4        (Thereupon, Defendant's Exhibit No. 22 was

5   marked, for identification).

6            MR. FLYNN:  Okay.  Thank you very much.

7   BY MS. KING:

8        Q.   If you want to take a moment and look over

9   this document and when you've had a minute, let me

10   know what this is and if you recognize it.

11       A.   I don't think I -- I don't know if I

12   recognize it.  It looks like another invoice from

13   NetJets to SLS Travel --

14       Q.   Okay.

15       A.   -- during a period in, you know, November

16   of 2014 to November of 2019, with another bill.

17       Q.   Okay.  And on the right-hand side, to

18   confirm, the aircraft says Global 6000 Signature and

19   that was the type of aircraft that's at issue in

20   this case, correct?

21       A.   Yep.

22       Q.   And if we go to the second page of this

23   document, there are two itineraries.  The first one

24   is for Teterboro to Cancun, Mexico.  Was for that

25   for business or personal?

Scott L. Shleifer                              March 10, 2025

Page 55

1              A.   12-23 to Cancun, that's feeling very -- I

2     do not recall this, but just seeing that it was the

3     week of Christmas to Cancun -- And the only reason I

4     say that is I believe that I did go to Cancun with

5     Tiger Global, but not during the holidays.  So I

6     have not seen this, so I'm just positing that -- I

7     am positing that this is a personal trip.

8              Q.   And the second is Seattle to Portland,

9     Portland to Cancun.  Was that personal or business?

10             A.   Personal.

11             Q.   Okay.

12             A.   Yeah, and -- yeah.

13                  MR. FLYNN:  Weird.

14                  THE WITNESS:  No, it's not weird,

15             actually.  Yeah.

16    BY MS. KING:

17             Q.   All right.  I am going to hand you what's

18    been marked as Exhibit 23.

19             (Thereupon, Defendant's Exhibit No. 23 was

20    marked, for identification).

21    BY MS. KING:

22             Q.   And I'm this was produced to us in a

23    Native Excel spreadsheet, so it does not have the

24    Bates numbers down at the bottom.  But, for the

25    record, this is Shleifer 7.

Scott L. Shleifer                                          March 10, 2025

 1              MR. FLYNN:  Fair enough.  Thank you.

 2    BY MS. KING:

 3         Q.   So I apologize.  I put it in Native and I

 4    didn't realize that.  We've been talking about the

 5    flights that occurred in November.  This has a bit

 6    more information.  Have you seen this spreadsheet

 7    before?

 8         A.   Yes.

 9         Q.   Do you know who created this spreadsheet?

10         A.   Nope.

11         Q.   Did you create this spreadsheet?

12         A.   I don't think -- No.  I don't think so.  I

13    don't think so.

14         Q.   Okay.  Do you know when this was created?

15         A.   I don't.

16         Q.   And do you know why this was created?

17         A.   Nope.

18         Q.   Okay.  I'm going to go over to the last

19    column.  It says reason the Company visited.

20    Obviously, the ones that we confirmed today are the

21    business flights --

22              MR. FLYNN:  I'm sorry.  The left or the

23         right are you going to?

24              THE WITNESS:  The right.

25

Page 57

1    BY MS. KING:

2         Q.   Okay.  There are four company names there.

3    Do you see that?

4         A.   I do.

5         Q.   Okay.  I know we talked about JD.  Can you

6    go through the other three companies and tell me

7    what the business relationship was connected to

8    these flights that were taken?

9         A.   I don't -- I don't remember.  I don't -- I

10   do not recall.

11        Q.    And for the record, the names of -- And

12   I'm so sorry if I butcher these -- is Soufun,

13   Miyababy, and Nice.  Were you thinking something

14   further about the three of those or --

15        A.    Well, I have like vague recollections of

16   what one of them is, but I could be wrong.  It was

17   11 years ago.  I think it's possible that Soufun was

18   sort of like a version of like a Zillow, in that it

19   was real estate related.  But it's just been so

20   long, I would just say I don't recall.  Like I do

21   recall JD.  Like I recall that a lot, and very

22   gratefully.  I just don't -- Like Miyababy, just

23   because of the name, I believe that there was a site

24   that was sort of like Diapers.com of China.  And so

25   only because of the name, but I don't recall the

Scott L. Shleifer                                                    March 10, 2025

Page 58

1    meeting.  I don't -- I believe that at some point we

2    looked at the Diapers.com of China.  I don't recall.

3         Q.   Well, today I learned that there's a

4    Diapers.com, so that's kind of cool.  You can tell I

5    don't have kids yet.  So going over to the passenger

6    side, there are two passengers and I'm so -- I try

7    to be so careful and cautious of the name, but it's

8    Bin Chang and Haoyu Shen?

9         A.   Yep.

10        Q.   Do you recall those names?

11        A.   Vaguely.

12        Q.   Do you remember who -- Like can you tell

13   me who they are?

14        A.   I believe they were employees of -- I

15   believe they were senior employees of JD.com, like

16   JD the Amazon-ish of China.

17             MS. KING:  We're at an hour, so I'm going

18        to go ahead and take a five-minute break, see

19        what we may have answered and see what we can

20        do.  I'm just trying to keep this as

21        streamlined as possible.

22             MR. FLYNN:  Sure.  Sure.

23        (Thereupon, there was a recess taken).

24             MS. KING:  Back on the record.

25

Scott L. Shleifer                                          March 10, 2025

Page 59

1    BY MS. KING:

2         Q.   All right.  I'm handing you what's been

3    marked as Exhibit Number 24, which is Ablamsky 233

4    through 235.

5          (Thereupon, Defendant's Exhibit No. 24 was

6    marked, for identification).

7    BY MS. KING:

8         Q.   If you could take -- I'll hand a copy to

9    opposing counsel.  If you could take a second to

10   look over this.

11        A.   Yep.

12        Q.   Do you recognize this document?

13        A.   I don't.

14        Q.   Okay.  Is that your handwriting on the top

15   of this?

16        A.   Nope.

17        Q.   Okay.  Do you recognize, if you look in

18   the fourth or fifth columns, there's the from and to

19   city, as well as dates?  If you'd take a moment to

20   look through those, do you recognize these flights?

21        A.   I do.

22        Q.   Okay.  If you want to take another minute

23   to look through them, can you look through them and

24   confirm that the flights listed on this document

25   were all business-related travel?  And it would be

Page 60

1      just on Bates 233 and 234.

2              MR. FLYNN:  I'm going to object.  But,

3          Scott, once again, if you can -- There's a lot

4          of material there, is all I'm saying.  So if

5          you can look at it.

6      BY MS. KING:

7          Q.   Yeah.  Take your time.

8          A.   Please repeat the question.

9          Q.   I was asking if all of the flights listed

10     here on Bates 233 and over to 234 were all

11     business-related flights for 2014?

12         A.   So I've never seen this, so I don't

13     recall.  I am relying on the far right column, which

14     says the meetings that were done.  And like, for

15     example, it is my understanding that Atlanta,

16     Georgia is where Carters is based.  Carters is a

17     retailer for kids clothing, in the United States.

18     So I'm relying -- Like it appears that there were

19     companies.  I remember meeting with all these

20     companies.  And, yeah.  So, yes, it appears that --

21     Yes.  It appears these are all business related.

22     And it looks like the first page is for airplane

23     rides.

24         Q.   Uh-huh.

25         A.   And the second page is for -- Well

Scott L. Shleifer                                         March 10, 2025

Page 61

1    Heliflite is a company that operates helicopters.

2          Q.    And when did you use helicopters, in 2014?

3          A.    In 2014, to get from Manhattan -- Well,

4    it's many locations, but the most prevalent used

5    case in my life, I can't speak to 2014, because it's

6    a long time ago, would be from Manhattan typically

7    to Teterboro, but there's many airports.  But the

8    most frequent airport that I use into and out of New

9    York City, where we lived, was Teterboro.  So it

10   would be like from Manhattan to Teterboro and then

11   we would land and go to the plane.

12         Q.    And, generally, for the business flights

13   in 2014, how would you pay for those flights?

14         A.    I believe SLS Travel and me would wire

15   NetJets money.

16         Q.    And then for the third page, what about

17   for the Heliflite?

18         A.    I don't know.  I don't know who paid that,

19   or I don't recall.

20         Q.    Would Tiger Global Management have paid

21   for the Heliflite?

22         A.    I don't recall.  There's what I think and

23   then there's what I remember.  I just don't

24   remember, so I'm not going to act like I do.

25               MR. FLYNN:  Fair enough.

Scott L. Shleifer                                    March 10, 2025

Page 62

1    BY MS. KING:

2         Q.    And do you recall if at any point, while

3    working at Tiger Global Management, did they pay for

4    Heliflites for you?

5         A.    I don't recall.

6         Q.    And who would have booked the Heliflites

7    for your travel?

8         A.    I don't recall.  Like best guess, Margot.

9    I mean, it could have been John Cramer.  I just -- I

10   don't know what the protocol was, or I do not

11   recall.

12        Q.    And to put it in -- Why would you book

13   private, versus booking commercial, for work-related

14   travel in 2014?

15        A.    Uh-huh.  Efficiency.  Efficiency like to

16   be able to do these trips, in an efficient way.

17        Q.    And what do you mean by that?

18        A.    Yeah.  So private travel has many benefits

19   to me.  It allows me to just typically reduce the

20   amount of time that business trips, well, and

21   personal, but certainly business trips, to reduce

22   the amount of time that the trips take.

23        Q.    Okay.

24        A.    And that because you can leave at a time

25   that is convenient and you can return at a time that

Scott L. Shleifer                                          March 10, 2025

Page 63

1    is convenient, as opposed to when commercial flights

2    happen to run from those cities to where I was

3    living, in Manhattan.  And so it was time savings to

4    me.

5         Q.   And --

6         A.   And efficiency.

7         Q.   If we go about --

8         A.   Oh, and it was also like, for business

9    purposes, having access to private jets, like this

10   is my belief, I would have done less business

11   travel, had I not had that.  And so business travel

12   in my lifetime has been extraordinarily profitable

13   for our customers, our limited partners, and by the

14   transit property, me and my family, because I've

15   only ever been compensated for like good, productive

16   work.  And if the work wasn't good and productive,

17   then, yeah, I wouldn't get -- We didn't have a

18   business, and I wouldn't get compensated.  Sorry.  I

19   wouldn't get compensated.  Strike the "We wouldn't

20   have a business."  Strike that.  Just like I

21   wouldn't get compensated.

22        Q.   Going I'm going to call it about

23   two-thirds, there's a flight on 5-25-2014, Teterboro

24   to Buenos Aires and it says that you flew back

25   commercial.  Do you recall if that was the only time

Scott L. Shleifer                                    March 10, 2025

Page 64

1    that you flew commercial for 2014?

2         A.   Don't recall.

3         Q.   Okay.  Do you know why you chose to fly

4    back commercial, versus private, at that time?

5         A.   I don't recall.

6         Q.   And how would you -- How did you pay for

7    that commercial flight?

8         A.   Don't know.  Don't know, but, I mean, I

9    could posit.  Okay.  Don't know.

10        Q.   I'm going to speak on behalf of your

11   attorney.  He probably doesn't want you to.

12             MR. FLYNN:  Yeah.  No need to guess, but

13        --

14   BY MS. KING:

15        Q.   Yeah.  No need to guess.  Yeah.

16        A.   I don't know.  But like I can give -- Not

17   this one, but like there were times where like

18   planes break.  Like so planes break and so, again, I

19   do not recall this, but there have been times where

20   I ended up flying commercial, just because like the

21   plane broke or there was a malfunction.  But I do

22   not recall why I flew back commercial.

23        Q.   Going to the last entry on this page, it

24   is a flight, per Mr. Ablamsky's log, that was dated

25   November 9th, 2014.  It says Teterboro to San Jose.

Scott L. Shleifer                                    March 10, 2025

                                                        Page 65

1          A.    Which date?

2          Q.    The last --

3          A.    Teterboro to San Jose.  Yes.

4          Q.    What is Yuri Milner, DST?

5          A.    Yuri Milner is a human and he is a

6    business colleague of mine.  DST is the name of the

7    firm.  I think he's the owner and founder of it.

8          Q.    Okay.

9          A.    Yep.

10         Q.    Do you recall what the purpose of the

11   flight to San Jose was?

12         A.    Nope.  Happy to tell you more about my

13   business relationship with Yuri.

14         Q.    That's okay.  We were looking at dates, so

15   I'm just trying to go through and get a timeline.

16         A.    Okay.

17         Q.    And then if you go through on the next

18   page, which is 234, Bates 234 --

19              MR. FLYNN:  The top of the next page,

20        you're referring to?

21              MS. KING:  Yeah.

22              THE WITNESS:  Okay.

23   BY MS. KING:

24         Q.    There are three flights on November 19th,

25   November 19th and November 21st.  New York to

Scott L. Shleifer                                    March 10, 2025

Page 66

```
 1     Boston, Boston to San Francisco, San Jose to Los
 2     Angeles.  Do you see those last three flights?
 3          A.   Uh-huh.
 4          Q.   Do you remember what those flights were
 5     for?
 6          A.   Nope.
 7          Q.   I don't want to butcher the name in the
 8     last column.  Do you know who that individual or who
 9     that business is?
10          A.   Xioahong Chen?
11          Q.   Yes.
12          A.   Yeah.  Xioahong was a partner at Tiger
13     Global for a long time.
14          Q.   Okay.  Was he a partner in 2014?
15          A.   She.
16          Q.   She.  Sorry.
17          A.   I don't know.  I don't remember the dates,
18     so I don't know.
19          Q.   If we compare Ablamsky 234 with Exhibit
20     Number 21, at Bates 2, do you know why the last
21     three flights are not on this NetJets invoice?
22          A.   Nope.
23          Q.   All right.  And do you remember what
24     business you conducted in Boston, San Francisco, and
25     Los Angeles, for Ms. Chen?
```

Scott L. Shleifer                                        March 10, 2025

Page 67

1          A.   Well, I don't know if I was -- Your
2     positing that I was on the plane.
3          Q.   Oh.  That's a good catch.  Okay.  Do you
4     know why you would have covered flights for
5     Ms. Chen, then, or why Mr. Ablamsky would have them
6     listed on your spreadsheet of business flights?
7          A.   I don't recall.
8          Q.   Did you ever let the other partners of
9     Tiger Global use your jet -- three jets, your
10    aircraft?
11         A.   I don't recall.
12         Q.   In 2014?
13         A.   I don't recall.
14         Q.   And touching on your travel, did you ever
15    use a car service or anything else to get to the
16    airport in Teterboro, from your home or from the
17    office?
18         A.   Yes.
19         Q.   Okay.  And what would you --
20         A.   Oh, I actually -- I don't know, because we
21    employed -- I just -- I don't know.  I don't know.
22         Q.   Okay.
23         A.   I don't know who was driving me in 2014,
24    because it could have been a car service.  It could
25    have been, you know, a driver that I employed.  I

Scott L. Shleifer                                                    March 10, 2025

                                                                    Page 68

1      just don't know who was driving me around in 2014.

2      I do not recall.

3           Q.    And in 2014 how would you determine

4      whether to use a helicopter or a car service, if you

5      used a car service?

6           A.    Whatever was faster, relative to like its

7      cost, right.  Like if it was going to be infinity,

8      then I would have to -- Because I don't have

9      infinity.  So it was always just like cost and

10     benefit, based on time savings, time of day.  As you

11     know, like traffic in New York is crazy during some

12     periods and so the time savings are more and less

13     during -- It was all just -- All travel was, you

14     know, just subjective, based on whatever was the

15     most efficient, you know, relative to its cost.

16          Q.    And just a question, reviewing the

17     spreadsheet, there's the second to last column says

18     wait, and those numbers are 200, 400 and 200, on the

19     last of Ablamsky 235.  I'm going to point to it, if

20     you don't mind my reach.  Do you know what those are

21     for?

22          A.    Nope.

23          Q.    Okay.  You can put that on the side.  Are

24     you good to continue?

25          A.    Yes.

Scott L. Shleifer                                                   March 10, 2025

Page 69

1          Q.   Okay.  Just making sure.  I'm going to

2     hand you what's been marked as Exhibit Number 25,

3     otherwise identified as TGM 9 through TGM 17.

4          (Thereupon, Defendant's Exhibit No. 25 was

5     marked, for identification).

6     BY MS. KING:

7          Q.   Ignore the last page.  I'll give a copy to

8     counsel, as well.  If you could take a moment to

9     look through this, and when you do, do you recognize

10    this document?

11         A.   No.

12         Q.   This was the Tiger Global Management

13    travel and entertainment policy that was provided to

14    us from the corporate representative of Tiger Global

15    Management.  So just to reaffirm, have you seen this

16    before?

17         A.   Not to my knowledge.

18              MR. FLYNN:  I'm sorry to interrupt you,

19         but could I just ask who you -- Could you

20         identify who provided this?  You said "A

21         representative of Tiger Global Management".

22              MS. KING:  It was counsel for Tiger Global

23         Management.

24              MR. FLYNN:  Okay.

25              THE WITNESS:  Greg Seidell?

Scott L. Shleifer                                    March 10, 2025

Page 70

1    BY MS. KING:

2         Q.   Yes.   Thank you.

3              MR. FLYNN:   For the record, thanks.

4    BY MS. KING:

5         Q.   And do you remember who the CFO was in

6    2014?

7         A.   No.

8         Q.   And do you remember who the COO was in

9    2014?

10        A.   I would guess -- Can I guess Anil Crasto?

11   But I don't -- But I could be wrong.  I just -- I do

12   not recall.

13             MS. KING:   Off the record.

14        (Thereupon, there was a discussion had, off the

15   record).

16             MS. KING:   All right.  Back on the record.

17   BY MS. KING:

18        Q.   I'm going to ask you some questions.   I

19   understand you haven't seen this policy, but just so

20   that I can work through the policy with you and get

21   a better understanding of 2014, to the extent that

22   we're able to, on page 2, which is TGM 12 --

23        A.   Uh-huh.

24        Q.   -- in the bolded section it says, "Any

25   business related travel, hotel reservation

1    arrangements or other expenses that are outside the

2    policies in the team handbook must be approved by

3    the COO."  Did you ever seek pre-approval for any

4    business expenses?

5          A.   I do not recall.

6          Q.   If you go to the top of page 3, it says,

7    "Employees who fly in an unauthorized fare class

8    will be responsible for personally paying the fare

9    difference, i.e., business to first, or business to

10   private, as applicable."  Were you ever reimbursed

11   for the business fare differentials between your

12   private flights and what it would have cost to take

13   a commercial flight for those?

14         A.   I don't know.

15         Q.   Do you know if this is the current travel

16   policy in place?

17         A.   I don't know.

18              MS. KING:  Off the record.

19         (Thereupon, there was a discussion had, off the

20   record).

21              MS. KING:  Going back on the record.

22   BY MS. KING:

23         Q.   Do you know whether this HEMA policy

24   applied to you?

25         A.   I don't, but I would assume so.

Scott L. Shleifer                                              March 10, 2025

                                                              Page 72

1        Q.    Okay.   In 2014?

2        A.    I would assume that it applied to me.

3        Q.    Okay.   I'm going to move on from talking

4    about the jet, I know the whole reason we're here,

5    and just talk about your tax filings for the year

6    2014.  Can you tell me, generally, about the process

7    for when you filed a tax return to 2014?  How does

8    that go down?  Who do you email?  How does that

9    work?

10       A.    I want to follow the law and pay all my

11   taxes on time and in full.  And so my understanding

12   is like April 15th is a pretty important date and,

13   yep, but my guiding principle is abide by the laws

14   of the United States of America and be a productive

15   contributing citizen and like a law-abiding citizen.

16       Q.    For when you're filing those returns, who

17   do you normally contact, for 2014?

18       A.    Like the team would have included John

19   Cramer and John Ablamsky and Rebecca Cramer, because

20   it's tax stuff, and that's sort of her -- That's her

21   department.

22       Q.    Was Mrs. Cramer -- What was Mrs. Cramer's

23   background?  I don't think we talked about that

24   before.

25       A.    I don't know.

Scott L. Shleifer                                              March 10, 2025

Page 73

 1          Q.   What was your involvement with filing your

 2     returns?

 3          A.   My involvement?

 4          Q.   Can I strike that?  Because I don't want

 5     to say filing your returns, because you did not

 6     personally file that, so --

 7          A.   Sure.  So my involvement was to try to

 8     provide all the information that would be required.

 9     So, yeah, just what information is required to do

10     that, and then they would tell me how much I needed

11     to pay and to which, you know, Federal or State

12     government, and then they would help me -- Yeah, and

13     then I had to do it.

14          Q.   Would you meet with Mr. Ablamsky,

15     personally?

16          A.   I don't recall if I ever met him in person

17     in 2014.

18          Q.   Let me rephrase that.  Would you have

19     discussions with him directly, if it's personal -- I

20     mean, conversations with him directly, whether it be

21     over the phone or email or anything of the sort?

22               MR. FLYNN:  For 2014?

23     BY MS. KING:

24          Q.   For 2014.

25          A.   I don't recall.  I don't recall.

Scott L. Shleifer                                    March 10, 2025

                                                         Page 74

1          Q.   Does Mr. Ablamsky still prepare your

2     returns?

3          A.   I don't know.  I don't know.  Just in

4     terms of percentage of time interacted with, I

5     mostly interact with Rebecca and John, and then they

6     are interacting with whoever, our accountants or

7     other professionals, who we need their expertise to

8     manage our taxes, our, you know, will and estates

9     and just the other things that are involved in

10    trying to be responsible.

11         Q.   And do you review your return before it's

12    filed?

13              MR. FLYNN:  Objection to vague, "If you

14         review."

15              THE WITNESS:  I don't recall whether I

16         reviewed.  I don't recall whether I reviewed

17         them in 2014.

18    BY MS. KING:

19         Q.   Were you involved with the process to file

20    the amended return for 2014?

21         A.   I don't recall.

22         Q.   When did you learn that and amended return

23    for 2014 needed to be filed?

24         A.   I don't recall.

25         Q.   Do you remember who told you that they

1    were going to file an amended return?

2            A.    No.

3            Q.    Do you remember any conversations

4    happening around filing an amended return for 2014?

5            A.    The only thing I remember is I believe at

6    one point I had to wire around $3 million, and so

7    I -- Yeah.  I believe I approved a $3 million wire.

8    I don't even remember when it was.  And I could be

9    wrong about that, but I just -- I just don't recall.

10           Q.    Do you have any understanding of the

11   depreciation deduction that was claimed on the

12   amended return?

13           A.    On this specific one, I am not -- I

14   don't -- I am not an expert at depreciation law and

15   accounting.

16           Q.    As related to the amended 2014 tax return,

17   what is your understanding of what happened after it

18   was filed?

19           A.    My understanding is that -- My

20   understanding is that the majority of the hours that

21   were flown during the period that mattered for a

22   specific plane were business related, so that the

23   laws entitle me to a deduction for I think it's

24   depreciation on the plane, that entitle me to

25   depreciation on the plane, but only for the hours

1    that are business related.  And that I believe that

2    the law is that it has to be over 50 percent.  So

3    like if it's below 50 percent, then you cannot do

4    it.  Which, again, for me, based on the use cases

5    for me, yeah.  Like in 2014, it was all the -- As we

6    can see, it was a lot of business travel.  So like

7    it was not a surprise to me, at all, that I was

8    entitled to a depreciation deduction in 2014.

9         Q.   Were you involved with the IRS's

10   examination of the amended return?

11             MR. FLYNN:  Objection to vagueness.

12             THE WITNESS:  Until today, this is the

13        first interaction that I've ever had with the

14        IRS, in person.

15   BY MS. KING:

16        Q.   Okay.

17        A.   To my knowledge.

18        Q.   And for the record, I'm DOJ, not the IRS.

19        A.   Sorry.

20             MR. FLYNN:  She's the lawyer of the IRS.

21             THE WITNESS:  Sorry.  Sorry.

22   BY MS. KING:

23        Q.   No.  That's okay.

24        A.   By the way, or the Department of Justice.

25        Q.   That is fine.  I'm going to hand you

Scott L. Shleifer                                            March 10, 2025

1        three -- two subsets of documents.  These are the

2        ones we've talked about earlier.  They've already

3        been entered in as Exhibit 9, during a previous

4        deposition.  But what we have here is Shleifer 145,

5        146 and 185.  I'll hand you a copy and a copy to

6        counsel, as well.  And, like I said earlier, these

7        are just two of the pertinent pages from that

8        amended return.

9                  MR. FLYNN:  And this will be one exhibit,

10            26?

11                 MS. KING:  This is not an exhibit.

12                 MR. FLYNN:  Oh, they're not?

13                 MS. KING:  These are the excerpts from

14            Exhibit 9.

15                 MR. FLYNN:  From Exhibit 9.  Got it.

16                 MS. KING:  Yeah.  Just the pertinent

17            pages.

18                 MR. FLYNN:  Okay.  Understood.

19                 THE WITNESS:  Okay.

20       BY MS. KING:

21            Q.   If we go to the second, which has 185,

22       which is the solo page there, this is for 2014,

23       Schedule A.  It says the -- I'm sorry.  If I said

24       this was an amended return, I mean this was the

25       original return.  I want to make sure that was

Page 78

1      clear.

2                  MR. FLYNN:  Okay.

3      BY MS. KING:

4            Q.    Yeah.   I said Exhibit 9 and then I wanted

5      to make sure that -- This is the one that was first

6      filed with the IRS, before they made the adjustments

7      for depreciation.   If you go through, do you know

8      what the travel expenses are on line 10?

9            A.    Nope.

10           Q.    Do you know what -- There are no research

11     expenses.   Do you know why it says research

12     expenses, and then zero?

13           A.    Nope.

14           Q.    Do you know what the $250,000 in deal fees

15     are?

16           A.    Nope.

17           Q.    Do you recall in 2014 giving Mr. Ablamsky

18     or anybody documentation supporting deal fees?

19           A.    I do not recall.

20           Q.    And for these types -- Do you recall an

21     entity called China Renaissance?

22                  MR. FLYNN:  I'm sorry.  I didn't get the

23           question?

24     BY MS. KING:

25           Q.    Do you recall an entity named China

Scott L. Shleifer                                          March 10, 2025

Page 79

1    Renaissance?

2              MR. FLYNN:  Entity?  Okay.

3              THE WITNESS:  I do not recall.

4    BY MS. KING:

5         Q.   Do you know why you would not have sought

6    to have deal fees reimbursed by Tiger Global

7    Management, versus claiming them on your form,

8    yourself?

9         A.   I do not recall.

10        Q.   In the last 10 years, do you ever recall

11   having deal fee expenses that weren't reimbursed by

12   Tiger Global?

13             MR. FLYNN:  Objection.

14             THE WITNESS:  I don't recall.

15   BY MS. KING:

16        Q.   What do you understand the term deal fees

17   to mean?

18        A.   I don't know.  I just -- I don't know.  In

19   this instance, I do not know what this is or, sorry,

20   I do not recall what it is.

21        Q.   Okay.  And then I'm going to hand you

22   what's been marked as Government's Exhibit 26, it's

23   212 to 217.

24             (Thereupon, Defendant's Exhibit No. 26 was

25   marked, for identification).

Page 80

```
 1    BY MS. KING:

 2         Q.   If you can take a moment and look through

 3    this.

 4              MR. FLYNN:  So you're not putting this in

 5         the record?

 6              MS. KING:  It's already in.  It's already

 7         in.

 8              MR. FLYNN:  Do you want this back?

 9              MS. KING:  I'll put that over here.  And a

10         copy for counsel, as well.

11              MR. FLYNN:  Thank you.

12    BY MS. KING:

13         Q.   And have you seen this document before?

14         A.   Not to my recollection.

15         Q.   Do you know who Loeb & Loeb is?

16         A.   Nope.

17         Q.   Do you recall doing any work with BNY

18    Mellon Wealth Management?

19         A.   I do not recall.

20         Q.   I will make it a fact of the record that

21    this is one of the invoices that was paid, along

22    with the purchase of the Global 6000.

23         A.   Uh-huh.

24         Q.   Because it's not a memory test, but just

25    to kind of go from there.  Do you remember working
```

Page 81

1    with Loeb, at all, for the purchase of the Global

2    6000?

3         A.   I do not.

4         Q.   And if you go to the second page, which

5    has the Bates ending in 213, the first line for

6    10-1-14 talks about bank loan documents.  Did you

7    get a loan for the plane?

8              MR. FLYNN:  I'm sorry.  Where are you,

9         please?

10             MS. KING:  Just the first line.

11             THE WITNESS:  I don't know.

12   BY MS. KING:

13        Q.   If you have bank loan documents?

14        A.   I don't recall.

15        Q.   And there's a D. Cornelius.  Do you know

16   who that is, in the second -- in the same sentence?

17        A.   I'm not -- Where -- What is the date for

18   D. Cornelius?

19        Q.   It's the same one.  10-1.  The same line.

20   It says, "Reviewed bank documents".

21        A.   Oh, 10-1.

22        Q.   And had a call with D. Cornelius and C.

23   Phalavi.  Do you know who they are?

24        A.   I do not recall.

25        Q.   The next line says, for 10-2-14, it has a

Scott L. Shleifer                                    March 10, 2025

Page 82

1      discussion of hedge fund documents.

2            A.    Uh-huh.

3            Q.    Do you remember discussing hedge fund

4      documents with Loeb & Loeb?

5                  MR. FLYNN:  Objection.

6                  THE WITNESS:  I do not recall.

7                  MS. KING:  Do you want to state the basis

8            for the objection?

9                  MR. FLYNN:  Objection.  There's been no

10           foundation that he had a discussion.

11                 THE WITNESS:  Yeah.  Like I do not recall.

12           Like I don't -- I've never seen this document,

13           so I don't know are these conversations that I

14           was supposed to be having, or someone else was

15           having?

16     BY MS. KING:

17           Q.    That's what I'm asking.  So this was a

18     document that --

19           A.    So I don't know.  I don't recall that we

20     ever hired Loeb & Loeb, but if there's documentation

21     that a bill was sent to, you know, me or an LLC and

22     that we paid it, like I will -- You know, I'm

23     guessing that this is -- I believe it to be real,

24     but I don't know if I was doing these calls or if,

25     for example, John Cramer was doing them --

Page 83

1          Q.   Okay.

2          A.   -- or Rebecca Cramer, or somebody else who

3     like works for me, to do their job.  I just don't

4     recall.

5          Q.   And then because you can tell by the Bates

6     numbers, this is a document that was produced by

7     your team in this litigation.  So I'm just trying to

8     figure out how these relate to the purchase of the

9     aircraft.  Because this was listed as an expense.

10         A.   Okay.  Well, I can just give you color

11    on -- If you would like color on that --

12         Q.   Yeah.

13         A.   You know, to buy and to -- We often, I

14    believe, work with outside experts that include --

15    Well, I don't even know who he is, because I don't

16    recall Loeb & Loeb.  But John and Rebecca Cramer

17    have, you know, discretion to, you know, bring in

18    experts to make sure that we're doing like

19    everything in a world-class way, that is legal and

20    moral.  And that often includes hiring third

21    parties, that have expertise that they don't, and

22    that I don't.  But like I don't even know what Loeb

23    & Loeb is.  Like what do they do?

24         Q.   I think they're attorneys.

25         A.   Perfect.

1              MR. FLYNN:  They are attorneys.

2       BY MS. KING:

3              Q.    That's what I -- They are attorneys?

4       Okay.  I was like I believe from my review of this,

5       they are attorneys.  Okay.  And just through some of

6       the -- I understood this, obviously, because it was

7       claimed with the form as expenses related to the

8       purchase of the aircraft, but there were just some

9       questions I have because you could tell there's an

10      entry for 10-2 and 10-8, talking about hedge fund

11      issues.  And I just want to know how those related

12      to the purchase of the aircraft?

13             A.    I do not know.

14             MR. FLYNN:  Can I just object and say, to

15             correct, it was really an expense of the

16             depreciation added to the basis.  It was not an

17             expense of the purchase.

18             MS. KING:  Yes, again.

19      BY MS. KING:

20             Q.    And then for just one more question.

21      Regarding 10-3, there's a discussion regarding

22      redemption rights.  And I haven't heard that term in

23      a while, but I was wondering if you knew what that

24      was about?

25             MR. FLYNN:  Same objection.

Scott L. Shleifer                                                      March 10, 2025

Page 85

1              THE WITNESS:  I have no idea what this --

2         I have no idea --

3    BY MS. KING:

4         Q.   That is fine.

5         A.   -- what the background is for this.

6         Q.   Okay.  And do you recall work withing a

7    firm called McAfee and Taft?

8         A.   Oh.  Well, again, I don't know what this

9    document is, but to give you potential color, so I

10   do not know whether I took a loan out to buy this

11   plane.

12        Q.   Uh-huh.

13        A.   But if work was done to potentially

14   consider it, then any lender would want to know what

15   like assets were available to pay off the loan.

16   But, again, I don't know if I took a loan or I

17   didn't.  I'm just giving you background.  In 2014 I

18   was definitely an investor in Tiger Global's hedge

19   fund.

20        Q.   Okay.

21        A.   And so one of the assets that

22   potentially -- But, again, I don't even know what

23   this is about, but like an asset that I had at that

24   time was an investment in our hedge fund.  You know,

25   and any lender that was doing research on a loan for

Scott L. Shleifer                                                                    March 10, 2025

Page 86

1     me, that would include a stake in the hedge fund,

2     and, again, I have no idea whether that was the case

3     or not, I just don't know, would have wanted to know

4     what were the redemption -- Meaning, how could I get

5     money out of the hedge fund and what are the

6     redemptions.  Because our hedge fund, and many of

7     our funds, they have specific rights.  Investors

8     can, in some of the funds, ask for their money back

9     on a certain schedule.  And in other funds, they can

10    not.  Like in our private funds, you cannot do that

11    and investors know that and sign an agreement.  In

12    our hedge fund you can put in a redemption request,

13    if you are an investor, of which I was an investor.

14    I am just hypothesizing.

15         Q.   Yeah.

16         A.   A lender that was going to make a loan,

17    that had any collateral from me in the hedge fund,

18    they would have wanted to know that.

19         Q.   So, basically, likely liquidity?

20         A.   Liquidity.

21         Q.   Okay.

22         A.   But, again, I do not -- I have no idea

23    what this document is.  I don't even remember what

24    Loeb & Loeb is.

25         Q.   That's fine.  Do you remember working with

1    a firm called McAfee and Taft?

2         A.   I don't.

3         Q.   I'm going to save us some trouble on that,

4    then.  There are a few individuals, I have documents

5    to support them.  I'm just going to ask names first,

6    from those documents.  Do you remember --

7         A.   But do you find of understand the idea of

8    redemption rights?

9         Q.   I do.  Yes.

10        A.   You know, you take a certain amount each

11   year, and have to put a request in, a certain number

12   of days before or after a -- Anyway, you got it.

13        Q.   That's just I was trying to make sure I

14   can line everything up and it all kind of passed

15   muster.  Do you remember working with a Briana

16   Morgan?

17        A.   Nope.

18        Q.   I guess she went by Brie.  Does that help?

19        A.   Nope.

20        Q.   And do you remember working or an

21   individual with the name of Heath Jennings?

22        A.   Well, Heath -- Does Heath work at Vinitas?

23        Q.   Yes.

24        A.   Yes.  So Heath works at Vinitas.

25        Q.   Is he still there?

1        A.    Yeah.

2        Q.    Okay.  And what kind of work would you do

3   with Heath?

4        A.    I don't do a lot of work with Heath.

5   Rebecca Cramer does a lot of work with Heath.

6        Q.    Okay.  And one of the email addresses that

7   we saw was taxsls@vinitaspartners.  Do you know who

8   would operate that email address?

9        A.    Some combination of the Vinitas team,

10  which includes John, Rebecca, Heath.

11       Q.    Okay.  And if we can go off the record,

12  we'll see if Hana has any other questions.  We'll

13  take another two minutes and see what else I have

14  for you.

15       A.    Okay.

16       (Thereupon, there was a recess taken).

17            MS. KING:  We'll go back on the record.  I

18       have great news.  I have no further questions.

19            MR. FLYNN:  I have greater news.  I have

20       no questions.

21            MS. KING:  Oh, that's even better.  Do you

22       want to discuss reading or waiving with your

23       client?

24            MR. FLYNN:  Yeah.  We're definitely going

25       to read.  Yeah.

Scott L. Shleifer                                      March 10, 2025

                                                      Page 89

1                    MS. KING:  I figured.

2                    MR. FLYNN:  We're definitely going to read

3           and we don't need an expedited transcript.  I

4           would like to have a few minutes with you

5           after.

6                    MS. KING:  Of course.  Yeah.  We're all

7           good, then.

8                    THE COURT REPORTER:  Do you want it

9           transcribed?

10                   MS. KING:  Do I want a transcript?  Yes.

11                   MR. FLYNN:  Yeah.  Likewise.  Yes.

12                   MS. KING:  I would say within seven.

13    (Thereupon, the deposition was concluded at 5:57

14    p.m.)

15

16

17

18

19

20

21

22

23

24

25

Scott L. Shleifer                                                           March 10, 2025

Page 90

1

2                        CERTIFICATE OF SERVICE

3

4        THE STATE OF FLORIDA, )

5        COUNTY OF PALM BEACH  )

6                    I, Gina Veeneman, Florida Professional

7        Reporter, Notary Public, State of Florida, certify

8        that SCOTT L. SHLEIFER, personally appeared before

9        me, and was duly sworn on the 10th day of March,

10       2025.

11                    WITNESS my hand and official seal this

12       13th day of March, 2025.

13

14

15

16

17       *Gina Veeneman*

18       GINA C. VEENEMAN, FPR
         Notary Public, State of Florida

19       Commission # HH237410
         My Commission expires June 10, 2026

20

21

22

23

24

25

Scott L. Shleifer                                            March 10, 2025

Page 91

                                     CERTIFICATE OF REPORTER

THE STATE OF FLORIDA    )
COUNTY OF PALM BEACH    )

           I, GINA C. VEENEMAN, Florida Professional
Reporter, certify that I was authorized to and did
stenographically report the deposition of SCOTT L.
SHLEIFER, that a review of the transcript was
requested; and that the transcript, Pages 1 through
93, is a true record of my stenographic notes.

           I further certify that I am not a
relative, employee, attorney, or counsel of any
of the parties, nor am I a relative or employee
of any of the parties' attorney or counsel
connected with the action, nor am I financially
interested in the action.
           The certification does not apply to
any reproduction of the same by any means
unless under the direct control and/or direction
of the reporter.

           Dated this 13th day of March,
2025.


           GINA C. VEENEMAN, F.P.R.

1    KEVIN M. FLYNN, ESQ.

2    kflynn@kostelanetz.com

3                        March 13, 2025

4    RE: Schleifer, Scott And Elena v. United States Of America

5        3/10/2025, Scott L. Shleifer (#7226751)

6        The above-referenced transcript is available for

7    review.

8        Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   erratas-cs@veritext.com.

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                     Yours,

23                     Veritext Legal Solutions

24

25

Scott L. Shleifer                                          March 10, 2025

                                                              Page 93

1     Schleifer, Scott And Elena v. United States Of America

2     Scott L. Shleifer (#7226751)

3                    E R R A T A   S H E E T

4     PAGE_____ LINE_____ CHANGE_____

5     _____

6     REASON_____

7     PAGE_____ LINE_____ CHANGE_____

8     _____

9     REASON_____

10    PAGE_____ LINE_____ CHANGE_____

11    _____

12    REASON_____

13    PAGE_____ LINE_____ CHANGE_____

14    _____

15    REASON_____

16    PAGE_____ LINE_____ CHANGE_____

17    _____

18    REASON_____

19    PAGE_____ LINE_____ CHANGE_____

20    _____

21    REASON_____

22

23    _____    _____

24    Scott L. Shleifer                              Date

25

Scott L. Shleifer

March 10, 2025

Page 94

1    Schleifer, Scott And Elena v. United States Of America

2    Scott L. Shleifer (#7226751)

3                  ACKNOWLEDGEMENT OF DEPONENT

4       I, Scott L. Shleifer, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Scott L. Shleifer                          Date

13   *If notary is required

14                      SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                      _____ DAY OF _____, 20____.

16

17

18                      _____

19                      NOTARY PUBLIC

20

21

22

23

24

25

| & | | | |
|---|---|---|---|
| **&**   11:12 80:15 82:4,20 83:16 83:23 86:24 | **17**   69:3 | **64**:1,25 66:14 | **24th**   48:4 |
| | **185**   77:5,21 | 67:12,23 68:1 | **25**   2:16 69:2,4 |
| | **19**   2:10 20:21 | 68:3 70:6,9,21 | **250**   3:13 |
| **1** | 20:22 21:17 | 72:1,6,7,17 | **250,000**   78:14 |
| | **19th**   65:24,25 | 73:17,22,24 | **26**   2:17 77:10 |
| **1**   42:20 91:10 | **1st**   22:3 43:15 | 74:17,20,23 | 79:22,24 |
| **1-2**   2:12 | | 75:4,16 76:5,8 | **280**   11:20 |
| **10**   1:16 2:2 | **2** | 77:22 78:17 | |
| 15:3,3,5,7,8,11 | | 85:17 | **3** |
| 17:1 78:8 | **2**   42:20 66:20 | **2015**   46:7 | |
| 79:10 90:19 | 70:22 | **2019**   43:10 | **3**   54:1 71:6 |
| **10-1**   81:19,21 | **20**   2:10,11 | 54:16 | 75:6,7 |
| **10-1-14**   81:6 | 30:16,17 94:15 | **2025**   1:16 2:2 | **3-4**   2:13 |
| **10-2**   84:10 | **200**   46:5,15 | 3:6 4:13 90:10 | **3/10/2025**   92:5 |
| **10-2-14**   81:25 | 68:18,18 | 90:12 91:19 | **30**   2:11 22:3 |
| **10-3**   84:21 | **2002**   27:24 | 92:3 | 92:16 |
| **10-8**   84:10 | 28:3,5 | **2026**   90:19 | **30th**   43:15 |
| **100**   15:7,8,11 | **2003**   11:5 | **20s**   17:5 | **314**   30:16 |
| **10007**   3:13 | **20044**   3:18 | **20th**   48:3 | **314-320**   2:11 |
| **101**   29:14 | **2014**   9:1,2,6,7 | **21**   2:12 42:20 | **320**   30:16 |
| **10th**   3:6 4:13 | 10:19,22,25 | 42:21,25 43:1 | **34th**   3:13 |
| 90:9 | 11:1,2,7,19 | 52:14 66:20 | **36**   17:3 |
| **11**   17:2 36:14 | 14:10 15:10,19 | **212**   79:23 | **3:50**   1:17 |
| 51:5 57:17 | 16:17 17:18,21 | **212-217**   2:17 | **3rd**   16:17 |
| **12**   70:22 | 19:17,23 22:3 | **213**   81:5 | |
| **12-23**   55:1 | 22:3,16,19 | **217**   79:23 | **4** |
| **12085**   90:17 | 24:1,4,11,13 | **21st**   65:25 | |
| 91:21 | 27:3 28:14,20 | **22**   2:13 54:1,4 | **4**   2:5 54:1 |
| **13**   92:3 | 29:1,11 31:12 | **23**   2:14 55:18 | **400**   68:18 |
| **13th**   90:12 | 32:5 33:13,18 | 55:19 | **40th**   29:15 |
| 91:18 | 33:23 35:8 | **233**   59:3 60:1 | **42**   2:12 |
| **14198**   3:18 | 36:11 39:13,25 | 60:10 | **45**   47:21 |
| **145**   77:4 | 42:4 43:9,15 | **233-235**   2:15 | **47**   17:2 |
| **146**   77:5 | 43:16 46:3,6 | **234**   60:1,10 | **4th**   45:11 |
| **14c**   24:7 | 46:12 48:17,24 | 65:18,18 66:19 | **5** |
| **15th**   72:12 | 49:6,14 51:17 | **235**   59:4 68:19 | |
| | 53:7,13 54:16 | **24**   2:15 59:3,5 | **5**   21:18 |
| | 60:11 61:2,3,5 | | **5-25-2014** |
| | 61:13 62:14 | | 63:23 |
| | | | **5-6**   2:10 |

Scott L. Shieffer

March 10, 2025

**[50 - amount]**

Page 2

| | | | |
|---|---|---|---|
| **50** 46:24 76:2,3 | **9:24** 1:3 | acknowledge... | 58:18 |
| **500** 3:5 4:15 | **9th** 64:25 | 94:3 | **aircraft** 16:13 |
| 11:12 | **a** | acknowledg... | 16:14,19 17:8 |
| **54** 2:13 | | 92:12 | 17:10,13,21 |
| **55** 2:14 | **abide** 72:13 | act 61:24 | 18:3 20:4 |
| **57th** 29:15,16 | **abiding** 72:15 | action 4:10 | 43:18 54:18,19 |
| **59** 2:15 | **ability** 6:25 | 91:13,14 | 67:10 83:9 |
| **5th** 29:16 45:11 | 32:14 | activity 43:15 | 84:8,12 |
| **6** | **ablamsky** 2:15 | actually 9:5 | **aires** 19:21 |
| | 38:8,9,16,20 | 11:23 20:9 | 63:24 |
| **6** 21:18 46:8 | 59:3 66:19 | 30:9 37:8 | **airplane** 37:13 |
| **60** 46:25 | 67:5 68:19 | 40:23 44:13,15 | 60:22 |
| **6000** 16:15 | 72:19 73:14 | 45:2,6 53:15 | **airport** 52:3 |
| 19:14,19 43:24 | 74:1 78:17 | 55:15 67:20 | 61:8 67:16 |
| 54:18 80:22 | **ablamsky's** | add 24:24,25 | **airports** 61:7 |
| 81:2 | 21:1 64:24 | added 84:16 | **alcohol** 6:25 |
| **6817508** 45:14 | **able** 32:22 36:6 | addition 12:14 | **allotted** 92:19 |
| **69** 2:16 | 62:16 70:22 | 13:10 | **allow** 5:23 26:2 |
| **6th** 29:16 | **above** 3:2 92:6 | additions 94:6 | **allowed** 40:14 |
| **7** | 94:7 | address 24:3,6 | **allows** 62:19 |
| | **absolutely** | 24:9 49:5 88:8 | **amanda** 3:15 |
| **7** 3:12 55:25 | 30:11 | addresses 88:6 | 4:12 |
| **7226751** 92:5 | **access** 22:15,18 | adjustments | **amazing** 52:19 |
| 93:2 94:2 | 22:24 23:3 | 78:6 | **amazon** 25:21 |
| **76** 11:6 | 63:9 | advantages | 26:5 46:4,23 |
| **777** 3:4 4:15 | **account** 20:7 | 42:12 | 58:16 |
| **79** 2:17 | 20:12,19 22:9 | agent 26:18 | **amended** 74:20 |
| **8** | 22:11,15,19,23 | ago 9:2,6 15:4 | 74:22 75:1,4 |
| | **accountant** | 17:3 51:5 | 75:12,16 76:10 |
| **80713** 1:3 | 38:10,11,12 | 57:17 61:6 | 77:8,24 |
| **895** 24:6 | **accountants** | agree 10:8 | **amendments** |
| **9** | 14:17 74:6 | 16:14 | 31:8 |
| | **accounting** | agreed 37:23 | **america** 1:7 |
| **9** 29:15 69:3 | 75:15 | agreement 31:4 | 72:14 92:4 |
| 77:3,14,15 | **accuracy** 92:9 | 31:6,9 37:11 | 93:1 94:1 |
| 78:4 | **accurate** 9:3 | 39:1 86:11 | **american** 8:2 |
| **9-18** 2:16 | **accurately** 7:1 | ahead 9:17,18 | **amount** 40:9 |
| **93** 91:10 | | 31:11 49:1 | 62:20,22 87:10 |
| **9598** 16:16 | | | |

**amsterdam**
   19:22
**analyst** 27:20
   27:22
**anchorage**
   45:15,15,16,16
**angeles** 66:2,25
**anil** 70:10
**announce** 4:17
   4:22
**annoying** 23:13
**answer** 6:6,11
   9:3 31:15 32:7
   32:21 34:15
   37:3
**answered** 8:18
   24:19 31:14
   49:1 53:10
   58:19
**answering** 6:22
**answers** 5:17
   5:18
**anybody** 15:15
   78:18
**anyway** 87:12
**apartment**
   24:7,10
**apologize**
   48:13 56:3
**appeared** 90:8
**appearing** 3:10
   3:14
**appears** 60:18
   60:20,21
**appended** 94:7
**applicable**
   71:10 92:8

**applied** 71:24
   72:2
**apply** 91:15
**appreciate**
   17:7
**approval** 71:3
**approved** 71:2
   75:7
**april** 28:5
   72:12
**areas** 47:2
**argentina**
   11:19 12:2
**arrangements**
   71:1
**arranging**
   48:18
**aside** 45:3
**asked** 31:14
   40:21 41:5
   48:25 53:9
**asking** 30:14
   41:25 60:9
   82:17
**asset** 85:23
**assets** 20:13
   41:7 46:14
   85:15,21
**assistant** 16:2
**assume** 18:19
   22:23 24:14
   71:25 72:2
**assumes** 49:18
**assuming** 44:3
   50:9
**atlanta** 60:15
**attached** 92:11

**attorney** 4:19
   7:22 9:12
   64:11 91:12,13
   92:13
**attorneys** 9:16
   83:24 84:1,3,5
**audit** 15:9
**augusta** 45:10
**authorized**
   91:8
**available** 85:15
   92:6
**avenue** 24:7
   29:15
**awesome** 16:8
   16:11

**b**

**back** 12:17
   14:10 27:9,16
   37:3 39:13
   43:14,25 44:11
   58:24 63:24
   64:4,22 70:16
   71:21 80:8
   86:8 88:17
**background**
   9:19 72:23
   85:5,17
**bad** 12:12
   32:13
**balance** 32:25
**ballooned**
   46:16,17
**ballpark** 15:2
**bank** 20:7,11
   20:19 21:24
   22:6 81:6,13

   81:20
**base** 11:5
**based** 19:9
   25:18 39:11
   60:16 68:10,14
   76:4
**basically** 86:19
**basis** 82:7
   84:16
**bates** 55:24
   60:1,10 65:18
   66:20 81:5
   83:5
**beach** 1:2 3:5
   4:16 90:5 91:6
**beautiful** 10:5
**behalf** 3:8,10
   3:14 64:10
**beijing** 19:21
   24:22 25:22
   45:15,15,21,22
   45:25 47:15,16
   49:25 50:6,6
   50:14
**belief** 63:10
**believe** 9:4
   11:24 15:25
   17:3 20:7,18
   22:11,12,13
   24:11 25:19,22
   26:17 28:2
   29:18 33:16
   34:24 35:10,13
   35:21 36:2,20
   36:22 38:11
   39:5 42:11
   46:1 47:11,15
   47:17 51:9

52:4 55:4
57:23 58:1,14
58:15 61:14
75:5,7 76:1
82:23 83:14
84:4
**benefit** 68:10
**benefits** 62:18
**best** 62:8
**better** 19:15
26:2 47:6
70:21 88:21
**big** 13:18 32:15
**biggest** 29:3
46:12
**bilicki** 3:16
4:23,23
**bill** 43:13 54:16
82:21
**billion** 46:8
**billions** 46:18
**bills** 8:4 43:12
**bin** 58:8
**bit** 56:5
**bny** 80:17
**bolded** 70:24
**book** 26:13
62:12
**booked** 48:4,5
48:5 62:6
**booking** 62:13
**boston** 66:1,1
66:24
**bottom** 55:24
**box** 3:18
**brazil** 11:18
12:1

**break** 5:22,23
37:3 45:20
47:22 58:18
64:18,18
**breaking** 33:10
**briana** 87:15
**brie** 87:18
**bring** 83:17
**broke** 64:21
**buenos** 19:21
63:24
**building** 25:25
32:17
**bunch** 15:20
23:9
**business** 8:9
9:24 11:3,9,9
13:7 14:23
15:22 19:3,6
19:16,23 24:3
25:6,11,14
26:6 33:13
35:14,16 36:22
37:1 38:4 40:7
40:11 44:5,8
45:18,23 46:22
48:2 54:25
55:9 56:21
57:7 59:25
60:11,21 61:12
62:20,21 63:8
63:10,11,18,20
65:6,13 66:9
66:24 67:6
70:25 71:4,9,9
71:11 75:22
76:1,6

**businesses**
11:14 12:7
**butcher** 57:12
66:7
**buy** 12:9 18:14
18:16,18 28:24
35:2 83:13
85:10

**c**

**c** 3:3 81:22
90:18 91:8,22
**calendar** 49:14
49:17,20 52:25
53:1,13,24
**call** 11:7 44:21
63:22 81:22
**called** 8:15,16
25:21 46:3
78:21 85:7
87:1
**calls** 82:24
**cancun** 54:24
55:1,3,4,9
**cap** 13:22
**capital** 8:10
11:17 12:15
14:4,5 32:15
**car** 67:15,24
68:4,5
**card** 39:23
40:6
**care** 37:10
**careful** 58:7
**carters** 60:16
60:16
**case** 1:3 18:4
19:3 27:4,7

36:19 43:19
54:20 61:5
86:2
**cases** 76:4
**cash** 33:1
**catch** 67:3
**cause** 3:2,7
**cautious** 58:7
**cell** 33:12
**center** 3:12
**centers** 47:9
**ceo** 47:11,19,19
47:20
**certain** 86:9
87:10,11
**certainly** 38:9
39:5 53:10
62:21
**certificate** 90:2
91:3
**certificates**
10:14
**certification**
91:15
**certify** 90:7
91:8,11
**cetera** 51:18
**cfo** 70:5
**chang** 58:8
**change** 93:4,7
93:10,13,16,19
**changed** 8:16
36:13
**changes** 92:10
94:6
**charge** 39:23
**chase** 11:5
12:18,21,24

Scott L. Shleifer
March 10, 2025

[chase - correct]

Page 5

28:6,17 31:16
**chase's** 12:20
  13:2
**chen** 66:10,25
  67:5
**chief** 25:17,18
**china** 11:18,25
  25:20,21 26:3
  26:5 46:4
  57:24 58:2,16
  78:21,25
**chose** 64:3
**christmas** 55:3
**cities** 63:2
**citizen** 72:15
  72:15
**citizens** 8:2
**city** 19:20 20:1
  59:19 61:9
**civil** 6:2
**claimed** 75:11
  84:7
**claiming** 79:7
**clarification**
  41:15,17
**class** 71:7
  83:19
**classification**
  24:1
**clear** 17:24
  23:11 78:1
**client** 7:22 8:22
  8:24,25 88:23
**clients** 9:4
  13:25,25
**clothing** 60:17
**coach** 36:21

**coleman** 12:21
  12:24 27:23
  31:16
**collateral**
  86:17
**colleague** 65:6
**college** 9:21
**color** 83:10,11
  85:9
**column** 56:19
  60:13 66:8
  68:17
**columns** 59:18
**combination**
  88:9
**combined** 12:1
**come** 18:4,5
**commercial**
  36:18 62:13
  63:1,25 64:1,4
  64:7,20,22
  71:13
**commission**
  90:19,19
**communicate**
  48:8
**communicati...**
  26:20,21
**companies**
  11:10 12:4
  13:14,16 25:2
  25:2 34:23
  35:1 51:10
  57:6 60:19,20
**company** 13:20
  13:22 25:20
  26:4,9 30:8
  32:12,13,13,17

32:23,24 33:16
  36:7 40:25
  46:3,6,16
  47:11 48:17
  51:23 56:19
  57:2 61:1
**company's**
  25:17 26:8
**compare** 66:19
**compensated**
  63:15,18,19,21
**complete** 94:8
**completed**
  92:16
**completion**
  2:22
**computer**
  33:18
**concluded**
  89:13
**conducted**
  66:24
**confidence**
  51:24
**confident**
  52:15
**confirm** 24:18
  38:24 48:1
  54:18 59:24
**confirmed**
  56:20
**connect** 33:13
**connected** 57:7
  91:13
**consider** 85:14
**consulting**
  34:22

**consumed** 6:24
**consumers**
  26:2
**contact** 72:17
**context** 28:24
**continue** 41:18
  68:24
**contributing**
  72:15
**control** 22:13
  40:25 91:16
**controlled** 41:9
**convenient**
  62:25 63:1
**conversation**
  7:17 36:4
**conversations**
  7:5 26:25,25
  27:3 36:4
  73:20 75:3
  82:13
**coo** 70:8 71:3
**cool** 58:4
**coordinate**
  50:22
**copies** 21:11
  92:14
**copy** 21:10
  42:23 54:2
  59:8 69:7 77:5
  77:5 80:10
**cornelius** 81:15
  81:18,22
**corporate**
  39:22 40:6
  69:14
**correct** 19:5
  39:2 43:19

54:20 84:15
94:8
**corrections**
94:6
**correspond**
48:23
**corresponden...**
48:16 50:25
**cost** 26:1 36:2
47:3,7 68:7,9
68:15 71:12
**costa** 44:16
52:8
**costs** 36:19
**counsel** 6:5
21:10 42:24
49:11 54:3
59:9 69:8,22
77:6 80:10
91:12,13 92:14
**count** 40:25
**country** 52:20
**county** 90:5
91:6
**couple** 35:11
42:11 47:15
**course** 16:10
36:12 89:6
**court** 1:1 4:11
5:10,14,15
21:12 89:8
**covered** 67:4
**cramer** 7:9
8:12,13 9:12
18:7 22:24
38:12,14,16
42:16 62:9
72:19,19,22

82:25 83:2,16
88:5
**cramer's** 72:22
**cranky** 41:23
**crasto** 70:10
**crazy** 68:11
**create** 56:11
**created** 23:7,14
52:16 56:9,14
56:16
**creating** 31:6
**creation** 23:17
**credit** 39:23
**cross** 2:4
**cs** 92:15
**cs7226751** 1:23
**current** 13:21
71:15
**currently**
10:16,17
**customers**
31:19 63:13
**cv** 1:3

**d**

**d** 2:1 81:15,18
81:22
**date** 1:16 4:13
28:2 65:1
72:12 81:17
93:24 94:12
**dated** 64:24
91:18
**dates** 44:18
59:19 65:14
66:17
**day** 3:6 50:15
50:16 53:5,5

68:10 90:9,12
91:18 94:15
**days** 26:11
52:10 87:12
92:16
**dc** 3:18
**deal** 34:7,8
35:25 37:5,6
37:15,23 39:8
39:11 78:14,18
79:6,11,16
**debating** 18:14
**debit** 39:22
**decide** 14:1
36:6
**decided** 36:15
**decision** 18:5
**declare** 94:4
**deduct** 35:16
35:16
**deduction**
75:11,23 76:8
**deductions**
39:11
**deemed** 94:6
**deeper** 25:5
**defendant** 1:8
1:14 3:8,14
**defendant's**
2:10,11,12,13
2:14,15,16,17
20:22 30:17
42:21 54:4
55:19 59:5
69:4 79:24
**definitely**
34:24 85:18
88:24 89:2

**definition** 5:6,8
**delivered** 16:16
**department**
3:17 72:21
76:24
**deponent** 92:13
94:3
**deposing** 92:13
**deposition** 1:13
3:1,8 4:14 5:3
5:6,8,13 6:1
7:4 21:1 77:4
89:13 91:9
**depreciation**
75:11,14,24,25
76:8 78:7
84:16
**determine**
18:20 68:3
**dewan** 28:17
**diapers.com**
57:24 58:2,4
**difference** 71:9
**different** 10:21
**differentials**
71:11
**difficult** 36:5
**dig** 25:5
**diligence** 25:16
26:8 35:1 47:2
**direct** 2:4 4:6
91:16
**direction** 91:16
**directly** 15:15
42:9 73:19,20
**discovery** 27:7
27:14

**discretion** 83:17
**discuss** 88:22
**discussing** 82:3
**discussion** 70:14 71:19 82:1,10 84:21
**discussions** 6:7 73:19
**distances** 19:24
**distributing** 46:7
**distribution** 47:9
**district** 1:1,1 4:11,11
**division** 1:2 3:17
**docket** 50:17
**document** 15:24 21:19 30:23 34:10 43:5,7,8,21,24 44:24 51:22 54:9,23 59:12 59:24 69:10 80:13 82:12,18 83:6 85:9 86:23
**documentation** 37:19 52:6 78:18 82:20
**documents** 9:10 12:25 17:23 34:7 39:6 49:9 77:1 81:6,13,20 82:1,4 87:4,6

**doing** 12:6,8 13:13,15 25:1 25:16 26:11 32:24 35:12 36:9 38:17,20 48:19 80:17 82:24,25 83:18 85:25
**doj** 76:18
**dollar** 40:9
**downside** 48:11
**drive** 3:5 4:15
**driver** 67:25
**driving** 67:23 68:1
**dst** 65:4,6
**due** 26:8
**duly** 4:3 90:9

### e

**e** 2:1 93:3,3,3
**ea** 16:2 26:16 26:20 49:23 53:17
**earlier** 29:5 40:15 48:1 49:5 77:2,6
**early** 27:24
**east** 3:5 4:15
**eat** 50:16
**economic** 52:18
**edit** 40:15
**efficiency** 62:15,15 63:6
**efficient** 62:16 68:15

**either** 12:1 18:16 36:21 46:19
**elena** 1:4 4:9 92:4 93:1 94:1
**email** 33:7,8 48:15,23 49:5 50:25 72:8 73:21 88:6,8
**emails** 27:1,2
**embarrassing** 6:19
**emerging** 11:18
**employed** 67:21,25
**employee** 91:12,12
**employees** 14:23 15:14 58:14,15 71:7
**employment** 15:10
**ended** 11:20 46:7 64:20
**endowments** 14:6
**entered** 53:15 77:3
**entertainment** 69:13
**entitle** 75:23,24
**entitled** 3:2 76:8
**entity** 22:12 41:9,10 78:21 78:25 79:2

**entrepreneurial** 10:1
**entries** 53:16
**entry** 64:23 84:10
**equity** 11:3 13:8,24 14:10 14:22 15:22
**errata** 2:22 92:11,13,16
**erratas** 92:15
**esq** 3:11,15,16 92:1
**estate** 57:19
**estates** 74:8
**et** 51:18
**ethical** 32:15
**ethically** 52:1
**exact** 11:23 15:21 43:23 45:23
**exactly** 5:5 42:15
**examination** 4:6 76:10
**examined** 4:3
**example** 11:19 51:20,24 60:15 82:25
**excel** 33:6 55:23
**except** 6:4
**excerpts** 77:13
**exchange** 46:19 46:20
**executive** 16:2 25:17

| | | | |
|---|---|---|---|
| **executives** 47:16 | **expires** 90:19 | **feroz** 28:17 | 44:8 54:23 |
| **exhaust** 51:3 | **explanation** 33:11 | **fewer** 14:16 15:7 | 60:22 71:9 76:13 78:5 |
| **exhibit** 2:10,11 2:12,13,14,15 2:16,17 20:21 20:22 21:17 30:16,17 42:20 42:21,25 52:13 54:1,4 55:18 55:19 59:3,5 66:19 69:2,4 77:3,9,11,14 77:15 78:4 79:22,24 | **extent** 70:21 | **fifth** 59:18 | 81:5,10 87:5 |
| | **extraordinarily** 63:12 | **figure** 13:19 83:8 | **five** 12:1 50:16 58:18 |
| | **extremely** 15:9 | **figured** 89:1 | **flagler** 3:4 4:15 |
| | **f** | **file** 73:6 74:19 75:1 | **flew** 19:22 25:24 63:24 64:1,22 |
| | **f.p.r.** 91:22 | **filed** 72:7 74:12 74:23 75:18 78:6 | **flight** 2:14 43:9 43:14 44:8 45:20 63:23 64:7,24 65:11 71:13 |
| | **facility** 47:18 | **filing** 72:16 73:1,5 75:4 | |
| | **fact** 29:22 49:18 80:20 | **filings** 72:5 | |
| **exhibits** 2:8 | **factual** 18:21 | **finance** 10:1 | **flights** 44:1,5 45:19 48:2,4 49:10 56:5,21 57:8 59:20,24 60:9,11 61:12 61:13 63:1 65:24 66:2,4 66:21 67:4,6 71:12 |
| **existence** 27:22 | **fails** 92:18 | **financial** 25:18 32:25 33:3 | |
| **existing** 20:15 25:3,23 | **fair** 56:1 61:25 | **financially** 91:13 | |
| **exists** 52:6 | **familiar** 19:13 19:13 | **find** 11:10 27:10 49:9 87:7 | |
| **expect** 18:24 | **family** 7:8,23 8:1 24:12,15 24:16 44:25 63:14 | | |
| **expectation** 18:23 | | **fine** 7:16 9:15 12:24 28:20 29:21 30:11 40:3 76:25 85:4 86:25 | **floor** 3:13 |
| **expected** 19:10 37:7 | **far** 19:15,18 48:18 60:13 | | **florida** 1:1 3:4 3:5 4:11,16 19:25 90:4,6,7 90:18 91:5,8 |
| **expedited** 89:3 | **fare** 71:7,8,11 | | |
| **expense** 83:9 84:15,17 | **faster** 68:6 | **fired** 24:25 | **flown** 75:21 |
| **expenses** 34:11 34:16,17 35:7 39:14 71:1,4 78:8,11,12 79:11 84:7 | **fasting** 50:17 | **firm** 10:21 11:1 14:4 28:23,25 34:25 46:10 65:7 85:7 87:1 | **flows** 33:1 |
| | **february** 28:5 | | **fly** 18:24 19:24 36:15,16,21 39:7 64:3 71:7 |
| | **federal** 6:2 23:25 73:11 | | |
| | **fee** 79:11 | **firm's** 46:2,12 51:8 | **flying** 11:20 64:20 |
| **expert** 75:14 | **feel** 31:25 | | |
| **expertise** 74:7 83:21 | **feeling** 55:1 | **first** 4:3 12:17 14:24 16:19,23 36:22 42:12 | **flynn** 3:11 4:18 4:18 6:8,10,14 |
| **experts** 83:14 83:18 | **fees** 34:7,8 35:5 78:14,18 79:6 79:16 | | |
| | **felt** 31:25 | | |

7:11,17 21:3,7
21:15,22 23:18
23:23 27:12
30:11,19 31:13
32:6 34:14
38:13 39:17
40:17 41:3,15
42:25 43:2
48:25 49:18
51:21 53:9
54:6 55:13
56:1,22 58:22
60:2 61:25
64:12 65:19
69:18,24 70:3
73:22 74:13
76:11,20 77:9
77:12,15,18
78:2,22 79:2
79:13 80:4,8
80:11 81:8
82:5,9 84:1,14
84:25 88:19,24
89:2,11 92:1
**focus** 10:25
**follow** 24:18
33:25 37:4
41:21 72:10
**following** 21:1
**follows** 4:4
**font** 44:3
**food** 40:4
**foregoing** 94:5
**forget** 42:13
**form** 6:4 23:18
26:22 79:7
84:7

**formal** 10:20
**format** 32:3
**formation**
27:17
**formats** 26:24
**formed** 28:8
**forms** 25:15
**forward** 6:1
19:11 30:24
49:11
**forwarded**
2:22
**foundation**
82:10
**foundational**
30:22
**founded** 11:6
13:3
**founder** 65:7
**four** 50:3,15
57:2
**fourth** 59:18
**fpr** 90:18
**fractional**
16:19 18:18
**francisco** 66:1
66:24
**frequent** 61:8
**friday** 27:12,14
49:10
**front** 43:17
**full** 12:23
72:11
**function** 53:13
**fund** 11:6
13:12 82:1,3
84:10 85:19,24
86:1,5,6,12,17

**funding** 14:9
**funds** 11:4
13:24 14:4,12
27:21 31:20
86:7,8,9,10
**further** 57:14
88:18 91:11
**future** 47:9

**g**

**general** 32:21
**generally** 40:2
42:15 61:12
72:6
**generate** 13:20
**georgia** 60:16
**getting** 25:10
**gina** 3:3 90:6
90:18 91:8,22
**give** 14:13 21:9
21:11 42:23
64:16 69:7
83:10 85:9
**given** 6:17 94:9
**giving** 78:17
85:17
**global** 10:17
11:4 13:3 14:2
14:12,17 16:15
19:14,19 24:22
26:17 27:16
28:8 29:1,10
30:4 31:4 32:1
33:17,21 34:3
35:8,22,25
36:1,10 39:22
42:2 43:24
44:15 45:4

48:24 49:6
54:18 55:5
61:20 62:3
66:13 67:9
69:12,14,21,22
79:6,12 80:22
81:1
**global's** 85:18
**go** 5:9 9:20
10:10 12:17
14:24 15:23
17:23 23:4
24:20 25:8,8
25:24 27:9
31:11 34:11
37:3 44:1,6,15
45:21 47:10
49:1,9 50:13
54:22 55:4
56:18 57:6
58:18 61:11
63:7 65:15,17
71:6 72:8
77:21 78:7
80:25 81:4
88:11,17
**goes** 6:12 32:19
49:8
**going** 4:16 6:16
10:7 11:13
12:3,11,11
14:10 16:12
18:19 19:10,19
19:20 20:8,20
21:11 24:14
25:13,16 26:1
26:5 27:16
30:22 35:1,24

36:1 37:3
39:10,13 40:12
42:19 43:17
44:1,6 47:6,8
47:21 48:14,19
48:20,20 50:23
51:3 53:25
55:17 56:18,23
58:5,17 60:2
61:24 63:22,22
64:10,23 68:7
68:19 69:1
70:18 71:21
72:3 75:1
76:25 79:21
86:16 87:3,5
88:24 89:2
**good** 9:5 11:13
12:12 13:18
32:12,13,15
41:15 63:15,16
67:3 68:24
89:7
**gosh** 44:13
**government**
73:12
**government's**
40:13 79:22
**grand** 50:5
**gratefully**
57:22
**great** 6:13 12:8
17:6 25:3
27:15 30:25
32:3,8,11 33:5
33:6,6,7,7,11
41:4,18,22
88:18

**greater** 88:19
**greatest** 52:20
**green** 12:12
**greenwich** 3:13
**greg** 69:25
**gritty** 31:21
32:2
**guess** 30:5,8
37:9 62:8
64:12,15 70:10
70:10 87:18
**guessing** 15:5
44:17 82:23
**guestimate**
19:1,9
**guiding** 72:13
**gunster** 4:14

**h**

**h** 93:3
**hair** 27:10
**half** 46:25
**hana** 3:16 4:21
4:23 23:21
88:12
**hand** 20:20
40:12 42:19
44:2 53:25
54:17 55:17
59:8 69:2
76:25 77:5
79:21 90:11
**handbook** 71:2
**handed** 21:17
**handing** 30:15
59:2
**handle** 5:25
38:3

**handwriting**
59:14
**haoyu** 58:8
**happen** 42:4
63:2
**happened** 7:14
75:17
**happening**
75:4
**happens** 41:12
**happily** 5:21
**happy** 5:23
15:12 65:12
**hat** 13:8
**haul** 19:14
**head** 9:14
**hear** 5:18
23:21,21
**heard** 84:22
**heath** 87:21,22
87:22,24 88:3
88:4,5,10
**hedge** 13:11,24
82:1,3 84:10
85:18,24 86:1
86:5,6,12,17
**held** 10:18
**helicopter** 68:4
**helicopters**
61:1,2
**heliflite** 61:1
61:17,21
**heliflites** 62:4,6
**help** 8:7,10
11:15 12:7
17:24 34:25
35:3 73:12
87:18

**helping** 11:3,8
12:14
**hema** 71:23
**hereto** 94:7
**hh237410**
90:19
**high** 9:22 15:9
32:14
**highly** 17:2
**hire** 12:15
**hired** 27:20,22
34:22 82:20
**hiring** 83:20
**historical** 33:2
**history** 46:10
**holidays** 55:5
**home** 48:3 49:9
67:16
**honestly** 51:25
**hotel** 26:10
44:15 45:2,3
50:2,4,9 70:25
**hotels** 40:4
50:5
**hour** 7:19,20
58:17
**hours** 8:8,9
11:20 18:9,11
18:12,22,23
19:2,6 35:14
35:15 36:8
75:20,25
**huge** 46:21
**huh** 12:19 18:2
20:17 21:14
24:8 32:18
37:21 48:9
60:24 62:15

| | | | j |
|---|---|---|---|

66:3 70:23
80:23 82:2
85:12
**human** 65:5
**hyatt** 50:6
**hypothesizing**
86:14

**i**

**i.e.** 71:9
**idea** 85:1,2
86:2,22 87:7
**identification**
20:23 30:18
42:22 54:5
55:20 59:6
69:5 79:25
**identified** 2:9
21:18 69:3
**identify** 69:20
**ignore** 69:7
**impair** 6:25
**implications**
52:19
**important** 51:7
51:8,9,14
72:12
**incentive** 51:25
**incidentals**
40:4
**include** 36:23
83:14 86:1
**included** 26:24
38:6 49:15
72:18
**includes** 83:20
88:10

**including**
11:18 32:24
**income** 33:1
**incur** 35:7
**incurred** 34:12
**individual**
42:10 66:8
87:21
**individuals**
14:7,11 87:4
**industry** 13:18
**infinity** 68:7,9
**information**
7:23 9:18
25:12 56:6
73:8,9
**initially** 38:15
**instance** 79:19
**instructions**
6:17
**interact** 74:5
**interacted** 74:4
**interacting**
74:6
**interaction**
76:13
**interest** 16:20
17:8,21 18:21
20:4
**interested**
91:14
**interests** 17:13
**interrupt** 69:18
**invest** 11:11
14:1,4
**invested** 11:17
25:20 34:21,22
46:5

**investing** 11:17
12:6,13 13:6
32:22 51:11
**investment**
12:11 14:19,21
25:23 46:3,13
46:16,21 51:9
85:24
**investments**
25:3,4,19
46:11 51:12
**investor** 12:10
85:18 86:13,13
**investors** 11:15
14:24 31:19
32:1 86:7,11
**invoice** 43:13
54:12 66:21
**invoices** 80:21
**involved** 13:5,6
74:9,19 76:9
**involvement**
13:2 73:1,3,7
**irs** 76:14,18,20
78:6
**irs's** 76:9
**ish** 11:8 18:10
27:24 28:5
36:14 44:21
46:15 58:16
**issue** 18:3 27:4
43:19 54:19
**issues** 84:11
**itineraries**
54:23
**itinerary** 49:12

**j** 3:15
**jd** 25:21 46:4
47:3,14,15,20
51:14 57:5,21
58:16
**jd.com** 50:22
58:15
**jennings** 87:21
**jet** 8:6 11:20
35:13 36:7,24
39:14 67:9
72:4
**jets** 8:6 35:12
35:19 36:24
39:1 63:9 67:9
**job** 1:23 12:6
14:17 25:1
32:5 83:3
**jog** 9:8 51:5
**john** 7:8,19
8:12,13 18:7
23:2 38:7,8,9
38:12,14,14,15
38:16 42:16
62:9 72:18,19
74:5 82:25
83:16 88:10
**jose** 64:25 65:3
65:11 66:1
**july** 28:3
**jump** 16:12
**june** 90:19
**justice** 3:17
76:24

**k**

**keep** 12:9
48:14 49:14,20
52:23 58:20
**keeping** 51:20
53:24
**kept** 35:14
49:17 51:17,19
52:3 53:3,8
**kevin** 3:11 4:18
7:6 92:1
**kflynn** 92:2
**kids** 19:17 58:5
60:17
**kind** 11:7
12:11 13:15,17
18:16 19:23
25:15 33:3,12
37:14 42:3
46:23 50:13
58:4 80:25
87:14 88:2
**king** 2:5 3:15
4:7,12,21 5:1
6:9,15 7:15,21
20:24 21:5,8
21:16 22:1
23:20,24 27:13
30:12,20 31:17
32:9 34:19
38:19 39:20
40:18 41:11,16
42:23 43:1,3
49:3,19 52:11
53:18 54:7
55:16,21 56:2
57:1 58:17,24

59:1,7 60:6
62:1 64:14
65:21,23 69:6
69:22 70:1,4
70:13,16,17
71:18,21,22
73:23 74:18
76:15,22 77:11
77:13,16,20
78:3,24 79:4
79:15 80:1,6,9
80:12 81:10,12
82:7,16 84:2
84:18,19 85:3
88:17,21 89:1
89:6,10,12
**knew** 37:7,11
84:23
**know** 5:5,7,22
7:25 8:4,5,5,7
8:8,13,19,20
8:21 9:3,5,9,13
9:16 10:20,21
10:22 12:11,12
12:15 13:11
14:6,13,19
15:8,11 16:24
17:20 18:15
19:10,11,13,25
22:10,15 23:1
23:5,9,10,14
23:25 24:3,6
25:14 26:4,18
27:8 28:7,10
28:17,18 29:13
30:5,9,10 31:8
31:10 32:4,14
32:16,17,25

33:6,8,9 34:4,7
34:24 35:23
36:3,14,19
37:1,8,17,17
37:18,19 38:9
38:12,22,25
39:4 41:7,20
42:6,7,8 43:6
43:20 44:4
45:7,23,24
46:15,19,20
47:12,25 48:22
49:4 51:2,11
51:13 52:4,8,9
52:10,17 53:3
53:4,6,14,20
54:10,11,15
56:9,14,16
57:5 61:18,18
62:10 64:3,8,8
64:9,16 66:8
66:17,18,20
67:1,4,20,21
67:21,23,25
68:1,11,14,15
68:20 71:14,15
71:17,23 72:4
72:25 73:11
74:3,3,8 78:7
78:10,11,14
79:5,18,18,19
80:15 81:11,15
81:23 82:13,19
82:21,22,24
83:13,15,17,17
83:22 84:11,13
85:8,10,14,16
85:22,24 86:3

86:3,11,18
87:10 88:7
**knowledge**
8:19,20 10:15
27:5 30:2
38:10 46:9
47:4 52:1
69:17 76:17
**kostelanetz**
3:12
**kostelanetz.c...**
92:2

**l**

**l** 1:4,13 2:3,21
3:1 4:2 90:8
91:9 92:5 93:2
93:24 94:2,4
94:12
**land** 52:4 61:11
**landau** 15:25
26:16,17
**large** 3:4
**largely** 18:7
**largest** 46:3,8,9
46:9
**late** 17:5 46:3
46:12
**law** 28:23
34:25 39:12
72:10,15 75:14
76:2
**laws** 52:20
72:13 75:23
**lawyer** 76:20
**lawyers** 34:25
35:2,4

**learn** 32:23
  74:22
**learned** 58:3
**learning** 26:6
**lease** 20:16
**leave** 62:24
**left** 44:2 56:22
**legal** 12:23
  14:18 83:19
  92:23
**lender** 85:14,25
  86:16
**letter** 2:21
**level** 33:10
**liability** 40:25
  42:13
**liberia** 44:9,11
  52:8
**library** 10:3
**life** 61:5
**lifetime** 63:12
**likely** 17:2
  22:25 23:2
  26:24 28:6
  86:19
**likewise** 89:11
**limited** 40:24
  42:12 63:13
**limits** 40:5
**line** 78:8 81:5
  81:10,19,25
  87:14 93:4,7
  93:10,13,16,19
**liquidity** 86:19
  86:20
**listed** 59:24
  60:9 67:6 83:9

**listen** 6:5
**listening** 4:24
**litigation** 83:7
**little** 19:17
  25:5 46:5,7
  51:13 52:24
**liu** 47:12,19
**live** 19:20,25
**lived** 24:13,17
  61:9
**living** 42:17
  63:3
**llc** 22:7 31:4
  40:24 42:9
  82:21
**llcs** 42:11
**llp** 3:12
**lm** 13:23
**loan** 81:6,7,13
  85:10,15,16,25
  86:16
**located** 4:14
  29:11
**locations** 61:4
**loeb** 80:15,15
  81:1 82:4,4,20
  82:20 83:16,16
  83:22,23 86:24
  86:24
**log** 2:14 64:24
**logistics** 48:17
**logs** 43:9
**long** 5:21,23
  9:2,6 15:4 16:3
  19:1,14,24
  38:17,20 47:3
  57:20 61:6
  66:13

**look** 21:23 27:6
  27:10 29:23
  30:21 43:4
  47:22 48:13
  54:8 59:10,17
  59:20,23,23
  60:5 69:9 80:2
**looked** 18:8
  19:6 58:2
**looking** 18:9,14
  65:14
**looks** 21:24
  43:8,13 44:20
  44:24 45:8
  54:12 60:22
**loop** 47:25
**los** 66:1,25
**lot** 10:8 13:21
  23:5 32:23,24
  46:10,15 51:14
  51:24 52:6
  57:21 60:3
  76:6 88:4,5
**louis** 22:12
**love** 52:24
**low** 46:22
**lower** 26:1 47:7
**lp** 31:18
**lps** 31:16

**m**

**m** 3:11 92:1
**mad** 40:20
**made** 10:8 31:9
  78:6 94:5
**major** 9:25
**majority** 11:16
  14:5 20:18

53:16,20 75:20
**majors** 10:2
**make** 9:8,18
  10:3 11:14,15
  13:1 19:9
  23:11 24:15
  26:3 32:14
  40:14 44:6
  51:4 77:25
  78:5 80:20
  83:18 86:16
  87:13
**making** 19:1
  69:1
**malfunction**
  64:21
**manage** 8:10
  11:3 12:15
  14:11 74:8
**managed** 32:15
**management**
  10:1 12:8
  13:18 24:23
  27:17 30:4,8
  31:4 34:3 35:9
  39:22 46:14
  61:20 62:3
  69:12,15,21,23
  79:7 80:18
**management's**
  29:10
**manhattan**
  61:3,6,10 63:3
**march** 1:16 2:2
  3:6 4:13 28:5
  90:9,12 91:18
  92:3

| | | | |
|---|---|---|---|
| **margin** 46:22 | **meaning** 86:4 | **minutes** 47:21 | 57:23,25 58:7 |
| **margins** 46:24 | **means** 5:14 6:3 | 88:13 89:4 | 65:6 66:7 |
| **margot** 15:25 | 91:15 | **miyababy** | 87:21 |
| 16:1 26:16,17 | **meant** 11:9,10 | 57:13,22 | **named** 78:25 |
| 26:22 38:7,11 | 38:14,15 | **model** 47:9 | **names** 15:23 |
| 48:7 49:22,22 | **medications** | **modeling** 32:25 | 57:2,11 58:10 |
| 49:23 53:17 | 6:21 | 33:3 | 87:5 |
| 62:8 | **medium** 12:12 | **moment** 30:21 | **narrow** 17:25 |
| **mark** 21:17 | **meet** 12:3 | 43:4,5 54:8 | **narrowing** |
| **marked** 20:20 | 27:23 73:14 | 59:19 69:8 | 29:23 |
| 20:23 30:15,18 | **meeting** 25:22 | 80:2 | **nasdaq** 11:12 |
| 40:12 42:19,22 | 58:1 60:19 | **monday** 3:6 | 46:20 |
| 54:1,5 55:18 | **meetings** 25:8 | **money** 11:15 | **native** 55:23 |
| 55:20 59:3,6 | 26:7 45:23,24 | 14:1,2 20:7,11 | 56:3 |
| 69:2,5 79:22 | 45:25 48:19 | 20:19 26:3 | **nature** 34:12 |
| 79:25 | 51:11 53:3 | 40:23 41:6,8 | **necessary** 94:6 |
| **market** 13:22 | 60:14 | 61:15 86:5,8 | **need** 5:22 8:6 |
| **marketing** | **mellon** 80:18 | **moral** 83:20 | 9:11 19:2,2,23 |
| 14:18 | **memories** 51:5 | **morgan** 87:16 | 23:11 25:12 |
| **markets** 11:18 | **memory** 9:9 | **moscow** 19:21 | 32:5,22 33:12 |
| **material** 29:22 | 80:24 | **mouth** 19:5 | 47:23 52:5,5 |
| 38:23 60:4 | **met** 27:24 28:6 | 29:4 | 64:12,15 74:7 |
| **math** 17:6 | 47:14 51:9 | **move** 23:4,20 | 89:3 |
| **matter** 4:9 5:7 | 73:16 | 72:3 | **needed** 18:13 |
| 51:12 | **mexico** 54:24 | **moved** 29:13 | 19:12 32:8,11 |
| **mattered** 75:21 | **microsoft** 33:5 | 29:17 | 32:11 35:2 |
| **mcafee** 85:7 | 33:8 52:25 | **moving** 6:1 | 73:10 74:23 |
| 87:1 | 53:4,12 | 30:23 | **needs** 19:16,16 |
| **meals** 50:13,19 | **mid** 46:6 | **multiple** 20:9 | **negative** 47:1 |
| **mean** 7:24 | **million** 11:6 | 26:24 | **net** 13:20 32:14 |
| 14:13 15:4 | 46:5,15 75:6,7 | **muster** 87:15 | **netjets** 16:17 |
| 18:13,15 28:22 | **milner** 65:4,5 | | 17:4,8,14 |
| 34:17 35:19 | **mind** 68:20 | **n** | 18:17 20:14,15 |
| 37:6,17 62:9 | **mine** 65:6 | **n** 2:1 | 41:7 42:10 |
| 62:17 64:8 | **minor** 40:15 | **n145qs** 43:18 | 51:23,25 52:3 |
| 73:20 77:24 | **minute** 54:9 | 43:20 | 54:13 61:15 |
| 79:17 | 58:18 59:22 | **name** 4:12 8:16 | 66:21 |
| | | 12:20,23,25 | |

neurotic  52:24
never  30:6
  50:15 60:12
  82:12
new  3:13 19:20
  20:1 24:7,7
  25:4,25 29:12
  46:20 47:4,5
  61:8 65:25
  68:11
news  88:18,19
nice  21:5 57:13
night  50:3
nitty  31:21
  32:2
nope  7:16
  26:14 28:12
  47:24 56:10,17
  59:16 65:12
  66:6,22 68:22
  78:9,13,16
  80:16 87:17,19
normal  25:15
normally  6:10
  72:17
notary  3:3 90:7
  90:18 94:13,19
note  92:10
noted  94:7
notes  48:12
  91:10
notice  3:7
november
  16:16 22:3,3
  27:4 43:9,10
  43:15,15 44:19
  45:11 48:3
  54:15,16 56:5

64:25 65:24,25
  65:25
number  11:23
  16:16 21:5
  30:16 43:18
  44:4 45:9,14
  52:14 59:3
  66:20 69:2
  87:11
numbered  3:2
numbers  55:24
  68:18 83:6
ny  3:13

**o**

oath  5:10
object  6:10
  60:2 84:14
objection  23:18
  31:13 32:6
  34:14 39:17
  48:25 49:18
  53:9 74:13
  76:11 79:13
  82:5,8,9 84:25
objections  6:4
objects  6:5
obviously  6:5
  56:20 84:6
occurred  36:4
  56:5
office  7:8,23
  33:5 52:25
  67:17
officer  25:18
  25:18
offices  25:17
  26:8 29:11,12

29:14,21
official  21:13
  90:11
oftentimes
  25:16
oh  13:7,9 17:2
  17:11 20:9
  31:23 38:6,8
  44:20 63:8
  67:3,20 77:12
  81:21 85:8
  88:21
okay  5:13 6:14
  7:7 9:10,15
  10:7,13 11:22
  12:22 13:4,9
  14:8 15:2,6
  16:7 17:6,7,12
  17:18,20 20:8
  20:10 21:3,7
  23:4,10,23
  27:6,9,19 28:4
  29:7,10 30:7
  30:13 31:5,11
  32:10 39:9,21
  41:4 42:7,19
  43:2,4,11,17
  43:22 44:21,22
  45:5,9,13,19
  47:25 48:11
  49:14 50:12,22
  53:19,25 54:6
  54:14,17 55:11
  56:14,18 57:2
  57:5 59:14,17
  59:22 62:23
  64:3,9 65:8,14
  65:16,22 66:14

67:3,19,22
  68:23 69:1,24
  72:1,3 76:16
  76:23 77:18,19
  78:2 79:2,21
  83:1,10 84:4,5
  85:6,20 86:21
  88:2,6,11,15
old  53:5
once  43:5 60:3
ones  21:13 47:8
  56:20 77:2
opened  47:4
opening  47:5
operate  51:25
  88:8
operates  61:1
operating  31:3
operations
  31:22
opinion  19:15
  32:12 52:21
opportunities
  25:23
opposed  32:21
  63:1
opposing  54:3
  59:9
options  18:16
orderly  21:5
original  77:25
outlook  53:4
  53:12
outside  17:13
  71:1 83:14
overbroad
  34:14

**overstep** 6:16
**own** 14:4 17:21
  22:13,14 24:10
  26:13 37:13
  53:24
**owned** 24:11
  29:25
**owner** 65:7
**ownership**
  28:21
**owning** 11:14
**owns** 22:10

**p**

**p** 11:12
**p.m.** 1:17,17
  89:14
**p.o.** 3:18
**page** 54:22
  60:22,25 61:16
  64:23 65:18,19
  69:7 70:22
  71:6 77:22
  81:4 93:4,7,10
  93:13,16,19
**pages** 77:7,17
  91:10
**paid** 20:3 33:15
  33:16,20 34:3
  34:5 35:13
  36:7,25 42:1,8
  43:14 50:10
  61:18,20 80:21
  82:22
**palm** 1:2 3:5
  4:15 90:5 91:6
**park** 24:6
  29:15,15

**part** 23:16 25:1
  46:21 52:16
**particular**
  19:11
**parties** 83:21
  91:12,13
**partly** 20:12
**partner** 10:17
  11:5 13:12
  28:25 29:5,8
  66:12,14
**partners** 11:8
  14:3 22:22
  28:7,10,13,18
  28:19 31:23
  35:11 37:9,12
  37:23 39:2
  63:13 67:8
**partnership**
  28:21 29:24
**pass** 31:12
**passed** 87:14
**passenger** 58:5
**passengers**
  44:16 58:6
**passing** 48:12
**passport** 52:5
**path** 21:6
**paulo** 19:22
**pay** 8:1,3,4
  30:3 35:4 36:1
  36:16 37:5,12
  39:10 40:22
  41:5 42:4
  50:19 52:16,17
  61:13 62:3
  64:6 72:10
  73:11 85:15

**paying** 42:9
  71:8
**payment** 52:18
**pending** 5:24
  5:25
**pennsylvania**
  9:23
**people** 8:6 9:16
  11:2 12:14,15
  14:6,20 32:16
  32:17 35:22
**perceived**
  37:18
**percent** 46:25
  46:25 47:1,1,1
  76:2,3
**percentage**
  46:13 74:4
**perfect** 19:19
  41:14 83:25
**performed**
  46:16
**period** 17:15
  18:24 43:9
  49:23 50:15,16
  53:24 54:15
  75:21
**periods** 33:2
  68:12
**person** 13:1
  26:25 35:23
  38:17 48:11
  73:16 76:14
**personal** 8:9
  11:24 19:7,16
  35:15,17 37:2
  38:4 44:4,7,10
  44:11,14,14,21

  44:23 45:1,2,8
  45:12,13 54:25
  55:7,9,10
  62:21 73:19
**personally**
  18:12 35:7
  36:2 48:6 71:8
  73:6,15 90:8
**perspective**
  11:10
**pertinent** 77:7
  77:16
**phalavi** 81:23
**phone** 26:25
  33:13 47:22
  73:21
**physical** 53:1
**physically** 7:4
**picking** 21:3
**pin** 18:1
**place** 4:14
  71:16
**places** 12:3
  19:22 52:10
**plaintiff** 3:10
**plaintiffs** 1:5
**plane** 18:15,17
  18:18 19:11,14
  41:5 42:8
  47:16 52:2
  61:11 64:21
  67:2 75:22,24
  75:25 81:7
  85:11
**planes** 22:14
  36:8 64:18,18
**play** 27:17

Scott L. Shleifer                                                    March 10, 2025

**please** 5:16,19
5:20,22 31:14
34:15 40:19
41:19 49:10
60:8 81:9
**pocket** 42:4
**point** 6:7 17:25
36:9 53:15
58:1 62:2
68:19 75:6
**policies** 71:2
**policy** 36:6,20
36:21,23 69:13
70:19,20 71:16
71:23
**portland** 55:8
55:9
**posit** 64:9
**positing** 55:6,7
67:2
**position** 34:13
39:21
**possible** 23:11
36:18 57:17
58:21
**potential** 25:4
85:9
**potentially**
85:13,22
**powerpoint**
33:7
**practice** 51:16
51:17 53:2
**pre** 71:3
**prepare** 7:3
74:1
**pretty** 72:12

**prevalent** 61:4
**prevent** 6:21
**previous** 77:3
**price** 13:21
**primary** 18:16
19:3 46:1,2
47:2
**principle** 72:13
**printed** 54:2
**private** 8:6,6
11:3,11,20
13:7,24 14:10
14:22 15:22
25:11 35:12,13
35:19 36:7,16
36:24,24 37:12
39:1,7,14
62:13,18 63:9
64:4 71:10,12
86:10
**probability**
15:9
**probably** 14:14
14:16 27:1
33:24 34:1
38:7,8 41:7,9
64:11
**procedure** 6:3
**process** 18:6
19:8 72:6
74:19
**procure** 8:7
36:8
**produced**
55:22 83:6
**production**
26:1

**productions**
47:7
**productive**
63:15,16 72:14
**profession** 9:13
**professional**
10:13 34:18
90:6 91:8
**professionals**
14:22 74:7
**profit** 11:14
13:20 32:14
46:24
**profitable**
63:12
**program** 13:23
**promise** 23:14
**property** 63:14
**prospective**
25:23
**protocol** 62:10
**proud** 8:2
**prove** 52:7,7,9
**provide** 5:16
26:2 73:8
**provided** 69:13
69:20
**public** 3:3 46:6
46:18 90:7,18
94:19
**publications**
33:23
**publicly** 11:12
13:13,16
**pull** 20:8 34:10
**purchase** 16:13
16:20,23 17:8
17:12 18:4,25

80:22 81:1
83:8 84:8,12
84:17
**purchased**
18:21
**purchases**
17:10
**purpose** 65:10
**purposes** 46:2
63:9
**pursuant** 3:6
6:2
**put** 17:25 19:4
29:4 52:24
56:3 62:12
68:23 80:9
86:12 87:11
**putting** 80:4

**q**

**question** 5:18
5:20,24,25
6:11 13:24
18:20 24:19
33:25 38:23
40:21 50:12
60:8 68:16
78:23 84:20
**questions** 5:2
5:17 6:19,22
7:1 8:18 9:19
23:10 25:9
30:23 37:4
41:19 70:18
84:9 88:12,18
88:20
**quickly** 47:23

| **r** | 47:13,14 48:7 | **recommending** | 42:5 |
|---|---|---|---|
| **r**  93:3,3 | 48:10,15,22 | 42:16 | **reimburseme...** |
| **raise**  12:15 | 49:2,13 50:11 | **record**  4:17,22 | 42:3 |
| **raised**  11:5 | 50:21 51:19 | 6:12,20 9:12 | **relate**  83:8 |
| **rather**  40:16 | 55:2 57:10,20 | 23:11 52:12,25 | **related**  8:9 |
| **reach**  68:20 | 57:21,21,25 | 55:25 57:11 | 25:6 35:14,16 |
| **read**  88:25 | 58:2,10 60:13 | 58:24 70:3,13 | 40:8 48:16 |
| 89:2 92:9 94:5 | 61:19,22 62:2 | 70:15,16 71:18 | 57:19 59:25 |
| **reading**  88:22 | 62:5,8,11 | 71:20,21 76:18 | 60:11,21 62:13 |
| **ready**  31:1 | 63:25 64:2,5 | 80:5,20 88:11 | 70:25 75:16,22 |
| **reaffirm**  69:15 | 64:19,22 65:10 | 88:17 91:10 | 76:1 84:7,11 |
| **real**  57:19 | 67:7,11,13 | **recorded**  5:14 | **relationship** |
| 82:23 | 68:2 70:12 | **records**  15:10 | 57:7 65:13 |
| **realize**  56:4 | 71:5 73:16,25 | 52:3,16 | **relative**  13:21 |
| **really**  5:5 6:12 | 73:25 74:15,16 | **recross**  2:4 | 68:6,15 91:12 |
| 11:13 32:12 | 74:21,24 75:9 | **redemption** | 91:12 |
| 33:5,6 46:17 | 78:17,19,20,25 | 84:22 86:4,12 | **relying**  60:13 |
| 46:17 51:14 | 79:3,9,10,14 | 87:8 | 60:18 |
| 84:15 | 79:20 80:17,19 | **redemptions** | **remember**  9:7 |
| **reason**  19:12 | 81:14,24 82:6 | 86:6 | 9:10,11 15:18 |
| 42:14,14 55:3 | 82:11,19 83:4 | **redirect**  2:4 | 20:3 21:19 |
| 56:19 72:4 | 83:16 85:6 | **reduce**  62:19 | 22:18 23:6,16 |
| 92:11 93:6,9 | **receipt**  92:17 | 62:21 | 28:13,20 29:7 |
| 93:12,15,18,21 | **received**  49:12 | **reduced**  37:15 | 29:16,20,24 |
| **rebecca**  8:14 | **receiving**  20:15 | **referenced** | 32:3 41:20 |
| 72:19 74:5 | 32:25 | 92:6 | 48:4 49:24 |
| 83:2,16 88:5 | **recess**  58:23 | **referred**  34:7 | 50:2,7 51:7 |
| 88:10 | 88:16 | **referring**  18:7 | 53:13 57:9 |
| **recall**  15:1,13 | **recognize** | 34:8 37:25 | 58:12 60:19 |
| 15:20 16:4,25 | 21:19 31:2,3 | 52:13,13 65:20 | 61:23,24 66:4 |
| 17:22 18:25 | 43:6,8 54:10 | **regarding**  39:1 | 66:17,23 70:5 |
| 22:17,20 23:1 | 54:12 59:12,17 | 48:14,24 49:10 | 70:8 74:25 |
| 23:5,19 29:2 | 59:20 69:9 | 84:21,21 | 75:3,5,8 80:25 |
| 31:7 34:4 35:6 | **recollection** | **reimbursed** | 82:3 86:23,25 |
| 36:17 39:6,19 | 50:4 80:14 | 36:18 71:10 | 87:6,15,20 |
| 40:10 42:6,15 | **recollections** | 79:6,11 | **renaissance** |
| 43:23 46:13 | 57:15 | **reimbursement** | 78:21 79:1 |
|  |  | 39:14,15 42:2 |  |

Scott L. Shleifer                                    March 10, 2025

| | | | |
|---|---|---|---|
| **rent** 30:3 | **reserved** 6:4 | **rides** 60:23 | **sao** 19:21 |
| **rented** 29:25 | **resources** | **right** 4:8 16:12 | **save** 87:3 |
| 30:1 | 35:11,19 40:24 | 16:12 30:15 | **savings** 63:3 |
| **repeat** 5:19 | **respond** 7:1 | 31:11 38:14 | 68:10,12 |
| 60:8 | 53:11 | 41:22 51:6,20 | **saw** 12:24 |
| **rephrase** 5:21 | **responsibilities** | 54:17 55:17 | 15:24 34:6 |
| 73:18 | 8:2 | 56:23,24 59:2 | 39:5 47:21 |
| **report** 31:12 | **responsibility** | 60:13 66:23 | 88:7 |
| 91:9 | 30:6,14 | 68:7 70:16 | **saying** 24:22 |
| **reported** 15:15 | **responsible** | **rights** 84:22 | 42:17 60:4 |
| 31:25 | 37:1 71:8 | 86:7 87:8 | **says** 22:2,6,22 |
| **reporter** 5:15 | 74:10 | **ring** 34:17 | 43:18,21,24 |
| 5:15 21:12 | **responsive** | **rio** 19:21 | 44:2,4 54:18 |
| 89:8 90:7 91:3 | 27:14 | **rlr** 1:3 | 56:19 60:14 |
| 91:8,16 | **rest** 5:2 | **rode** 47:16 | 63:24 64:25 |
| **represent** 4:12 | **result** 42:18 | **role** 10:21 11:1 | 68:17 70:24 |
| **representative** | **retailer** 46:23 | 27:17 31:5 | 71:6 77:23 |
| 69:14,21 | 60:17 | **roles** 14:17 | 78:11 81:20,25 |
| **reproduction** | **retreat** 45:4 | **room** 4:17 | **schedule** 77:23 |
| 91:15 | **return** 32:15 | **rosewood** 50:6 | 86:9 |
| **request** 86:12 | 62:25 72:7 | **round** 45:10 | **scheduling** |
| 87:11 | 74:11,20,22 | 48:3 | 27:3 |
| **requested** | 75:1,4,12,16 | **rounds** 53:21 | **schleifer** 92:4 |
| 91:10 | 76:10 77:8,24 | **rules** 6:2 | 93:1 94:1 |
| **require** 24:23 | 77:25 92:13,16 | **run** 8:15 11:8,9 | **school** 9:20,22 |
| **required** 34:12 | **returns** 72:16 | 63:2 | 9:24 10:12 |
| 52:18 73:8,9 | 73:2,5 74:2 | **running** 13:6 | **scope** 29:23 |
| 94:13 | **review** 74:11 | **runs** 7:9 | **scott** 1:4,13 2:3 |
| **research** 12:6 | 74:14 84:4 | **russia** 11:18 | 2:21 3:1 4:2,9 |
| 13:13,15,17 | 91:9 92:7 | 12:3 | 4:18,20 21:22 |
| 14:19,21 25:2 | **reviewed** 74:16 | | 22:11 31:14 |
| 32:8,11 34:21 | 74:16 81:20 | **s** | 32:7 34:15 |
| 34:22,23 35:5 | **reviewing** | **s** 11:12 93:3 | 53:10 60:3 |
| 46:22 78:10,11 | 68:16 | **safe** 22:22 | 90:8 91:9 92:4 |
| 85:25 | **rica** 44:16 52:8 | **san** 64:25 65:3 | 92:5 93:1,2,24 |
| **reservation** | **richard** 47:12 | 65:11 66:1,1 | 94:1,2,4,12 |
| 44:3 45:9,14 | 47:19 | 66:24 | **seal** 90:11 |
| 70:25 | | | |

seattle 55:8
second 24:20
   27:21 37:24
   42:13 54:22
   55:8 59:9
   60:25 68:17
   77:21 81:4,16
section 70:24
see 22:4,7 44:2
   44:16 47:10
   48:21 53:1
   57:3 58:18,19
   66:2 76:6
   88:12,13
seeing 26:7
   55:2
seek 39:13 42:5
   71:3
seen 23:1 55:6
   56:6 60:12
   69:15 70:19
   80:13 82:12
segue 9:5
seidell 69:25
sell 35:2
send 27:11
senior 11:8,8
   58:15
senseless 50:12
sent 27:6 82:21
   92:14
sentence 81:16
serial 16:16
series 11:4
service 67:15
   67:24 68:4,5
   90:2

set 22:13 48:14
setting 18:23
   48:18
seven 89:12
shakes 9:14
shanghai 19:21
   25:24 45:16,16
   45:21,22 46:1
   47:5,13,17
   49:25 50:14,23
share 41:7
shareholders
   12:5
shares 11:15
   12:9,9 20:13
   20:14 35:2,2
sheet 92:11
sheets 2:22
   33:1
shen 58:8
shleifer 1:4,13
   2:3,10,11,12
   2:13,17,21 3:1
   4:2,9,20 21:18
   22:12 30:16
   42:20 54:1
   55:25 77:4
   90:8 91:9 92:5
   93:2,24 94:2,4
   94:12
shleifer's 4:19
side 12:13
   43:25 44:2
   54:17 58:6
   68:23
sided 43:5 54:2
sign 86:11
   92:12

signature
   54:18 90:17
   91:21
signed 92:19
similar 13:17
simpler 33:11
site 57:23
six 12:1
sleeping 26:10
sls 2:14 22:7,9
   22:11 23:5,6
   23:14,16 24:1
   24:4 54:13
   61:14
smaller 11:24
   20:2 44:3
smart 12:7
   42:17
software 33:4
solo 77:22
solutions 92:23
somebody 83:2
sorry 13:9
   16:24 24:17
   38:13 56:22
   57:12 63:18
   66:16 69:18
   76:19,21,21
   77:23 78:22
   79:19 81:8
sort 8:14 18:8
   24:20 25:21
   31:23 46:4
   57:18,24 72:20
   73:21
soufun 57:12
   57:17

sought 39:15
   79:5
sounds 20:25
   42:16
source 14:9
south 3:4 4:15
southern 1:1
   4:11
spaces 29:25
   30:1,3
speak 35:25
   61:5 64:10
specialized
   11:16
specific 32:21
   75:13,22 86:7
speculate 22:21
spent 11:16
spin 27:16
split 53:14
spoke 7:19
spreadsheet
   55:23 56:6,9
   56:11 67:6
   68:17
stake 18:18
   20:16 46:18
   51:13,14 86:1
stakes 22:14
start 28:2
started 17:4
starting 11:5
state 3:4 73:11
   82:7 90:4,7,18
   91:5
statement
   21:25 22:2,6

**statements**
33:1,1
**states** 1:1,7
4:10,10,13,24
60:17 72:14
92:4 93:1 94:1
**stay** 50:9
**stayed** 45:3
49:24 50:2,4,5
**staying** 26:10
50:7
**stenographic**
91:10
**stenographic...**
5:14 91:9
**stick** 44:25
**stock** 46:20
**streamlined**
58:21
**street** 3:13
**stretch** 17:20
**strike** 40:11
45:7,7 63:19
63:20 73:4
**strong** 34:1
**structure** 47:3
**stuff** 72:20
**subjective**
68:14
**subpoena** 9:15
**subpoenaing**
9:17
**subscribed**
94:14
**subscriptions**
33:22
**subsets** 77:1

**substance** 6:24
**suite** 3:5 4:15
**suited** 19:15
**supplies** 32:5
32:20
**support** 14:20
87:5
**supporting**
14:22 37:19
78:18
**supposed** 82:14
**sure** 9:8,18
13:1 14:8
19:12 24:15
44:6 51:4 52:7
58:22,22 69:1
73:7 77:25
78:5 83:18
87:13
**surprise** 76:7
**sworn** 4:3 90:9
94:14

**t**

**t** 93:3,3
**taft** 85:7 87:1
**tail** 43:18
**take** 5:17,21,22
5:23 10:3
14:15 15:12
21:22 24:20
26:23 30:21
43:4 47:22
54:8 58:18
59:8,9,19,22
60:7 62:22
69:8 71:12
80:2 87:10

88:13
**taken** 1:14 3:2
5:3 6:2 57:8
58:23 88:16
**talented** 32:16
**talk** 5:25 16:13
23:4 72:5
**talked** 24:21
42:7 45:19
48:1 49:4 57:5
72:23 77:2
**talking** 16:15
44:5 56:4 72:3
84:10
**talks** 81:6
**tax** 3:17 5:7
23:25 52:19,19
72:5,7,20
75:16
**taxes** 8:1,3
38:17,21 72:11
74:8
**taxsls** 88:7
**team** 13:18
14:18,18,20,21
15:21 18:8
36:25 37:25
38:1,3,5,6 71:2
72:18 83:7
88:9
**teams** 12:8
**technically**
22:10 41:8
**telephone** 3:16
**telephonically**
4:24
**tell** 7:4,13 9:6
39:3 57:6 58:4

58:12 65:12
72:6 73:10
83:5 84:9
**tells** 6:6
**tend** 47:23
**term** 79:16
84:22
**terms** 32:13
74:4
**test** 80:24
**testified** 4:4
39:18
**testimony** 5:16
38:25 44:7
92:9,17 94:8
**teterboro** 44:9
44:12 45:10,14
45:17 48:2
54:24 61:7,9
61:10 63:23
64:25 65:3
67:16
**text** 27:2
**texts** 27:1
**tgm** 2:16 69:3,3
70:22
**thank** 21:15
30:19 54:6
56:1 70:2
80:11
**thanks** 70:3
**thanksgiving**
44:20,22
**thing** 29:3
37:24 75:5
**things** 9:11
34:2,6 36:13
42:1 74:9

**[think - two]**

think  8:15,21
8:24 11:25
12:2,23 15:8
18:10 19:17
20:9,11,12
25:15 26:17
27:21,24,25
28:2,23 31:13
32:20 35:22,23
36:4 37:9 38:7
40:21,22,23
44:13,14 47:20
49:8,22 52:22
54:11 56:12,12
56:13 57:17
61:22 65:7
72:23 75:23
83:24
thinking  12:5
57:13
third  16:21
27:20 61:16
83:20
thirds  63:23
thought  11:13
25:25 36:5
38:24 47:6
thoughts  48:13
three  6:19 11:8
17:10,13 19:17
57:6,14 65:24
66:2,21 67:9
77:1
tie  47:25
tied  18:22
tiger  10:17
11:4 13:3 14:2
14:12,17 24:22

26:17 27:16
28:8 29:1,10
30:4 31:4 32:1
33:17,21 34:3
34:13 35:8,22
35:25 36:1,10
39:16,21 42:2
44:15 45:4
48:24 49:6
55:5 61:20
62:3 66:12
67:9 69:12,14
69:21,22 79:6
79:12 85:18
time  1:17 8:4
9:2,6,17,19
11:10,17 13:10
15:4 17:15
21:22 29:24
38:18 47:3,19
51:15 60:7
61:6 62:20,22
62:24,25 63:3
63:25 64:4
66:13 68:10,10
68:12 72:11
74:4 85:24
92:18
timeframe  17:9
92:8
timeline  65:15
timer  53:5,5
times  64:17,19
tiny  40:15
title  8:14 10:18
10:20,22 15:24
today  4:8 6:22
6:24 7:4 8:25

9:12 47:20
56:20 58:3
76:12
told  51:3 74:25
took  25:14,14
85:10,16
tools  33:12
top  22:2 44:2
59:14 65:19
71:6
total  14:23,25
touching  67:14
tour  47:12,18
track  8:7,8
35:14 51:18,19
51:20
trade  3:12
traded  11:12
13:13,16
traffic  68:11
transaction
52:18
transcribed
89:9
transcript  89:3
89:10 91:9,10
92:6,19 94:5,8
transit  63:14
travel  2:14 8:5
22:7,9,11 23:5
23:6,14 24:4
24:23 25:7
26:13,18 27:3
36:6,19 37:13
50:20 51:18
54:13 59:25
61:14 62:7,14
62:18 63:11,11

67:14 68:13
69:13 70:25
71:15 76:6
78:8
travel's  23:17
traveled  18:11
18:12
traveling  25:1
travels  24:21
tried  36:20
trip  12:2 25:19
44:22 45:8,10
46:2 48:3,16
48:24 49:12
50:3 51:7,8
55:7
trips  11:25
12:1 25:14
48:15 49:15
62:16,20,21,22
trouble  87:3
true  91:10 94:8
truthfully  7:1
try  9:8 17:24
58:6 73:7
trying  11:10
13:19 14:9
25:9,12 29:3
29:23 52:22
53:1 58:20
65:15 74:10
83:7 87:13
turn  43:25
two  8:18 9:4
10:2 11:25
13:11 16:23
18:16 29:13,19
29:21 37:4

Scott L. Shleifer                                                    March 10, 2025

**[two - week]**                                                       Page 23

43:5 47:1,1
50:4 54:2,23
58:6 63:23
77:1,7 88:13
**type** 48:13
54:19
**types** 78:20
**typical** 51:16
51:17
**typically** 18:9
61:6 62:19

| u |
| --- |

**u.s.** 3:17 46:19
**uh** 12:19 18:2
20:17 21:14
24:8 32:18
37:21 48:9
60:24 62:15
66:3 70:23
80:23 82:2
85:12
**ultimately**
13:19
**unauthorized**
71:7
**under** 5:9
46:14 91:16
**undergraduate**
9:24
**underneath**
44:4
**understand**
5:11,20 6:17
14:9 31:22
52:22 70:19
79:16 87:7

**understanding**
6:21 34:2 39:4
39:7 60:15
70:21 72:11
75:10,17,19,20
**understood**
37:22 38:25
41:13 77:18
84:6
**united** 1:1,7
4:9,10,12,23
60:17 72:14
92:4 93:1 94:1
**university** 9:23
14:6
**ups** 41:21
**usage** 19:7
**use** 14:1 19:3
33:4 35:11,19
40:6,11 53:4
61:2,8 67:9,15
68:4 76:4
**used** 8:15
24:10 40:2,22
61:4 68:5
92:19
**usually** 26:19

| v |
| --- |

**v** 92:4 93:1
94:1
**vacationing**
19:25
**vague** 32:6
57:15 74:13
**vaguely** 58:11
**vagueness**
76:11

**value** 20:15
24:24,25 26:2
46:17
**vast** 11:16 14:5
53:16,20
**veeneman** 3:3
90:6,18 91:8
91:22
**venture** 19:18
**verbal** 5:17
37:15
**verify** 92:9
**veritext** 92:14
92:23
**veritext.com.**
92:15
**verse** 4:9
**version** 57:18
**versus** 42:9
62:13 64:4
79:7
**vinitas** 8:17,21
87:22,24 88:9
**vinitaspartners**
88:7
**visa** 52:5
**visitas** 22:22
**visited** 56:19
**visiting** 26:4
32:24
**visits** 26:8
**visium** 8:15,20
**vs** 1:6

| w |
| --- |

**wait** 68:18
**waiving** 88:22

**walking** 26:5
**want** 4:21 7:13
7:22 9:18
10:24,25 18:19
19:4 25:10
27:11 30:21
54:8 59:22
64:11 66:7
72:10 73:4
77:25 80:8
82:7 84:11
85:14 88:22
89:8,10
**wanted** 12:25
24:15 36:15,16
36:24 39:7
47:10 78:4
86:3,18
**warehouse**
25:24,25 47:5
**warehouses**
26:6 47:10
**washington**
3:18
**way** 13:7 17:6
36:10 40:14
41:21 62:16
76:24 83:19
**ways** 20:9
32:24
**we've** 29:12,14
46:11 47:21
56:4 77:2
**wealth** 80:18
**wealthy** 14:6
**week** 7:6,9,11
7:12,18 55:3

**[weekend - zoom]**

**weekend** 44:21
44:22
**weird** 55:13,14
**went** 10:11
24:22 46:6
52:9 87:18
**west** 1:2 3:5
4:15 29:15
**wharton** 9:24
10:11
**wife** 8:14
**wild** 27:10
**winner** 46:8,10
**wire** 40:24 42:8
61:14 75:6,7
**wired** 40:23
41:6,8,10
**wise** 10:12
**withing** 85:6
**witness** 3:1 4:5
4:20 5:10 6:13
7:12,18 9:14
21:24 23:19
31:16 32:8
34:16 38:15
39:19 41:4
49:2 51:22
53:12 55:14
56:24 65:22
69:25 74:15
76:12,21 77:19
79:3,14 81:11
82:6,11 85:1
90:11 92:8,10
92:12,18
**wonderful**
41:17

**wondering**
84:23
**word** 5:16,16
33:6 40:23
**words** 19:4
29:4
**work** 10:16
11:21 13:23
14:11 16:3
18:9,11 24:23
33:18 35:8
46:11 62:13
63:16,16 70:20
72:9 80:17
83:14 85:6,13
87:22 88:2,4,5
**worked** 24:17
31:25 34:24,25
**working** 15:21
17:4 62:3
80:25 86:25
87:15,20
**works** 26:18
83:3 87:24
**world** 3:12
27:15 52:20
83:19
**worst** 16:9
**worth** 51:13,14
**written** 37:15
**wrong** 19:5
57:16 70:11
75:9

**x**

**x** 2:1
**xioahong** 66:10
66:12

**y**

**yeah** 6:9 8:19
8:20 10:9
12:16 14:7,15
14:24 16:1,2
17:3,11,11
19:17 24:24
26:9,19 27:20
28:1 31:24
33:9 34:21,21
34:23 37:11
38:9 40:7
44:21 50:24
51:10 53:22,23
55:12,12,15
60:7,20 62:18
63:17 64:12,15
64:15 65:21
66:12 73:9,12
75:7 76:5
77:16 78:4
82:11 83:12
86:15 88:1,24
88:25 89:6,11
**year** 18:10,10
19:2 27:21
29:17 53:15
72:5 87:11
**years** 17:1,3
36:14 51:5
57:17 79:10
**yep** 5:12 7:11
16:18 19:8,8
22:5 23:12
24:16,16 54:21
58:9 59:11
65:9 72:13

**york** 3:13
19:20 20:1
24:7,7 46:20
61:9 65:25
68:11
**yuri** 65:4,5,13

**z**

**zero** 78:12
**zillow** 57:18
**zoom** 7:6,9,12
7:14,18

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.