# NETJETS FRACTIONAL PROGRAM AGREEMENT

## NETJETS SHARE

BY AND AMONG

SLS TRAVEL L.L.C.

AND

NETJETS SALES, INC.
NETJETS AVIATION, INC.
NETJETS SERVICES, INC.

# NETJETS FRACTIONAL PROGRAM AGREEMENT

This **NetJets Fractional Program Agreement** ("Agreement") is entered into by and among the Owner and the NetJets entities identified in Item A of the General Schedule set out in Section 1 (collectively the "Parties" and individually each a "Party"). Sales, Manager, and Services are collectively referred to herein as "NetJets." In consideration of the promises and of the mutual covenants, agreements, representations, and warranties herein contained, the Parties agree as follows.

### Section 1 – Intent of the Parties

Owner desires to (i) purchase from Sales an undivided ownership Interest in the Airframe and Engines (Airframe and Engines collectively, the "Aircraft") described below, (ii) delegate to Manager the management of the Aircraft, including flight and maintenance services, and (iii) participate in the aircraft interchange program provided by Services. The General Schedule set out below provides details regarding the Owner, Owner's Interest in the Aircraft, and the financial terms of the Agreement.

| | GENERAL SCHEDULE | |
|---|---|---|
| **Party Information** | | |
| A.1 | Owner | SLS Travel L.L.C. |
| A.2 | Owner's Principal Contact | Scott Louis Shleifer |
| A.3 | NetJets Sales ("Sales") | NetJets Sales, Inc. |
| A.4 | NetJets Manager ("Manager") | NetJets Aviation, Inc. |
| A.5 | NetJets Services ("Services") | NetJets Services, Inc. |
| **Aircraft and Interest Information** | | |
| B.1 | Airframe (year, make, model) ("Airframe") | 2014 Bombardier Inc. BD-700-1A10 (Global 6000), together with appurtenances, appliances, parts, instruments, accessions, furnishings and other equipment of whatever nature incorporated in or contained in or attached to the same. |
| B.2 | Aircraft Engines ("Engines") | Two (2) Rolls Royce BR700-710A2-20 engines, which may be removed and replaced by NetJets at its discretion with alternative engines of the same type |
| B.3 | Anticipated Closing Date | October 15, 2014 |
| B.4 | Closing Date | November 3, 2014 |
| B.5 | Aircraft FAA Registration Number | N145QS |
| B.6 | Aircraft Serial Number | 9598 |
| B.7 | Undivided Interest Size ("Interest") | 37.5% |
| B.8 | Allotted Hours | 300 per Year |
| B.9 | Borrowing Hours | 75 |
| B.10 | Minimum Commitment Date | 36 month anniversary of the Closing Date |
| B.11 | Contract Adjustment Date | 5 year anniversary of the Closing Date |
| **Financial Information** | | |
| C.1 | Purchase Price | $19,687,500.00 |
| C.2 | Brokerage Fee | 4% of the Fair Market Value (Calculated at the Time of Repurchase) |
| C.3 | Operating Fund | $109,200.00 |
| C.4 | Monthly Management Fee | $123,996.00 |
| C.5 | Occupied Hourly Fee | $4,368.00 |
| C.6 | Occupied Hourly Fee Increase 1 | Not Applicable |
| C.7 | Occupied Hourly Fee Increase 2 | $650 effective on the first day of the 60th month following delivery of the Aircraft to Sales by the manufacturer |
| C.8 | Occupied Hourly Fee Increase 3 | To be determined, provided that such increase is not to occur prior to the one hundred twentieth month following delivery of the Aircraft to Sales by the manufacturer |
| C.9 | Occupied Hourly Fee Increase 4 | To be determined, provided that such increase is not to occur prior to the one hundred eightieth month following delivery of the Aircraft to Sales by the manufacturer |
| C.10 | Fuel ▮▮▮ Rate | ▮▮▮▮▮▮ |
| C.11 | ▮▮▮ Fuel ▮▮▮▮ | ▮▮▮▮▮▮ |
| C.12 | Hourly Ferry Fee | $3,058.00 |
| C.13 | Supplemental Rate 1 | $25,472.00 |
| C.14 | Supplemental Rate 2 | $27,787.00 |

**Section 2 – Terms and Conditions of Fractional Ownership**

**2.1    Purpose.** This Agreement sets forth the general terms and conditions agreed to by the Parties with respect to: (a) Owner's acquisition and use of a fractional interest in the NetJets fractional program Airframe and Engines described in the General Schedule above (collectively, the "Aircraft"), and (b) NetJets' sale and management of the Aircraft for Owner. Included as exhibits and incorporated herein by reference are additional terms and conditions specific to the aircraft sale, management services, and fractional dry-lease exchange. In the event of any conflict between the main text of this Agreement and the exhibits, the language of this main text will govern.

**2.2    Exhibit A - Fractional Interest Purchase Terms & Conditions.** This Agreement and the sale of the Interest in the Aircraft to Owner are subject to the Fractional Interest Purchase Terms & Conditions between Owner and Sales attached as Exhibit A.

**2.3    Exhibit B - Fractional Aircraft Management Services Terms & Conditions.** This Agreement and the fractional program management services delegated by the Owner to Manager are subject to the Fractional Aircraft Management Services Terms & Conditions between Owner and Manager attached as Exhibit B.

**2.4    Exhibit C - Fractional Dry-Lease Aircraft Exchange Terms & Conditions.** This Agreement, the dry-lease aircraft exchange program provided by Services, and other conditions of fractional aircraft ownership are subject to the Fractional Dry-Lease Aircraft Exchange Terms & Conditions agreed upon by Owner and Services, attached as Exhibit C.

**2.5    Exhibit D – General Terms & Conditions.** This Agreement is subject to the General Terms & Conditions attached as Exhibit D.

**Section 3 – Term and Termination**

**3.1    Term.**

a.    General. This Agreement shall commence on the Closing Date listed in Item B.4 of the General Schedule and continue in effect until the date the Interest in the Aircraft is repurchased by Sales (or an affiliate of Sales) from Owner in accordance the terms herein, or until this Agreement is amended as provided in Section 3.1.b below.

b.    Periodic Contract Adjustment. At least one hundred twenty (120) days prior to the Contract Adjustment Date specified in Item B.11 of the General Schedule, NetJets may send the Owner a proposed Extension Notice detailing certain changes to become effective on the Contract Adjustment Date. A thirty (30) day review period shall then commence for Owner to review the terms of the Extension Notice.

i.    If Owner notifies NetJets during the review period that it does not accept the terms of the Extension Notice, or if NetJets does not send any Extension Notice, the election will be deemed to be a repurchase request pursuant to Section A.3.2.

ii.    If Owner accepts the terms of the Extension Notice, no further action is necessary and the Extension Notice will automatically go into effect on the Contract Adjustment Date.

**3.2    Termination Rights.**

a.    Termination for Interference with Crew, Criminal Behavior, or Safety or Security Violations. NetJets may immediately terminate this Agreement by giving Owner written notice in the event any person designated by Owner to be a passenger on a NetJets aircraft does any of the following: (1) interfere with, threaten, assault, or fail to comply with the safety directions of a NetJets crewmember; or (2) violate the criminal laws or aviation safety or security laws of the United States or any jurisdiction in which NetJets has placed an aircraft at Owner's direction.

b.    Termination for Nonpayment. In the event that Owner breaches this Agreement by failing to make any payment within ten (10) days after being given notice that its payment is overdue, NetJets may terminate this Agreement by giving the Owner written notice. NetJets reserves the right to refuse to provide any services under this Agreement during any period that Owner's account is overdue.

c.    Termination for Insolvency, Bankruptcy, or Receivership. In the event either Party ceases to do business as a going concern, makes an assignment for the benefit of creditors, admits in writing its inability to pay its debts as they become due, is insolvent or the subject of a bankruptcy or receivership proceeding, or in the event any substantial part of the Party's property is or becomes subject to any levy, seizure, assignment or sale for or by any creditor or governmental agency without being released or satisfied within ten (10) days thereafter, then the other Party may terminate this Agreement by giving the other Party written notice.

d.    Termination for Uncured Breach. In the event that either Party is in breach of any material provision of this Agreement (excluding breaches covered by Sections 3.2.a-3.2.c above) and that breach continues uncured for a period of thirty (30) days after written notice thereof, then the non-breaching Party may terminate this Agreement by giving the other Party written notice.

e.    Termination for Operations Problems. In the event of any of the following, Owner may terminate this Agreement by giving NetJets written notice: (i) the NetJets Program experiences three (3) or more separate events in any twelve (12) month period that are reportable to the National Transportation Safety Board ("NTSB") as an accident (as that term is defined by the NTSB), and as a result of these events the Federal Aviation Administration ("FAA") revokes or

Page **2** of 27

suspends NetJets' management specifications or air carrier certificate and operations specifications; or (ii) Manager is more than two (2) hours late in furnishing the Aircraft to Owner on four (4) or more separate occasions during any twelve (12) month period under circumstances which entitle Owner to free additional flight time pursuant to this Agreement.

f.  Aircraft Repurchase and Remedies Cumulative. Any event of early termination shall be handled as specified in Section A.3 of Exhibit A. The non-breaching Party shall be entitled to pursue all remedies available to it in law or in equity.

### Section 4 – Miscellaneous Provisions

**4.1   Disclaimer of Warranties.** EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT OR THE EXHIBITS, THERE ARE NO WARRANTIES OR REPRESENTATIONS OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, CONCERNING THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT, OR THE AIRCRAFT, ITS CONDITION, ITS FITNESS FOR A PARTICULAR PURPOSE, ITS AIRWORTHINESS, ITS DESIGN, ITS OPERATION, ITS MERCHANTABILITY OR WITH RESPECT TO PATENT INFRINGEMENT OR THE LIKE.

**4.2   Governing Law and Court Jurisdiction.** This Agreement shall be governed by and interpreted in accordance with the laws of the State of Ohio, without regard to that state's or any other state's choice of law provisions. Any action or other legal proceeding of any kind, legal or equitable, based upon or in any way related to the subject matter of this Agreement, including the sale, operation, maintenance, management, inspection, servicing or occupancy of the Aircraft, shall be brought exclusively in an appropriate court of competent jurisdiction located in Franklin County, Ohio (if the action is brought in state court) or in the United States District Court for the Southern District of Ohio (if the action is brought in federal court). The Parties further agree that a final judgment in any such action shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

**4.3   LIMITATION OF LIABILITY.** THE PARTIES AGREE THAT UNDER NO CIRCUMSTANCES SHALL ANY PARTY BE LIABLE TO THE OTHERS FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, EXEMPLARY, OR PUNITIVE DAMAGES IN CONNECTION WITH THIS AGREEMENT, WHETHER IN CONTRACT OR TORT (INCLUDING STRICT LIABILITY AND NEGLIGENCE) INCLUDING LOSS OF REVENUE, LOSS OF USE, OR ANTICIPATED PROFITS.

**4.4   JURY WAIVER.** THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTELLIGENTLY WAIVE THEIR RIGHTS TO A JURY TRIAL IN ANY ACTION, SUIT OR PROCEEDING RELATING TO, ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT AND ANY OTHER DOCUMENT, AGREEMENT OR INSTRUMENT EXECUTED OR DELIVERED IN CONNECTION WITH THIS AGREEMENT.

IN WITNESS WHEREOF, the Parties hereto, each acting under due and proper authority, have executed this NetJets Fractional Program Agreement effective as of the Closing Date specified in the General Schedule.

NetJets Aviation, Inc. ("Manager")
NetJets Sales, Inc. ("Sales")
NetJets Services, Inc. ("Services")
("NetJets")

By: _____

Name:   Romero Tanner

Title:   Manager, Contract Administration

With Notices Addressed to NetJets:
Attn: NetJets Legal Department
Owner Contract Administration
4111 Bridgeway Ave., Columbus, Ohio 43219
Phone: 614.239.5500 / Fax: 614.239.2119
E-mail: ContractNotices@netjets.com

SLS TRAVEL L.L.C.
A LIMITED LIABILITY COMPANY FORMED
UNDER THE LAWS OF ~~CONNECTICUT~~ DELAWARE

By: _____

Name:   Scott Louis Shleifer

Title:   Manager

With Notices Addressed to Owner:
Attn: Scott Louis Shleifer
SLS Travel L.L.C.
c/o Tiger Global Management, LLC
9 West 57th Street, 35th Floor
New York, New York  10019
Phone: 212.984.8812 /  Fax:
E-mail: sshleifer@tigerglobal.com

# EXHIBIT A – FRACTIONAL INTEREST PURCHASE TERMS & CONDITIONS

These Fractional Interest Purchase Terms & Conditions ("Purchase T&Cs") between Sales and Owner are incorporated by reference into the Agreement. In the event of any conflict between this Exhibit A and the main text of the Agreement, the language of the main text of the Agreement will govern.

### Section A.1 – Sale of Interest in the Aircraft

**A.1.1    Transfer of Ownership.** Sales will convey good and marketable title to the Interest in the Aircraft free and clear of any and all liens or encumbrances to the Owner on the Closing Date. The Aircraft shall consist of the airframe together with all parts, instruments, furnishings, engines and other equipment of whatever nature contained or attached to the same (and all aircraft logbooks and records, if any, relating to the airframe, and, to the extent assignable, all rights of Sales to service and warranty rights with respect to the airframe).

a.    Sales represents that on the Closing Date the Aircraft will be in good working order and repair, and have a valid Certificate of Airworthiness issued by the FAA.

b.    Sales represents that the Aircraft (i) either has been newly delivered from its manufacturer or has been maintained and inspected during the preceding twelve (12) months in accordance with the applicable provisions of 14 CFR Part 91, Subparts E or K, or Part 135; and (ii) is in compliance with the applicable requirements of 14 CFR Part 91, Subparts E or K, or Part 135.

**A.1.2    Sale of Additional Interests.** Sales shall have the right to sell or lease additional undivided interests in the Aircraft for the remaining unsold portion of the Aircraft to such persons as Sales, in its sole discretion, deems acceptable and Owner shall have no right to object to any such sale or lease by Sales. Upon any such sale or lease by Sales to other interest owners a tenancy-in-common shall arise among Owner and such other interest owners.

**A.1.3    Ownership Rights.**

a.    Tax Benefits. Owner shall be entitled to its pro-rata share of the depreciation, gain, loss, deduction, credit or any tax benefits with respect to the Aircraft.

b.    Permitted Encumbrances. Owner shall be permitted to allow only the following encumbrances on the Interest in the Aircraft (i) a lien (the "Bank Lien") in favor of a licensed financial institution or lender (collectively, the "Bank") in form and substance acceptable to NetJets, and (ii) leases between Owner and related persons or entity that are acceptable to NetJets and in compliance with applicable law of the Federal Aviation Administration. Bank Liens constituting acceptable encumbrances shall: (a) be limited to the Owner's Interest size; (b) be limited to airframe only; (c) recognize the rights of the other owners of interests in the Aircraft; (d) recognize and give senior priority to the rights of NetJets under this Agreement; (e) contain the agreement of the Bank to allow the Aircraft to continue to be operated under this Agreement and within the NetJets Program notwithstanding the occurrence of an event of default under the Bank Lien or a lease back arrangement with a Bank (the "Bank Lease"); and (f) contain the agreement of the Bank to file

all appropriate releases with the Federal Aviation Administration and to register all appropriate discharges with the International Registry promptly upon receipt of payment for the indebtedness secured by the Bank Lien. If Owner causes or permits an encumbrance that is not permitted under this Agreement, Owner shall at its own cost take all necessary steps to achieve the removal of the encumbrance.

### Section A.2 – Closing

**A.2.1    General.** Upon the delivery of the executed Agreement by Owner, any other documents required by the Federal Aviation Administration or reasonably required by NetJets, and the balance of the Purchase Price, Sales will cause the Aircraft to be positioned in the mutually agreed upon location set forth below in Section A.2.2. Following the positioning of the Aircraft, Sales will file the FAA Bill of Sale and Aircraft Registration Application to record the conveyance of the Interest in the Aircraft from Sales to Owner. The date of closing of the sale of the Interest in the Aircraft to Owner shall be defined as the Closing Date and listed in item B.4 of the General Schedule. Owner appoints Sales as its agent to accept delivery of the Aircraft on the Closing Date.

**A.2.2    Closing Location.** The closing shall occur in a mutually acceptable closing location, which (subject to the possible change of tax laws) shall include the following states: Connecticut, Delaware, Florida, Maine, Massachusetts, Montana, New Hampshire, North Carolina, Ohio, Oregon, Rhode Island, and South Carolina. Upon the request of Sales, Owner will provide a sales tax exemption certificate.

**A.2.3    Taxes.**

a.    The Aircraft shall be registered with the state of Ohio by Sales at its expense.

b.    Owner agrees that it shall be responsible for any sales, use, excise, luxury or similar tax, including any related penalties and interest, assessed or imposed on the purchase or use of the Interest in the Aircraft. In the event any sales, use, excise, luxury or similar tax is assessed on Sales with respect to the purchase of the Interest in the Aircraft, then Owner covenants and agrees to pay an amount equal to the assessed tax, and any related penalties and interest, to Sales within ten (10) days of receiving written notice from Sales, and Sales shall apply such amount to payment of the tax. Owner may protest such taxes, provided it fully indemnifies Sales for such tax. Owner agrees to indemnify Sales for any sales, use, excise, luxury or similar tax, including any related penalties and interest, assessed, or imposed on the purchase or use of the Interest in the Aircraft.

**A.2.4    Precondition to Closing.** If Owner is a corporation, it shall be required to provide NetJets with a corporate resolution and power of attorney in a form reasonably acceptable to NetJets. If Owner is a limited liability company, or is entering into this Agreement in its capacity as trustee of a trust, it shall be required to provide NetJets

any information or forms required by the FAA for registration of the Interest. In all cases, Owner shall be required to provide NetJets with a power of attorney in a form acceptable to NetJets. Receipt of the documents required by this section is a precondition to closing on the Aircraft.

### Section A.3 - Repurchase of the Interest

**A.3.1    General.** This Section A.3 sets forth the options for Sales' repurchase of the Interest in the Aircraft from Owner. Upon repurchase, Owner shall transfer to Sales good and marketable title to the Interest in the Aircraft free and clear of any and all liens or encumbrances relating to or caused by Owner or by any lender or lessor to Owner other than NetJets. Further, as a condition to closing on the repurchase, Owner must submit to Sales a duly executed bill of sale in proper form for filing with the FAA, conveying title to the Interest in the Aircraft from Owner to Sales. Sales reserves the right to require the Aircraft to be positioned to a location of its choice for the title transfer. The Repurchase Date shall be the date that title transfers from Owner to Sales.

**A.3.2    Repurchase at Owner's Request.** Owner, upon at least ninety (90) days written notice to Sales, shall have the right to cause Sales to repurchase the Interest in the Aircraft at any time after the Minimum Commitment Date specified in item B.10 of the General Schedule for the then Fair Market Value less (i) the Brokerage Fee and (ii) any and all unpaid sums due NetJets from Owner as of the Repurchase Date ("Unpaid Sums"). In the event the Fair Market Value is insufficient to deduct the Brokerage Fee and Unpaid Sums, then Owner shall remain liable to Sales, or the applicable NetJets entity, to the extent of such deficiency.

**A.3.3    Repurchase upon Termination by NetJets.** Upon termination by NetJets under Section 3.2(a-d) of the Agreement, Sales shall have the right, in addition to any other remedies at law or in equity to which Sales may be entitled, to repurchase the Interest in the Aircraft for the Fair Market Value minus the Brokerage Fee and any Unpaid Sums. In the event this repurchase occurs prior to the Minimum Commitment Date specified in item B.10 of the General Schedule, then Owner must pay to Sales the lesser of: (i) twelve (12) months Monthly Management Fees or (ii) the remaining Monthly Management Fees due through such Minimum Commitment Date.

**A.3.4    Repurchase upon Other Termination by Owner.** Upon termination by Owner under Section 3.2(c-e) of the Agreement (and provided no material default by Owner has occurred and is continuing uncured under this Agreement), Owner shall have the right and option to cause Sales to repurchase Owner's Interest in the Aircraft for the Fair Market Value minus any Unpaid Sums.

**A.3.5    Fair Market Value.**

a.    Fair Market Value means the value of the Aircraft as determined by mutual agreement of Owner and Sales, - or as determined by Section A.3.5.b, multiplied by the percentage equivalent of the interest size being repurchased. In all cases, the value will be determined using the assumptions that: (i) the Aircraft is in the condition required to be maintained under the Fractional Management Services Terms & Conditions, (ii) the interior and paint

are of normal wear and tear based on the age of the Aircraft, (iii) the Aircraft is mid-life (pre Hot Section inspections), (iv) the Aircraft has the average number of hours based on all Aircraft of similar make and vintage in the NetJets fleet; (v) the airframe is half-way to the time required for any heavy maintenance checks, and (vi) there is no regard to or consideration of any maintenance reserves established by NetJets.

b.    If Owner and Sales cannot mutually agree on the Fair Market Value, then the Fair Market Value shall be determined by the following appraisal process: Owner and Sales shall each hire at their own cost and expense an Appraiser to perform a desk top appraisal of the Aircraft. Thereafter, Owner and Sales will attempt to mutually agree on the Fair Market Value. If Owner and Sales are still unable to mutually agree on the Fair Market Value, then the originally chosen Appraisers shall select a third Appraiser to conduct an appraisal of the Aircraft, with such third appraisal being paid for equally by Owner and Sales. Thereafter, the Fair Market Value shall be the value determined by two of the three Appraisers agreeing upon the Fair Market Value. The Appraisers must use the assumptions given in the Fair Market Value definition and comply with the current Uniform Standards of Professional Appraisal Practice (USPAP).

### Section A.4 – Transferability, Substitutions, and Trade-Ins

**A.4.1    Transferability.** Owner may transfer its interest to a third party ("New Owner") only with the written consent of Sales. Such consent shall not be unreasonably withheld, provided that the New Owner (i) satisfies Sales' creditworthiness criteria and (ii) assumes the rights and obligations and makes the necessary representations under the this Agreement. Notwithstanding the foregoing, Sales shall have a ten (10) day right of first refusal to purchase the Interest in the Aircraft on the same terms and conditions as offered to such proposed New Owner. Sales will handle the necessary documents and filings required for such transfer (and Owner shall be responsible for fees associated with registration with the International Registry). For all assignments to a New Owner, a fee of $10,000 shall be charged and all unused hours (pro-rata up to that date) shall be forfeited. For all assignments to a New Owner that is an individual family relative of Owner, a business entity affiliated with Owner, or an owner, manager, director, or officer of Owner, only a fee of $5,000 shall be charged and any underflown hours accrued during the previous term of ownership may be retained by such subsequent transferee.

**A.4.2    Aircraft Substitution.** Owner acknowledges that Sales may deem it desirable to substitute the Interest in the Aircraft for an interest in another aircraft of equal or greater value. If Sales requests Owner to substitute its Interest in the Aircraft, then Owner will complete all necessary paperwork required for the substitution (including making any requested International Registry registrations) within ten (10) business days after receiving notice from Sales.

**A.4.3    Trade-In Option.** If Owner trades the Interest in the Aircraft for an interest in another aircraft from NetJets that is both: (i) equal to or larger in interest size and (ii) equal to or more valuable than the Interest in the Aircraft, then the trade value provided for the Interest in the Aircraft shall be the Fair Market Value and the Brokerage Fee shall not apply. Upon trade-in, Owner shall transfer to Sales good and marketable title to the Interest in the Aircraft free and

clear of any and all liens or encumbrances relating to or caused by Owner or by any lender or lessor to Owner other than NetJets.

**Section A.5 – International Registration of the Aircraft**

**A.5.1   International Registry.** International Registry shall mean the registry established by the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment. The following sets forth the Parties' understanding with respect to registrations at that International Registry regarding the Interest in the Aircraft. Each Party shall bear its own costs and fees and shall act with all reasonable diligence to complete any such permitted registrations.

**A.5.2   Purchase by Owner.** Owner may register the sale of the Interest in the Airframe (but not Engines) on the International Registry pursuant to this Section. Upon receiving notice from the International Registry that Owner has initiated a proper registration of a sale of the Interest in the Airframe, Sales will promptly consent to such registration. The registration with the International Registry of any interest relating to the Engines, or any portion thereof, is not permitted.

**A.5.3   Repurchase or Trade-In.** As a condition to the (i) closing of the repurchase contemplated by Section A.3 or a trade-in as provided in Section A.4.3, or any other arrangement whereby Owner conveys or has agreed to convey all or a portion of the Interest in the airframe to Sales, and (ii) payment of any funds or other consideration from Sales to Owner, Owner and Sales shall complete the registration at the International Registry of a sale of the Interest (or any portion thereof) in the airframe to be conveyed to Sales, at Owner's expense.

**A.5.4   Service Provider.** Prior to the registration of any sale of the Interest, or any portion thereof, in the airframe on the International Registry in accordance with this Section, Owner shall enter into an International Registry Services Agreement with DeBee Gilchrist CTC, Inc., or such other service provider as requested by Sales, unless Owner has already established an account with International Registry as a registry user, in which case DeBee Gilchrist CTC, Inc., or one of its employees or agents acceptable to Sales, shall be appointed as a professional user for any transactions related to the Interest in the airframe.

**A.5.5   Permitted Registrations and Discharges.** Owner shall only initiate, consent to, or otherwise permit registrations on the International Registry that pertain to the Interest in the airframe and are permitted under this Section. For avoidance of doubt, prospective contract of sale, prospective international interest or any other prospective registration on the International Registry are not permitted. If in the sole determination of Sales, Owner has created or permitted (directly or indirectly) any registration at the International Registry with regard to the Aircraft other than as allowed by this Section, Owner shall be obligated, at its own cost and expense, to take all actions which in the reasonable opinion of Sales are necessary to discharge or remove such registration from the International Registry.

\#   \#   \#

*ATTACHMENT A.1 – CLOSING STATEMENT*

Issued: September 5, 2014

SLS Travel L.L.C.
c/o Tiger Global Management, LLC
9 West 57th Street
35th Floor
New York, New York 10019

**PURCHASE OF AN UNDIVIDED 37.5% INTEREST IN GLOBAL 6000
S/N 9598, FAA REGISTRATION NUMBER N145QS**

| | |
|---|---|
| Purchase Price | $  19,687,500.00 |
| Deposit | ($      600,000.00) |
| Trade-in Credit for N455QS | ($   2,217,300.00) |
| Lease Deposit Credit for N448QS | ($      123,700.00) |
| **Total amount due NetJets Sales, Inc. on Closing Date** | **$ 16,746,500.00*** |

*In addition to this amount, any applicable sales tax will appear on the first invoice.

*ATTACHMENT A.3 – BILL OF SALE & ASSIGNMENT*

**KNOW ALL MEN BY THESE PRESENTS**, that NetJets Sales, Inc., a Delaware corporation having its principal office and place of business at 4111 Bridgeway Avenue, Columbus, Ohio 43219-1882 ("Seller"), for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration received from SLS Travel L.L.C. ("Buyer"), the receipt and sufficiency of which is acknowledged, has bargained, sold, transferred, assigned, set over and conveyed, and by these presents does bargain, sell, transfer, assign, set over and convey unto the Buyer, its successors and assigns forever, an undivided interest in all of the personal property (the "Equipment") listed as follows:

| | |
|---|---|
| **Aircraft:** | Bombardier Inc. BD-700-1A10 (Global 6000), together with all engines, appurtenances, appliances, parts, instruments, accessions, furnishings and other equipment of whatever nature incorporated in or contained in or attached to the same |
| **Interest:** | 37.5% |
| **Manufacturer's Serial No.:** | 9598 |
| **FAA Registration No.:** | N145QS |
| **Engines:** | Rolls Royce BR700-710A2-20 |
| **Delivery Location:** | Connecticut |

**TO HAVE AND TO HOLD** the Interest in the Aircraft unto the Buyer, its successors and assigns, to its and their own use and behalf forever.

Seller reaffirms as of the date hereof the representations and warranties made by Seller to Buyer in Section A.1.1 of a certain Fractional Interest Purchase Terms & Conditions between Seller and Buyer dated of even date herewith (the "Terms and Conditions of Sale"), as if such representations and warranties and assignment were set forth herein in total exactly as written.

EXCEPT AS SPECIFICALLY SET FORTH IN THE PURCHASE AGREEMENT, TERMS AND CONDITIONS OF SALE, OR IN THIS BILL OF SALE & ASSIGNMENT, THERE ARE NO WARRANTIES OR REPRESENTATIONS OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, CONCERNING THE TRANSACTIONS CONTEMPLATED BY THE PURCHASE AGREEMENT OR THE EQUIPMENT, ITS CONDITION, ITS DESIGN, ITS OPERATION, ITS FITNESS FOR A PARTICULAR PURPOSE, ITS AIRWORTHINESS, ITS MERCHANTABILITY, OR WITH RESPECT TO PATENT INFRINGEMENT OR THE LIKE. SELLER SHALL, IN NO EVENT, BE LIABLE TO BUYER FOR ANY INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES CAUSED, DIRECTLY OR INDIRECTLY, BY THE EQUIPMENT OR ANY INADEQUACY THEREOF FOR ANY PURPOSE, OR ANY DEFICIENCY OR DEFECT THEREIN, OR THE USE OR MAINTENANCE THEREOF, OR ANY REPAIRS, SERVICING OR ADJUSTMENTS THERETO.

Seller, for itself and its successors and assigns, further covenants and agrees to do, execute and deliver, or to cause to be done, executed and delivered, all such further acts, transfers and assurances, for the better assuring, conveying and confirming unto Buyer and its successors and assigns, all and singular, the Interest in the Aircraft bargained, sold, assigned, transferred, set over and conveyed, as Buyer and its successors and assigns shall request.

This Bill of Sale & Assignment and the representations, warranties, and covenants herein contained shall inure to the benefit of Buyer and its successors and assigns, shall be binding upon Seller and its successors, assigns and transferees, and shall survive the execution and delivery hereof.

**IN WITNESS WHEREOF**, Seller has caused this Bill of Sale & Assignment to be executed and delivered this 3 day of November , 2014.

NetJets Sales, Inc.
Signature:
Name:       Romero Tanner
Title:       Manager, Contract Administration

#   #   #

*ATTACHMENT A.4 – LIMITED POWER OF ATTORNEY*

**Limited Power of Attorney:** Buyer hereby designates, constitutes and appoints the President, or any Vice President, Secretary, Treasurer or Assistant Secretary of NetJets Sales, Inc. ("NJS") or NJI Sales, Inc. ("NJI"), and any one or more of them acting individually and not jointly, the true and lawful attorney-in-fact for the Buyer on certain limited matters in connection with the registration of any aircraft of which Buyer has been named as the purchaser on any bill of sale, for all or a fractional ownership interest in such aircraft, from NJS or NJI, as seller (herein, an "Aircraft"), with the Federal Aviation Administration (the "FAA"), including the execution and filing with the FAA, or other appropriate agency, certain AC Form 8050-1 Aircraft Registration Applications, or the equivalent thereof (including counterpart signature pages) with regard to the registration of an Aircraft, as hereinafter defined, in the name of the Buyer as owner or co-owner, as the case may be; and to take such other actions and execute such other documents for filing with the FAA as necessary or required to register an Aircraft, expedite the registration of an Aircraft (including the execution and delivery of a Declaration of International Operations or the equivalent), to change the United States registration number of an Aircraft, and to execute and deliver all necessary documentation, including an AC Form 8050-2, Aircraft Bill of Sale, to effectuate the repurchase of an Aircraft under Section A.3.3 of the NetJets Fractional Program Agreement. The Buyer further designates the President, or any Vice President, Secretary, Treasurer or Assistant Secretary of NJS or NJI to execute and submit on behalf of the Buyer, the Confirmation of Entitlement to Act as required and in accordance with the Regulations and Procedures of the International Registry.

The Power of Attorney set forth herein shall be deemed coupled with an interest and shall expire ten (10) years from the date set forth below.

Additionally, Buyer hereby certifies that Buyer is a citizen of the United States, as that term is defined in 49 U.S.C. § 40101, *et seq.*, as amended.

       **DATED** this _____ day of _____, 2014.

SLS Travel L.L.C.
("**Buyer**")
Signature: _____
Name:      Scott Louis Shleifer
Title:       Manager

*BILL OF SALE FOR TRADE-IN AIRCRAFT*

UNITED STATES OF AMERICA

U.S. DEPARTMENT OF TRANSPORTATION FEDERAL AVIATION ADMINISTRATION

FORM APPROVED
OMB NO. 2120-0042

**AIRCRAFT BILL OF SALE**

FOR AND IN CONSIDERATION OF **$1+OVC** THE UNDERSIGNED OWNER(S) OF THE FULL LEGAL AND BENEFICIAL TITLE OF THE AIRCRAFT DESCRIBED AS FOLLOWS:

UNITED STATES REGISTRATION NUMBER **N** 455QS

AIRCRAFT MANUFACTURER & MODEL
Gulfstream Aerospace GIV-X **(G450)**

AIRCRAFT SERIAL No.
4074

DOES THIS 3 DAY OF Nov. 2014 HEREBY SELL, GRANT, TRANSFER AND DELIVER ALL RIGHTS, TITLE, AND INTERESTS IN AND TO SUCH AIRCRAFT UNTO:

Do Not Write In This Block
FOR FAA USE ONLY

**PURCHASER**

NAME AND ADDRESS
(IF INDIVIDUAL(S), GIVE LAST NAME, FIRST NAME, AND MIDDLE INITIAL.)

NJI Sales, Inc.
c/o DeBee Gilchrist, PC
100 North Broadway Ave., Suite 1500
Oklahoma City, OK 73102

UNDIVIDED INTEREST

12.5% of 100%

DEALER CERTIFICATE NUMBER

AND TO THEIR SUCCESSORS ~~EXECUTORS, ADMINISTRATORS,~~ AND ASSIGNS TO HAVE AND TO HOLD SINGULARLY THE SAID AIRCRAFT FOREVER, AND WARRANTS THE TITLE THEREOF:

IN TESTIMONY WHEREOF   I   HAVE SET   MY   HAND AND SEAL THIS 3 DAY OF November 2014

| | NAME(S) OF SELLER<br>(TYPED OR PRINTED) | SIGNATURE(S)<br>(IN INK) (IF EXECUTED FOR CO-OWNERSHIP, ALL MUST SIGN.) | TITLE<br>(TYPED OR PRINTED) |
|---|---|---|---|
| **SELLER** | SLS Travel L.L.C. | X<br>Scott Louis Shleifer | Manager |

ACKNOWLEDGMENT (NOT REQUIRED FOR PURPOSES OF FAA RECORDING: HOWEVER, MAY BE REQUIRED BY LOCAL LAW FOR VALIDITY OF THE INSTRUMENT.)

ORIGINAL:

AC   Form 8050-2 (9/92) (NSN 0052-00-629-0003) Supersedes Previous Edition

# Exhibit B – Fractional Aircraft Management Services Terms & Conditions

These Fractional Management Services Terms & Conditions ("Management T&Cs") between Manager and Owner are incorporated by reference into the Agreement. In the event of any conflict between this Exhibit B and the main text of the Agreement, the language of the main text of the Agreement will govern.

### Section B.1 – Aircraft Management Services

**B.1.1    General.** Manager agrees for the benefit and at the direction of Owner that it shall use, manage and maintain the Aircraft with all reasonable care and in accordance with applicable insurance coverage and within the standards and guidelines established by the FAA and shall comply with all laws, ordinances or regulations relating to the use, operation and maintenance of the Aircraft. Manager shall permit the Aircraft to be used only as contemplated by the manufacturer thereof as specified in the owner's manual and other technical materials regarding the Aircraft provided by the manufacturer or FAA to Manager.

**B.1.2    Maintenance Services.** Manager shall, at its own cost and expense: (a) have the Aircraft inspected, maintained, serviced, repaired, overhauled and tested by duly competent personnel, in accordance with the Aircraft manufacturer's inspection and maintenance program or with another inspection and maintenance program approved by the FAA, so as to keep the Aircraft in good operating condition, ordinary wear and tear excepted, and in such condition as may be necessary to obtain and hold a certificate of airworthiness for the Aircraft; (b) as often as necessary in the reasonable discretion of Manager to the extent required to keep the Aircraft in good cosmetic appearance, repaint the exterior and refurbish the interior of the Aircraft; and (c) maintain all records, logs and other materials required by the FAA to be maintained in respect of the Aircraft.

**B.1.3    Flight Crewmembers.**

a.    Manager shall supply professionally qualified pilots familiar with and licensed to operate the Aircraft, and on certain aircraft, professionally qualified flight attendants. In addition, Manager shall be responsible for all expenses related to the flight crewmembers, including travel, training, salary, and lodging expense.

b.    If Owner is an individual, he or she may at any time arrange to act as a pilot on his or her flights using the fractional program aircraft, but only so long as: (i) Owner gives NetJets at least twenty-four (24) hours prior notice of his or her intention to act as a pilot for a particular flight, (ii) Owner satisfies in advance all of the pilot certificate, type rating, currency, medical certificate, and other qualifications that NetJets has established for its employee pilots, (iii) Owner complies with pilot rest and flight time requirements established by NetJets, and (iv) Owner's actions as a pilot will not violate the terms and provisions of any insurance policy covering the Aircraft or a pilot union agreement.

### Section B.2 – Flight Management Services

**B.2.1    General.** Owner hereby directs Manager, and Manager agrees to make all necessary take-off, flight, and landing arrangements for flights operated by Owner.

**B.2.2    Reserving Aircraft for a Flight.**

a.    In order to facilitate the provision of services by Manager, Owner agrees to provide its desired flight schedule and related information as far in advance as reasonably possible but in all cases within the time period specified below ("Minimum Advanced Notice").

| Flights within the Continental United States | 6 hours* |
| Flights between Continental United States and airports listed on the Canadian Airports List | 12 hours |
| Flights between Continental United States and areas in Canada outside the Canadian Airports List | 18 hours |
| Flights outside the Continental United States (excluding Canada) or on a Peak Period Day | 48 hours |

*10 hours if Owner's aggregate interest size in the same or larger cabin aircraft in the NetJets Program falls below 25% or greater

b.    Owner shall provide Manager with the following information for each proposed flight: (i) desired departure point; (ii) desired destination; (iii) desired date and time of flight; (iv) the number and names of passengers; (v) the nature and extent of luggage; and (vi) any other information concerning the proposed flight that may be pertinent or is reasonably required by Manager. With respect to any flight involving international travel by a minor without both parents or guardians present, Owner also shall provide written evidence satisfactory to NetJets that such travel is approved by the non-traveling parent or guardian or is otherwise lawful. Calls with NetJets' owner services personnel may be monitored or recorded by Manager for quality assurance.

c.    Owner shall ensure that the flight crew is provided with: (i) a valid, government issued photo ID for the lead passenger, and if necessary a valid, government issued photo ID for every passenger so that the crew can verify each passenger against the flight manifest prior to boarding (for passengers younger than eighteen (18) years of age, the lead passenger can verbally acknowledge that the minor is the person noted on the flight manifest), and (ii) for international flights, (a) a current passport for each passenger (including minors), (b) evidence that any necessary visas have been obtained, and (c) any other documents reasonably required by Manager.

d.    The Aircraft may be used at any time during any day of the week, and aircraft provided herein shall be available at any airport suitable for landing in accordance with applicable law and with safety standards established by NetJets for the aircraft then being operated and for which Manager can obtain a landing slot and provided the same does not violate the terms of applicable insurance coverage.

NJ_015

Owner shall be guaranteed the use of one (1) NetJets Program aircraft per calendar day.

**B.2.3    Peak Period Day.** Manager may designate up to ten (10) days per calendar year as Peak Period Days. Manager shall be entitled to accelerate or delay requested departure times on Peak Period Days by up to three (3) hours and the Minimum Advanced Notice required for flights on Peak Period Days shall be forty-eight (48) hours.

**B.2.4    Lateness.**

a.    Owner. There shall be no charge to Owner in the event Owner is late or cancels a scheduled flight; except that (i) the Aircraft shall be permitted to leave in the event Owner is more than one (1) hour late for the flight and has not notified Manager that Owner will be late and (ii) if Manager has scheduled an aircraft specifically for such flight, Owner shall reimburse Manager for all crew and aircraft repositioning expenses (not to exceed the estimated cost of the canceled trip) unless it has given Manager at least ten (10) hours prior notice for domestic trips and twenty-four (24) hours for international trips of any such cancellation. Provided however that in any event of a cancelation, Manager reserves the right to pass through any third party fees incurred by Manager associated with the cancelled flight for catering, permitting, ground transportation, or otherwise.

b.    Manager. Manager shall have no liability for delay or failure to furnish the Aircraft and pilots pursuant to these Management T&Cs when such failure is caused by operation of law, by the action or inaction of any government or airport authority, by sudden or unexpected mechanical difficulty, or by a force majeure event. In the event Manager is more than two (2) hours late in furnishing the Aircraft at any time due to any reason other than the foregoing, Owner shall be granted additional flight time at no additional cost equal to the length of the delay after one (1) hour, up to a maximum of two (2) hours per occurrence.

<u>Section B.3 – Hours and Usage</u>

**B.3.1    Hours.** Owner shall be entitled to fly an amount equal to the Allotted Hours per Year listed in Item B.8 of the General Schedule (Year shall be defined as the period of time beginning on the Closing Date and on the same date for each subsequent year during the term of the Agreement, and ending at 11:59 P.M. on the day before the same date of the following year). Any Allotted Hours not utilized by Owner in any single Year ("Underflown Hours") will be carried forward for Owner's use in subsequent Years, subject to the usage restrictions in this Section. In addition to the Allotted Hours, Owner may fly, at the Occupied Hourly Fee, an amount of hours equal to (i) Owner's Underflown Hours, if available, up to an amount equal to 25% of Owner's Allotted Hours, plus (ii) the Borrowing Hours, if available, (collectively, the "Maximum Annual Hours"). Any Borrowing Hours used by Owner in a Year will be deducted from the subsequent Year's Allotted Hours. In the event Owner utilizes more than the Maximum Annual Hours in any single Year, Manager reserves the right to invoice the Owner the Supplemental Rate 1 for any such hours flown in excess of the Maximum Annual Hours. Additionally, if Owner exceeds an amount equal to 25% of Owner's

Allotted Hours billed at the Supplemental Rate 1, then Manager reserves the right to invoice the Owner the Supplemental Rate 2 for each additional hour flown thereafter. For the avoidance of doubt, any hour which NetJets bills at a Supplemental Rate shall not be deducted from Owner's Allotted Hours.

**B.3.2    Occupied Hours.** Flights shall be deemed to commence at the time of take-off and shall terminate when such aircraft lands ("Flight Segment"). In addition, two-tenths (2/10) of an hour shall be added to each Flight Segment to account for taxi time for take-off and landing. Notwithstanding the foregoing, Owner acknowledges and agrees that all Flight Segments shall be deemed to be a minimum of one (1) hour duration (with such one (1) hour minimum including the additional two-tenths (2/10) of an hour for taxi time) the above referenced minimum Flight Segment duration shall not apply to any Flight Segment caused solely as a result of government regulation such as a Customs stop, in which event Owner shall be charged for actual Passenger Occupied Hours plus $500. Flight Segments shall be rounded to the nearest one-tenth (1/10) of an hour and each hour, or portion thereof, that makes up of a Flight Segment shall be referred to as an "Occupied Hour".

**B.3.3    Hours Reconciliation upon Reduction, Termination or Trade.**

a.    Overflown Hours. If at the reduction or termination of the Agreement, Owner has used more Occupied Hours than earned during Owner's pro-rated time of ownership, then Owner shall be responsible to pay the applicable Supplemental Rate with respect to each excess hour flown. If such hours were previously billed and paid at the Occupied Hourly Fee, then the Owner will be responsible to pay the difference between the Occupied Hourly Fee and the applicable Supplemental Rate for such hours.

b.    Underflown Hours Remaining at Termination or Reduction. If at the reduction or termination of the Agreement, Owner has used fewer Occupied Hours than earned during Owner's prorated time of ownership, then Owner shall forfeit all of such hours, or in the case of a reduction, the pro-rata share of such hours.

c.    Underflown Hours Remaining at Time of Trade. If Owner trades the Interest in the Aircraft for an interest in another aircraft that is equal to or larger in interest size than the Interest in the Aircraft, then Owner may carry forward any Underflown Hours based upon Owner's pro-rated time of ownership. The hours carried forward shall be interchanged at the appropriate interchange rate pursuant to the Aircraft Interchange Schedule for the new aircraft, when applicable, and treated as underflown hours under the new contract. In the event Owner elects to trade-in the Interest in the Aircraft for a smaller interest size, then the trade carry forward hours referenced above shall be reduced proportionately with such decrease.

**B.3.4    Aircraft Interchange.**

a.    Owner may request the use of another type of aircraft in the NetJets fleet according to the Aircraft Interchange Schedule provided as Attachment B.2. Requests for downgrades from the Aircraft are guaranteed. Requests for upgrades from the Aircraft are not

guaranteed and are subject to operational availability as determined by NetJets in its sole discretion. Owner shall be deemed to have used the number of Occupied Hours used for the flight multiplied by the relevant ratio specified in the Aircraft Interchange Schedule.

b.   Owner may request Owner's Aircraft at any time. Owner agrees and acknowledges that in the event the Aircraft and all other aircraft that are the same or greater make and model as the Aircraft are unavailable, Manager may provide Owner with a NetJets Global 5000, Gulfstream G550, GV, G450, G400, or GIV-SP aircraft and Owner shall be deemed to have used the number of Occupied Hours used for the flight multiplied by the applicable ratio specified in the Aircraft Interchange Schedule. Owner further agrees and acknowledges that in the event the Aircraft and all other aircraft under the Exchange T&Cs are unavailable, Manager will arrange at Manager's sole cost and expense to charter for Owner's use a comparable, mission capable aircraft, including amenities and configuration, which may or may not be the same make and model as the Aircraft. Manager will advise Owner in advance whenever a non-NetJets Program aircraft is being substituted for a NetJets Program aircraft and Owner will have the option to accept the flight on a non-NetJets Program aircraft or wait until NetJets can provide a NetJets Program aircraft. If Owner elects to wait for a NetJets Program aircraft, then Manager shall have no liability for the delay to Owner's requested departure time. If Owner accepts such non-NetJets Program aircraft, Owner acknowledges that the flight will be operated by the charter operator under 14 CFR Part 135 or other applicable regulations. Any aircraft so provided by Manager shall be deemed the Aircraft when used by Owner for the purpose of the Agreement and these Management T&Cs.

### Section B.4 -- Fees

**B.4.1     Operating Fund.** Upon receipt of the initial invoice, Owner will advance to Manager the Operating Fund specified as Item C.3 of the General Schedule to be used by Manager to defray the cost of maintenance, fuel and miscellaneous expenses incurred as a result of invoicing Occupied Hourly Fee charges in arrears. Such amount shall be returned to Owner, without interest, at the expiration of the Agreement.

**B.4.2     Monthly Management Fee.** Owner agrees to pay to Manager a Monthly Management Fee in the amount specified in Item C.4 of the General Schedule on the first day of each month throughout the term of the Agreement (except if this Agreement starts on any day of the month, other than the first, then the first and last months' Monthly Management Fee will be charged on a pro-rated basis). In all cases, Owner shall be responsible for the Monthly Management Fee through and including the Repurchase Date.

**B.4.3     Occupied Hourly Fee.** Owner agrees to pay to Manager an Occupied Hourly Fee in the amount specified in Item C.5 of the General Schedule multiplied by the number of Occupied Hours flown by Owner during the previous month which charges shall be payable within ten (10) days after receipt of an invoice therefor.

**B.4.4     Hourly Fuel Fee.** Owner agrees to pay to Manager an Hourly Fuel Fee multiplied by the number of Occupied Hours flown by Owner during the previous month which fee shall be payable

within ten (10) days after receipt of an invoice therefor. The Hourly Fuel Fee will vary each month depending on what Manager's average cost of fuel was in any given month. The Hourly Fuel Fee



An example of the Hourly Fuel Fee calculation is set forth below:

| **Example** |
| --- |
| |

The Hourly Fuel Fee will increase or decrease as a result of adjustments to the component of the charge that relates to fuel (including taxes imposed in fuel unless such taxes are creditable or refundable to Manager).

**B.4.5     Ground.** Manager agrees, at Owner's request, to coordinate any or all ground transportation required by Owner, which shall be at Owner's expense plus a five percent (5%) handling fee.

**B.4.6     Catering.** NetJets will bill Owner for all catering and additional in-flight food and beverages, except for standard stock items and the first one hundred dollars ($100) of the order.

**B.4.7     Additional Compliance and Safety.** Owner agrees that the cost of compliance of any airworthiness or other directive or regulation issued by the FAA or any other governmental agency, whether international or domestic ("Directive"), and the cost of complying with any Aircraft Service Changes or Customer Bulletins (as defined by the Aircraft manufacturer), to the extent Manager has not been reimbursed for such costs from the manufacturer or other appropriate party, shall be borne by Owner and any additional interest owners ("Additional Interest Owners") on a pro-rata basis except that for a period of five (5) years from and after purchase of the Aircraft from the manufacturer, Owner's liability under this Section shall be limited to its pro-rata share of the cost of compliance with any Directive that is generic to general aviation turbofan-engine aircraft or to multiple types of general aviation turbofan-engine aircraft, and not solely applicable to Aircraft type. Manager agrees to use commercially reasonable efforts to seek reimbursement for such costs from the manufacturer or other appropriate party. Owner agrees to pay its share of such costs to Manager promptly upon receipt of an appropriate invoice therefor. In addition to the foregoing, in the event Manager in its reasonable judgment determines that an upgrade is necessary to improve the compliance or safety of the Aircraft, Manager reserves the right to seek reimbursement for such costs from Owner on a pro-rata basis; provided that Owner's pro-rata share of such costs shall not exceed Fifteen Thousand Dollars ($15,000.00) per 6.25% interest per calendar year.

**B.4.8    Hourly Ferry Fee.**

a.    There will be no Hourly Ferry Fee to ferry (position) the aircraft for any Flight Segment which (i) both originates and terminates in the Collective Service Area (as defined below), or (ii) takes place between airports in the Collective Service Area and in the Ferry Waiver Zone (set forth in Attachment B.4 of these Management T&Cs) for the Owner's Aircraft.

b.    The Collective Service Area includes (i) all approved airports within the Continental United States, and (ii) Canadian Airports with the airport codes of CYHM (Hamilton Airport), CYGK (Kingston), CYKF (Kitchener\Waterloo), CYXU (London), CYQA (Muskoka),    CYOW    (Ottawa\MacDonald-Cartier),    CYPQ (Peterborough),    CYZR    (Sarnia-Hadfield),    CYSN    (St. Catharines/Niagara), CYQS (St. Thomas), CNM4 (Stratford), CYYZ (Toronto\Pierson    International),    CYKZ    (Toronto\Buttonville Municipal), and CYQG (Windsor), CYUL (Montreal/Pierre-Elliott-Trudea) and CYHU (Montreal-St. Hubert) and CYVR (Vancouver International) (collectively, the "Canadian Airports List").

c.    In the event Owner requests a smaller aircraft than the aircraft type purchased and the requested aircraft is available for interchange, then that Flight Segment shall be eligible for the ferry waiver zone for the aircraft type requested.

d.    In the event Owner requests and is granted a larger aircraft than the aircraft type owned, then that Flight Segment shall be eligible only for the ferry waiver zone for the aircraft type owned.

e.    In the event the Flight Segment does not meet the requirements of Section B.4.8.a, Owner shall be invoiced for the Hourly Ferry Fee as specified in Item C.12 of the General Schedule per flight hour (including the applicable Hourly Fuel Fee) that would be required to ferry the Aircraft to or from such location to or from the nearest suitable international airport within the Continental United States (without regard to the location from which NetJets actually ferries the Aircraft). As an alternative to paying the Hourly Ferry Fee, in those instances where an Owner's itinerary for a trip both originates and terminates in the Collective Service Area, but has one or more Flight Segments within the trip itinerary wherein the Hourly Ferry Fee would be assessed, Owner can elect to pay the greater of (i) an average of three (3) Occupied Hours per day for the duration of the trip (including day of departure and day of return) or (ii) the number of Occupied Hours per day actually used for the duration of the trip.

**B.4.9    International Travel.** For permitted international Flight Segments that do not originate and terminate in the Continental United States, Owner will be charged for the following:

a.    International Crew Fees for overnight expenses if the flight's duration is equal to or exceeds four and one-half (4½) hours. The International Crew Fees will be charged in accordance with the schedule below.

| Aircraft with No Flight Attendant (2 Crewmembers) | | Aircraft with Flight Attendant (3 Crewmembers) |
|---|---|---|
| | | |

| Passenger Occupied Hour | Charge | | Passenger Occupied Hour | Charge |
|---|---|---|---|---|
| 0-4.4 hours | None | | 0-4.4 hours | None |
| 4.5-9.4 hours | $603 | | 4.5-9.4 hours | $897 |
| 9.5 hours and greater | $1,205 | | 9.5 -15 hours | $1,796 |
| | | | 15 hours and greater | $2,693 |

b.    International Handling Fees for any and all foreign permit, communication, handling, overflight, navigation, and air space, customs, head taxes, emissions taxes and similar assessments relating to the ownership, operation, maintenance or use of the Aircraft by Owner.

c.    For certain international locations, International Flat Fees may be invoiced to Owner in lieu of the International Handling Fees for certain international locations. Such fees are based on Manager's average costs of traveling to such locations. The International Flat Fees are as listed on the International Flat Fees Schedule attached as Attachment B.3 and may change at any time without notice.

d.    In the event Owner's trip itinerary includes a destination or enroute destinations without reasonably available approved aircraft maintenance facilities or when an additional crew member is sent due to the duration of the trip, at Owner's request, or other reasons, Owner will be surcharged $353 per day per additional employee sent (the "Crew Surcharge"), plus expenses; and

e.    The actual transportation costs (business class for overseas travel, coach for the Continental United States travel) and room and board expenses for the positioning and repositioning of each crew member affected when Owner has either requested that the Aircraft be operated with multiple crews or Owner's itinerary would require the crew to exceed a fourteen (14) hour duty day.

**B.4.10    Annual Fee Adjustment.** On January 1 of each year, commencing in the year 2015: (i) the Occupied Hourly Fee, the Supplemental Hourly Fees (1 & 2), International Crew Fees, Crew Surcharge, and the Hourly Ferry Fee shall each be increased by the ████████████████████████████████████████████████ and (ii) the Monthly Management Fee shall be increased by ████████

**B.4.11    Periodic Increases.** As the Aircraft ages it becomes more expensive to operate; accordingly, NetJets has established periodic increases based on the age of the Aircraft. The schedule for these increases is specified in Items C.6, C.7, C.8, and C.9 of the General Schedule.

**B.4.12    Taxes & Other Fees.** Owner shall be and remain responsible for any and all federal, state, local, and international taxes, charges, fees, imposts, excise taxes, duties and costs (including for the avoidance of doubt user fees, access fees, emissions fees

(trading and offsets), property taxes and similar charges) and interest and penalties thereon, imposed by any governmental authority, foreign or domestic, associated with ownership, management, maintenance and use of the aircraft, and the services provided to Owner under the Agreement.

**B.4.13    Use of Aircraft.** Owner agrees that Manager may, during such periods of time that the Aircraft is not actually being utilized by Owner, operate the Aircraft for maintenance, positioning, training, demonstration, air transportation, and other lawful purposes, and that Manager shall be entitled to retain for its own account any savings, reimbursements, or receipts accrued by Manager from such use of the Aircraft.

**B.4.14    Payment Terms.** Unless otherwise provided herein, all fees due NetJets from Owner under this Agreement shall be payable within ten (10) days from the date of the invoice. In the event any fees hereunder are not promptly paid when due, Owner shall pay all costs of enforcement and collection of such fees including reasonable attorney's fees and interest from the date the fees were due at the rate of twelve percent (12%) per annum (but not in excess of the maximum rate permitted by law).

### Section B.5 – Regulatory Requirements

**B.5.1    General.** The Parties agree as follows:

a.    Manager, as the program manager, shall ensure that the NetJets Program satisfies the definitions of 14 CFR § 91.1001 and meets the applicable requirements of 14 CFR Part 91, Subpart K and 14 CFR Part 135, when applicable;

b.    Manager shall maintain fractional program management specifications under 14 CFR Part 91, Subpart K and an Air Carrier Certificate and operations specifications under 14 CFR Part 135;

c.    Manager shall manage the NetJets Program and the Aircraft in accordance with its fractional program management specifications and its operations specifications issued by the FAA;

d.    Manager shall comply with all applicable laws of the United States and of each jurisdiction in which the Aircraft is operated, and shall maintain the Aircraft in proper condition for operation under such laws;

e.    Owner, Manager or the pilots may terminate a flight, refuse to commence a flight, or take other action necessitated by such safety considerations without liability for loss, injury, damage or delay when, in the reasonable view of Owner, Manager or the pilots of the Aircraft, safety may be compromised. Owner can also dictate limitations of flights, provided, however, that notwithstanding the foregoing, any powers of Owner to limit or terminate a flight shall be confined to those flights being made at the direction of Owner as part of Owner's use of the Aircraft under these Management T&Cs;

f.    Subject to the conditions set out in Section B.5.3 below, Owner shall have the right to inspect and audit, or to have a designee of Owner inspect and audit Manager's records (i) pertaining to the operational safety of the program, (ii) required to show compliance

with the management specifications and all applicable regulations (including the management specifications, manuals, log books, and all maintenance records maintained by Manager) and (iii) pertaining to actual flight hours incurred during Owner's operation of the Aircraft in the NetJets Program; and

g.    Owner designates Manager, and Manager accepts Owner's designation of Manager, as Owner's agent to receive service of notices pertaining to the NetJets Program that the FAA seeks to provide to NetJets Program owners, and authorizes the FAA to send any such notices to Manager in its capacity as Owner's agent for such service, provided that the FAA has the right to contact Owner directly if the FAA Administrator determines that direct contact is necessary.

**B.5.2    Manager Services.** At Owner's direction, Manager agrees that it will provide assistance to, and consult with, Owner in all matters regarding the Aircraft, including:

a.    Administrative and aviation support services, including those listed in 14 CFR § 91.1001(b)(8);

b.    Acceptance of the delivery of the Aircraft specified herein;

c.    FAA and manufacturer's correspondence and directives;

d.    Enforcement of warranty claims;

e.    Enforcement, litigation and settlement of insurance matters; and

f.    Parts replacement, services and maintenance arrangements.

**B.5.3    Inspections and Audits.** Owner may exercise its right to inspect and audit according to the following conditions intended to avoid any unreasonable disruption of NetJets' business or flight operations and to protect the confidential information of individual customers and employees, as well as the confidential information of NetJets.

a.    Owner must provide NetJets with advance written notice of its desire to conduct the inspection or audit;

b.    Owner or its designee must conduct the audit at a reasonable time during NetJets' daytime business hours;

c.    Owner and its designee must agree to keep NetJets' manuals, records, and other proprietary information confidential;

d.    Owner and its designee must refrain from removing any of NetJets' property, manuals, records, or proprietary information from NetJets' premises; and

e.    Neither Owner nor its designee may inspect or audit (i) NetJets' customer records, employee records, or any other information that is protected as confidential by law or by contract, or (ii) any information that is not reasonably related to the operational safety or compliance of the program or the flight hours incurred on the Aircraft.

**B.5.4    Operational Control Briefing and Acknowledgement.** Owner acknowledges that it has received the Briefing on Fractional Owner's Operational Control Responsibilities provided as Attachment B.5 and the Acknowledgement of Fractional Owner's Operational Control Responsibilities provided as Attachment B.6. (the "Acknowledgement"). Owner's execution of the Acknowledgement is a precondition to Manager's obligations under this Agreement and to Owner being eligible to operate any flights as a fractional owner under 14 CFR Part 91, Subpart K.

#    #    #

*ATTACHMENT B.1 – PEAK PERIOD DAYS*

| **Currently Identified NetJets Peak Period Days** | | |
|---|---|---|
| **Day of the Week** | **Date** | **Description** |
| Saturday | January 4, 2014 | Saturday after New Years |
| Sunday | January 5, 2014 | Sunday after New Years |
| Thursday | February 13, 2014 | Thursday before Presidents Day |
| Friday | February 14, 2014 | Friday before Presidents Day |
| Monday | February 17, 2014 | Presidents Day |
| Wednesday | November 26, 2014 | Wednesday before Thanksgiving |
| Sunday | November 30, 2014 | Sunday after Thanksgiving |
| Saturday | December 20, 2014 | Saturday before Christmas |
| Friday | December 26, 2014 | Friday after Christmas |
| Saturday | December 27, 2014 | Saturday after Christmas |

*Updated copies of this list may be requested at any time from your Sales Executive or Owner Services Team. Any changes or additions to the above list will be published and distributed by NetJets with at least sixty days' notice.*

*ATTACHMENT B.2 – AIRCRAFT INTERCHANGE SCHEDULE*

| Aircraft Interchange Schedule | |
|---|---|
| **Type of Aircraft** | **Interchange Ratio** |
| Hawker 400XP* | 0.48 : 1 |
| Citation Encore | 0.53 : 1 |
| Phenom 300* | 0.54 : 1 |
| Citation XLS  / Citation Excel | 0.55 : 1 |
| Hawker 900XP / Hawker 800XPC | 0.59 : 1 |
| Sovereign | 0.63 : 1 |
| Citation X | 0.71 : 1 |
| Gulfstream G200 | 0.73 : 1 |
| Challenger 350* | 0.73 : 1 |
| Falcon 2000EX / 2000 | 0.82 : 1 |
| Gulfstream G450 / G400 / GIV-SP | 0.80 : 1 |
| Global 5000* | 0.95 : 1 |
| Gulfstream G550 / GV | 0.85 : 1 |
| Global 6000* | 1.00 : 1 |

*Indicates a NetJets fleet that contains a limited number of aircraft. Requested interchanges to these fleets are not guaranteed. Owners wishing to request an interchange to one of these fleets should contact their Owner Services team and NetJets will work with them to find a mutually acceptable solution.

**NetJets reserves the right to amend the Interchange Schedule on sixty days' written notice.

*ATTACHMENT B.3 – INTERNATIONAL FLAT FEES SCHEDULE*

| Location | Airport | Hawker 400XP Citation Encore/+ Citation Excel/XLS Embraer Phenom 300 | H800XP H900XP Sovereign | Citation X Gulfstream G200 Challenger 350 | Falcon 2000/2000EX | G450/GIV-SP G550/GV G5000/G6000 |
|---|---|---|---|---|---|---|
| **Alaska** | | | | | | |
| Anchorage | PANC | $524 | $524 | $524 | $594 | $734 |
| All Other Locations | | $559 | $559 | $559 | $814 | $934 |
| **Bahamian Islands** | | | | | | |
| Nassau | MYNN | $664 | $684 | $684 | $709 | $769 |
| All Other Locations | | $1,159 | $1,174 | $1,174 | $1,299 | $1,434 |
| **Bermuda** | | | | | | |
| | TXKF | $1,284 | $1,334 | $1,334 | $1,359 | $1,534 |
| **Canada** | | | | | | |
| Gander | CYQX | $621 | $621 | $621 | $836 | $1,086 |
| All Other Locations | | $446 | $556 | $556 | $586 | $1,256 |
| **Caribbean** | | | | | | |
| Anguilla | TQPF | $1,634 | $1,839 | $1,839 | $1,909 | $1,909 |
| Antigua & Barbuda | TAPA | $1,424 | $1,509 | $1,509 | $1,584 | $1,539 |
| Aruba | TNCA | $1,454 | $1,944 | $1,944 | $2,044 | $2,234 |
| Aruba | TNCB | $1,370 | $1,860 | $1,860 | $1,960 | $1,960 |
| Aruba | TNCC | $1,370 | $1,860 | $1,860 | $1,960 | $2,150 |
| Barbados | TBPB | $1,754 | $1,994 | $1,994 | $2,084 | $2,084 |
| British Virgin Islands | TUPJ | $1,359 | $1,359 | n/a | n/a | n/a |
| Cayman Islands | MWCB, MWCR | $1,589 | $1,664 | $1,664 | $1,684 | $2,059 |
| Dominica | All Airports | $1,284 | $1,334 | $1,334 | $1,359 | $1,359 |
| Dominican Republic | All Airports | $1,684 | $1,684 | $1,684 | $2,029 | $2,234 |
| Grenada | TGPY | $1,459 | $1,459 | $1,459 | $1,459 | $1,909 |
| Guadeloupe | TFFR | $2,159 | $2,159 | $2,159 | $2,159 | $2,159 |
| Jamaica | MKJP,MKJS | $2,059 | $2,059 | $2,059 | $2,159 | $2,909 |
| Martinique | All Airports | $1,559 | $1,709 | $1,709 | $1,859 | $1,859 |
| Puerto Rico | All Airports | $1,114 | $1,399 | $1,399 | $1,859 | $2,084 |
| St. Kitts & Nevis | TKPK | $1,234 | $1,234 | $1,234 | $1,234 | $1,234 |
| St. Lucia | TLPC,TLPL | $1,534 | $1,534 | $1,534 | $1,534 | $1,534 |
| St. Martin/Maarten | TNCM | $1,594 | $1,804 | $1,804 | $1,994 | $2,159 |
| St. Vincent & The Grenadines | All Airports | $1,384 | $1,984 | $1,984 | $1,984 | $1,984 |
| Trinidad & Tobago | TTPP | $1,684 | $1,834 | $1,834 | $2,074 | $1,984 |
| Turks & Caicos | MBPV,MBGT | $1,134 | $1,259 | $1,259 | $1,284 | $1,609 |
| U.S. Virgin Islands | TISX,TIST | $919 | $944 | $944 | $959 | $1,009 |
| **Central America** | | | | | | |
| Belize | MZBZ | $1,459 | $1,934 | $1,934 | $1,984 | $2,484 |
| Costa Rica | MROC,MRLB | $2,804 | $3,274 | $3,274 | $3,274 | $4,079 |
| Guatemala | All Airports | $2,134 | $2,134 | $2,134 | $2,134 | $2,134 |
| Honduras | All Airports | $1,859 | $2,559 | $2,559 | $2,609 | $2,609 |
| Nicaragua | All Airports | $2,359 | $2,359 | $2,359 | $3,534 | $3,534 |
| Panama | MPTO,MPHO | $2,669 | $2,734 | $2,734 | $3,689 | $5,309 |
| **Hawaii** | | | | | | |
| All Locations | All Airports | n/a | n/a | $609 | $734 | $734 |
| **Mexico** | | | | | | |
| Acapulco | MMAA | $2,534 | $3,104 | $3,104 | $3,134 | $3,134 |
| Cancun | MMUN | $2,229 | $2,544 | $2,544 | $2,634 | $2,834 |
| Puerto Vallarta | MMPR | $2,334 | $2,509 | $2,509 | $2,609 | $2,759 |
| Los Cabos Int'l Airport | MMSD | $1,909 | $2,109 | $2,109 | $2,259 | $2,559 |
| Cabo San Lucas | MMSL | $2,009 | $2,109 | $2,109 | $2,359 | $2,409 |
| Toluca | MMTO | $2,214 | $2,369 | $2,369 | $2,669 | $3,009 |
| All Other Locations | | $2,059 | $2,109 | $2,109 | $2,269 | $2,559 |

*For each departure and arrival at certain airports an all-inclusive flat fee that is aircraft and airport specific will be charged.
**International Flat Fees may be adjusted, without notice, upward or downward to reflect actual costs, based upon actual invoices NetJets receives.
***Surcharges may be added to specific airports to recover short term price increases due to specific events.

*ATTACHMENT B.4– FERRY WAIVER ZONE LOCATIONS*

| NetJets Ferry Waiver Zone Locations | | |
|---|---|---|
| **GROUP I – Citation Encore/Encore+ / Citation Excel/XLS / Phenom 300** | | |
| AIRCRAFT * | -Berry Islands | Guadeloupe |
| •Citation Encore+/Encore | -Bimini | Jamaica |
| •Phenom 300 | -Cat Island | Martinique |
| •Citation XLS/ Excel | -Eleuthera | Netherlands Antilles: |
| | -Grand Bahama | Bonaire |
| FERRY WAIVER ZONE | -Nassau/Paradise Island | Curacao |
| •Alaska | -San Salvador | St. Eustatius |
| •Bermuda | British Virgin Islands: | St. Martin/ St. Maarten |
| •Canada | -Tortola | Puerto Rico |
| •Caribbean Islands: | Barbados | St. Kitts |
| Anguilla | Cayman Islands: | St. Lucia |
| Antigua | -Cayman Brac | St. Vincent & The Grenadines |
| Aruba | -Grand Cayman | Trinidad & Tobago |
| Bahamian Islands: | •Mexico | Turks & Caicos |
| -Abaco Islands | Dominica | U.S. Virgin Islands: |
| -Acklins Island | Dominican Republic | St. Croix |
| -Andros | Grenada | St. Thomas |
| **GROUP II – Hawker 900XP/800XPC / Citation Sovereign** | | |
| AIRCRAFT * | FERRY WAIVER ZONE | El Salvador |
| • Hawker 900XP/800XP | • All locations in Group I | Guatemala |
| • Citation Sovereign | • Central America: | Honduras |
| | Belize | Nicaragua |
| | Costa Rica | Panama |
| **GROUP III – Citation X, Gulfstream 200, Challenger 350** | | |
| AIRCRAFT * | FERRY WAIVER ZONE | |
| • Citation X | • All locations in Groups I and II | |
| • Gulfstream G200 | • Hawaii | |
| • Challenger 350 | | |
| **GROUP IV – Falcon 2000EX/2000 / Gulfstream G450/G400/GIV-SP / Gulfstream G550/GV / Global 5000** | | |
| AIRCRAFT * | Herzegovina | Finland |
| • Falcon 2000EX/2000 | Madeira | Romania |
| • Gulfstream G450/G400 (GIVSP) | Bulgaria | France |
| • Gulfstream G550/GV | Germany | Serbia |
| • Global 5000 | Slovakia | Spain |
| FERRY WAIVER ZONE | Gibraltar | Hungary |
| All locations in Groups I, II, and III | Slovenia | Sweden |
| Cyprus (Greek) | Greece | Ireland |
| European Region: | Malta | Switzerland |
| Albania | Canary Islands | Italy |
| Kosovo | Montenegro | United Kingdom |
| Austria | Croatia | Greenland |
| Latvia | Netherlands | Iceland |
| Azores | Czech Republic | Israel |
| Lithuania | Norway | Morocco (cities north of 33° North Latitude plus |
| Belgium | Denmark | cities of Agadir and Marrakech) |
| Luxembourg | Poland | Russia/Belarus/Ukraine cities of Moscow, St. |
| Bosnia & Macedonia | Estonia | Petersburg, Minsk, Kiev, and L'viv |
| | Portugal | Turkey (cities west of 35° East Longitude) |
| **GROUP V – Global 6000** | | |
| AIRCRAFT * | Ecuador | Argentina |
| • Global 6000 | Guyana | China |
| | Suriname | India |
| FERRY WAIVER ZONE | French Guiana | Bolivia |
| • All locations in Groups I, II, III and IV | Peru | Chile |
| Colombia | Brazil | Paraguay |
| Venezuela | Uruguay | |
| Due to regulations, safety concerns, weather, or other limitations, it may not be possible to go into all airports in these areas for all aircraft in the respective group. Applicable International Fees and Crew Fees are not waived. See fees section for more details on how these fees are charged. | | |

*ATTACHMENT B.5 – BRIEFING ON FRACTIONAL OWNER'S OPERATIONAL CONTROL RESPONSIBILITIES*

During the term of the Agreement (including any extensions of the term), Owner may exercise its rights under this Agreement and under the Federal Aviation Administration's fractional ownership regulations (14 C.F.R. Part 91, Subpart K) to engage in the operational control of fractional program aircraft.

The FAA defines "operational control" as follows: "Operational control, with respect to a flight, means the exercise of authority over initiating, conducting or terminating a flight." 14 C.F.R. § 1.1.

Along with the right to exercise operational control over fractional program aircraft comes a measure of responsibility for the aircraft and their operation. This responsibility includes:

(1)     Joint responsibility with the fractional program manager for compliance with the management specifications and all applicable regulations.

(2)     Responsibility for enforcement actions for any noncompliance.

(3)     Civil liability risk in the event of a flight-related occurrence that causes personal injury or property damage.

You will have operational control over fractional program aircraft whenever you arrange for your use of one of the aircraft under 14 C.F.R. Part 91, Subpart K. You will not have operational control over fractional program aircraft whenever (1) you ask the fractional program manager to operate an aircraft on your behalf under 14 C.F.R. Part 135, (2) an approved vendor aircraft operating under 14 C.F.R. Part 135 is provided to serve your private flight needs, or (3) the fractional program manager operates the aircraft for maintenance, positioning, demonstration, or purposes other than to carry you and your guests.

The relevant regulations of the Federal Aviation Administration (14 C.F.R. § 91.1013) require that you sign an acknowledgement of your operational control responsibilities.

If you have any questions regarding operational control issues, please consult your legal counsel or contact NetJets Owner Contracts by email at contractnotices@netjets.com or by phone at 614-239-5500.

#   #   #

*ATTACHMENT B.6 – ACKNOWLEDGEMENT OF FRACTIONAL OWNER'S OPERATIONAL CONTROL RESPONSIBILITIES*

The undersigned Owner hereby signs this Acknowledgement of Operational Control Responsibilities ("Acknowledgement") to certify that Owner has read, understands, and accepts its operational control responsibilities, including those responsibilities described in 14 CFR Part 91, Subpart K, and in this Acknowledgement.

Owner acknowledges that:

1.      NetJets Aviation, Inc. is the fractional ownership program manager ("Manager") for the NetJets fractional ownership program ("the Program"), and Manager has briefed Owner on Owner's operational control responsibilities. As used in this Acknowledgement The term "Owner" includes persons who own an interest or hold a multi-year leasehold interest in an aircraft in the Program ("Program Aircraft").

2.      This Acknowledgement is part of the program management services contract between Owner and Manager.

3.      Owner understands that Owner is in operational control of a Program Aircraft and Owner may operate that Program Aircraft in accordance with 14 CFR Part 91, Subpart K when: (i) Owner has the rights and is subject to the limitations set forth in sections 91.1003 through 91.1013 of Subpart K, (ii) Owner has directed that a Program Aircraft carry passengers or property designated by Owner, and (iii) the Program Aircraft is carrying those passengers or property. Owner understands that Owner is in operational control of a Program Aircraft even where the Owner leases the Program Aircraft from another owner through the Master Dry-Lease Aircraft Exchange Agreement.

4.      When Owner is in operational control, the following apply:

   a.      Owner is responsible for safe operations and for complying with all applicable laws and regulations and the management specifications issued to Manager. Even though Owner may delegate to Manager performance of some or all of the tasks associated with carrying out Owner's responsibilities, Owner continues to be jointly and individually responsible, along with the Manager, for performance of these tasks and for compliance with applicable requirements.

   b.      Owner may have liability risk in connection with the operation of the Program Aircraft, including possible liability risk for at least the following: (i) enforcement actions for any noncompliance, or (ii) liability if a flight-related occurrence causes personal injury or property damage.

Owner or Owner's representative may access copies of the acknowledgements for the Owner's Program Aircraft.

OWNER:
SLS Travel L.L.C.

Signature: _____

Name:      Scott Louis Shleifer

Title:      Manager

Contract ID: 18538

#  #  #

# EXHIBIT C – FRACTIONAL DRY-LEASE AIRCRAFT EXCHANGE TERMS & CONDITIONS

These Fractional Dry-Lease Aircraft Exchange Terms & Conditions ("Exchange T&Cs") between Services and Owner are incorporated by reference into the Agreement. In the event of any conflict between this Exhibit C and the main text of the Agreement, the language of the main text of the Agreement will govern.

## Section C.1 – NetJets Dry-Lease Aircraft Exchange Arrangement

**C.1.1    General.** Owner owns or leases an undivided interest in one or more aircraft enrolled as Fractional Ownership Program Aircraft under 14 CFR Part 91 Subpart K, with Manager being the named fractional program manager, (all of said aircraft being together referred to as the "Program Aircraft". The Owner, together with such other parties that own or lease the remaining undivided interests in the Aircraft and undivided interests in Program Aircraft (collectively, "Participants", and each individually a "Participant") have agreed to participate in the NetJets Fractional Ownership Program managed by Manager and to engage Manager as the program manager for that program, and/or to participate in other fractional ownership programs managed by an affiliate of Manager or, to the maximum extent allowed by law, by each foreign program manager that is licensed by NetJets Inc. to provide a NetJets-branded fractional program outside the United States (collectively, the "NetJets Program"). Owner, together with such other parties which own or lease the remaining undivided interests in the Aircraft, desires to enter a Dry-Lease Aircraft Exchange Arrangement that is part of the NetJets Program, and as such arrangements are defined in Section 91.1001(b) of the Federal Aviation Regulations. The Owner desires to engage Services to provide administrative services to administer the NetJets Dry-Lease Aircraft Exchange Arrangement and to participate in the NetJets Dry-Lease Aircraft Exchange Arrangement, both by dry leasing its Aircraft to other Participants, and by dry leasing Program Aircraft from other Participants. Services shall manage and administer the Dry-Lease Aircraft Exchange Arrangement contemplated hereunder for an annual fee of $200 per Participant, provided that such fee shall be paid by Manager.

**C.1.2    Participation.** Owner agrees to participate in the NetJets Dry-Lease Aircraft Exchange Arrangement, both as lessor of its respective Aircraft and as lessee of other Program Aircraft provided by other participants in the NetJets Program, to be bound by all of the provisions of these Exchange T&Cs, and to dry lease the Aircraft to all other Participants in good standing under these Exchange T&Cs. Each Participant shall be entitled to the use of another Program Aircraft, on an as available, first come, first served, basis. No charge shall be made for the right to dry lease another Participant's Aircraft under these Exchange T&Cs in exchange for making available to others the dry lease of Participant's aircraft. Each Participant agrees to make its Aircraft available, during the period in which Participant is a Party to the Agreement, for dry lease to all other Participants in the NetJets Dry-Lease Aircraft Exchange Arrangement. Participant agrees that these Exchange T&Cs include as participants, fractional ownership program owners that participate in a fractional ownership program, along with Owner, that is managed by a program manager determined by the FAA to be an affiliate (as defined in 14 CFR § 91.1001(b)) of Manager, including participants in any NetJets Program.

## Section C.2 – Fractional Aircraft Ownership

Owner, as an undivided interest owner or lessee of the Aircraft, hereby agrees:

a.    Owner will engage Manager as its fractional program manager for so long as Owner owns or leases the Interest in the Aircraft.

b.    Owner acknowledges that, in order to provide each owner with sufficient use of the Aircraft, Owner shall not be entitled to utilize the Aircraft in excess of such Owner's available flight hours during any given Year except to the extent permitted by the Management T&Cs and by 14 C.F.R. Part 91, Subpart K.

c.    Owner acknowledges and agrees that each owner's respective interest shall represent an undivided interest in the Aircraft, shall be indivisible, and shall be subject to all of the terms and conditions of its respective Agreement. Each owner shall be entitled to its pro-rata share of the depreciation, gain, loss, deduction, credit or any tax benefits with respect to the Aircraft.

d.    Owner acknowledges and agrees that the relationship of the owners among themselves shall be that of tenants-in-common of a chattel (the Aircraft). Notwithstanding the foregoing, each owner waives whatever right it may have to demand the partition, or sale for partition, of the Aircraft under any law of the State of Ohio, or any other jurisdiction, and agrees that the sole and adequate means by which an owner may divest itself of its interest in the Aircraft shall be as set forth in this agreement.

e.    That it is not the purpose or intention of this Section to create, and this Section shall not be considered as creating, a joint venture, partnership, or other relationship whereby any of the Participants in the NetJets Program shall be held liable for the omissions or commissions of any other Participant. No partnership, legal person, association, or jural entities are intended or created by the Parties.

## Section C.3 – Truth In Leasing

TRUTH IN LEASING STATEMENT UNDER SECTION 91.23 OF THE FEDERAL AVIATION REGULATIONS.

C.3.1    EACH PARTICIPANT HEREBY CERTIFIES THAT ITS AIRCRAFT (i) EITHER HAS BEEN NEWLY DELIVERED FROM ITS MANUFACTURER OR HAS BEEN MAINTAINED AND INSPECTED DURING THE PRECEDING TWELVE (12) MONTHS IN ACCORDANCE WITH THE APPLICABLE PROVISIONS OF 14 CFR PART 91, SUBPARTS E OR K, OR PART 135; AND (ii) IS IN COMPLIANCE WITH THE

APPLICABLE REQUIREMENTS OF 14 CFR PART 91, SUBPARTS E OR K, OR PART 135.

C.3.2 EACH PARTICIPANT AGREES, CERTIFIES AND KNOWINGLY ACKNOWLEDGES THAT WHEN IT OPERATES ANY AIRCRAFT UNDER THESE EXCHANGE T&C'S, IT SHALL BE KNOWN AS, CONSIDERED, AND IN FACT WILL BE THE OPERATOR OF SUCH AIRCRAFT.

C.3.3 AN EXPLANATION OF FACTORS BEARING ON OPERATIONAL CONTROL AND PERTINENT FEDERAL AVIATION REGULATIONS CAN BE OBTAINED FROM THE NEAREST FAA FLIGHT STANDARDS DISTRICT OFFICE, GENERAL AVIATION DISTRICT OFFICE, OR AIR CARRIER DISTRICT OFFICE.

C.3.4 THE PARTIES HERETO CERTIFY THAT A TRUE COPY OF THESE EXCHANGE T&C'S SHALL BE CARRIED ON THE AIRCRAFT AT ALL TIMES OR OTHERWISE COMPLIES WITH THE REQUIREMENTS OF THE FAA, AND SHALL BE MADE AVAILABLE FOR INSPECTION UPON REQUEST BY AN APPROPRIATELY CONSTITUTED IDENTIFIED REPRESENTATIVE OF THE ADMINISTRATOR OF THE FAA.

IN WITNESS WHEREOF, the Parties have executed this Fractional Dry-Lease Aircraft Exchange Terms & Conditions effective as of November 3, 2014

NetJets Services, Inc. ("Services")

By: _____

Name: Romero Tanner

Title: Manager, Contract Administration

Aircraft Interest:
Manufacturer: Bombardier Inc.
Type: BD-700-1A10
Serial No.: 9598
Registration No.: N145QS
Fractional Interest: 37.5%

SLS TRAVEL L.L.C.
A LIMITED LIABILITY COMPANY FORMED UNDER THE LAWS OF ~~CONNECTICUT~~ DELAWARE

By: _____

Name: Scott Louis Shleifer

Title: Manager

# # #

# EXHIBIT D – GENERAL TERMS & CONDITIONS

This Exhibit D describes the general terms and conditions, including insurance coverage and liability limitations, that apply to the Agreement. In the event of any conflict between this Exhibit D and the main text of the Agreement, the language of the main text of the Agreement will govern.

### Section D.1 – Representations, Warranties, and Covenants

**D.1.1    Mutual Representations, Warranties, and Covenants.** Sales, Manager, Services, and Owner each represent, warrant and covenant that:

a.    If a business entity, it is duly and validly organized or formed and existing in good standing under the laws of the state of its formation;

b.    This Agreement constitutes the valid and binding obligations of the Parties and is enforceable in accordance with its terms; and

c.    It has the power and the authority to enter into this Agreement and to carry out the transactions contemplated hereunder and, if the Party is a juridical person, the person executing this Agreement on its behalf is duly authorized to do so.

**D.1.2    Representation, Warranties, and Covenants of Owner.** Owner represents, warrants, and covenants to NetJets that:

a.    Owner specifically acknowledges, for the benefit of NetJets, that neither NetJets nor any employee or agent of (or counsel to) NetJets has made any representation or warranty to Owner as to (i) the future sale value or rental value of the Aircraft or the Interest in the Aircraft, or (ii) any tax consequence to Owner of its participation in any transaction contemplated by this Agreement or otherwise related in any way to the Aircraft, the Interest, or the purchase, sale, management, use, or financing thereof;

b.    Owner will do nothing to impair the registration of the Aircraft in the United States throughout the term of this Agreement(except as permitted by this Agreement);

c.    Owner will use the Aircraft or any aircraft provided to it in accordance with all applicable laws and regulations and will not use the Aircraft or any aircraft provided to it for any illegal purposes or for purposes of providing transportation of passengers or cargo for compensation or hire except as permitted under 14 CFR § 91.501 and 14 CFR § 91.1005 or by other law; and

d.    Owner is a citizen of the United States (as defined in 49 USC § 40102(a)(15) and will remain a citizen of the United States while it holds the Interest in the Aircraft.

**D.1.3    Representation, Warranties, and Covenants of NetJets.** NetJets represents, warrants, and covenants to Owner that:

a.    Manager is and will continue to be (i) a fractional ownership program manager, holding Management Specifications issued by the Federal Aviation Administration pursuant to 14 C.F.R. Part 91, Subpart K, (ii) registered with the U.S. Department of Transportation under 14 C.F.R. Part 298, and (iii) certificated by the Federal Aviation Administration under 14 C.F.R. Parts 119 and 135.

### Section D.2 – Aviation Insurance Coverage

**D.2.1    General.** Owner directs and Manager agrees to arrange for and obtain the following insurance coverage with insurers of recognized reputation, responsibility and having at least an A.M. Best rating of an "A" or better.

a.    At Manager's expense, aircraft physical damage insurance (excluding war risk coverage and other allied perils coverage) as commercially available with respect to the Aircraft, against loss, theft or damage, extended coverage with respect to any engines or parts while removed from the Aircraft for the fair market value of the Aircraft (as determined by NetJets from time to time) naming NetJets, Owner and Additional Interest Owners as named insureds, and naming the Bank, if applicable, as lienholder.

b.    At Manager's expense, passenger and third party liability insurance (excluding war risk coverage and other allied perils coverage) as commercially available for the Aircraft which it operates in an amount not less than **Four Hundred Million Dollars ($400,000,000.00)** combined single limit liability coverage for passengers and third party bodily injury and property damage naming Owner, NetJets, and Additional Interest Owners as named insureds.

c.    At Owner's expense and as commercially available, war risk and other allied perils coverage for aircraft physical damage in an amount not less than the fair market value of the Aircraft (as determined by NetJets from time to time), passenger liability in an amount not less than **Four Hundred Million Dollars ($400,000,000.00)** combined single limit liability coverage and **Two Hundred Fifty Million Dollars ($250,000,000.00)** third party non-passenger war risk liability coverage.

**D.2.2    Additional Terms.** The policies arranged under this Exhibit D shall contain the following:

a.    The policies shall contain a severability of interest clause, a waiver of subrogation on behalf of Owner, and a General Policy Condition in favor of Owner whereby the insurance coverage required shall not be impaired or invalidated by a breach or violation by Manager of any representations, declarations, or conditions contained in such policies. Owner shall be permitted to obtain, at the expense of Owner, contingent liability insurance separate from the insurance coverage provided by Manager hereunder, provided that the insurance procured by Manager shall be primary in all events.

b.    In the event of any damage to or loss, theft or destruction of, the Aircraft by any cause whatsoever ("Loss or Damage"), not involving an actual or constructive (i.e., the Aircraft cannot be properly or economically repaired) total loss, all insurance proceeds in respect thereof shall be paid to Manager in trust for the repair and restoration of the Aircraft to good repair, condition and working order.

c.    Notwithstanding an event of Loss or Damage to the Aircraft under Section D.2.2.b above, Manager shall continue to provide Owner with the use of an aircraft in accordance with the terms of this Agreement while the Aircraft is being repaired.

d.    In the event of an actual or constructive total loss of the Aircraft ("Total Loss"), Manager shall have the option, but not the obligation, to substitute a Global 6000 aircraft ("Replacement Aircraft"), having a fair market value at least equal to the fair market value of the Aircraft immediately preceding such Total Loss (assuming the Aircraft was in the condition required to be maintained hereunder), for the Aircraft such Total Loss. Such option shall be exercised, in writing, within thirty (30) days after a final determination is made by the insurance company that the Aircraft has suffered a Total Loss. In the event such substitution option is exercised, Owner shall be entitled to enjoy all the

benefits of this Agreement during the period from loss to replacement without interruption and Manager shall be entitled to use the proceeds of insurance to purchase the Replacement Aircraft and retain any excess proceeds for its own account. If the insurance proceeds are insufficient to purchase such Replacement Aircraft, Manager shall fund the difference. Each of Manager and Owner agrees to execute all documents including appropriate bills of sale, registration applications, proofs of loss, and checks to accomplish the foregoing. In the event of a Total Loss when Manager elects not to purchase the Replacement Aircraft, Owner shall be entitled to the Fair Market Value of the aircraft, as defined in the Purchase Agreement, as of the date of the Total Loss, multiplied by the percentage equivalent of the Interest.

e.   In no event shall either Owner or NetJets (or their respective parents, affiliates, directors, members, partners, officers, or employees) be liable to the other for any indirect, special, punitive, or consequential damages including loss of profit, loss of use, depreciation or diminution of value following loss.

f.   Owner shall reimburse Manager for all costs and expenses resulting from damage caused by the negligence of Owner or Owner's officers, directors, members, managers, employees, or guests.

g.   Copies of such policies and certificates of Insurance shall be furnished to Owner promptly upon the execution of this Agreement. Such Insurance shall be maintained by Manager in full force and effect throughout the term hereof, and the insurer shall provide Owner thirty (30) days advance notice of cancellation or material alteration, provided, however, notification for war risk and other allied perils coverage are as set forth in the terms and conditions of the policy.

h.   In the event of an unexpected increase in insurance premium costs, NetJets reserves the right to charge back to Owner and Additional Interest Owners the additional cost of such premium to the extent of the increase.

**D.2.3   Sole Recourse**

a.   GENERAL. OWNER AGREES TO ACCEPT THE PROCEEDS OF THE HULL INSURANCE SPECIFIED IN THE POLICY REQUIRED BY THIS AGREEMENT AS OWNER'S SOLE RECOURSE AGAINST NETJETS FOR ANY LOSS OR DAMAGE SUSTAINED TO THE AIRCRAFT. THE PARTIES AGREE TO ACCEPT THE PROCEEDS OF THE LIABILITY INSURANCE REQUIRED BY THIS AGREEMENT AS THEIR SOLE RECOURSE AGAINST EACH OTHER IN THE EVENT OF ANY CLAIM RELATING TO A TYPE OF INJURY, DEATH, OR PROPERTY DAMAGE FOR WHICH SUCH INSURANCE IS BEING PROVIDED UNDER THIS AGREEMENT.

b.   Limitations on Sole Recourse. The limitations provided above will not operate against Owner or NetJets to the extent that insurance proceeds are withheld or reduced due to the actions or inactions of the other Party, or in the event that one Party is subjected to claims or other damages, due to: (i) the other Party causing the insurance proceeds to be withheld or reduced, or (ii) the other Party acting with gross negligence or willful misconduct.

### Section D.3 – Miscellaneous Provisions

**D.3.1   Amendment.** Except as provided in Section 3.1 of the Agreement with respect to adoption of the written Extension Notices, no amendment or waiver of this Agreement will be effective unless it is in writing and duly signed by the Parties hereto.

**D.3.2   Assignment.**

a.   Except as otherwise provided in Section A.4.1 of the Purchase T&Cs neither Party may assign its rights or responsibilities under this Agreement without the prior written consent of the other Party, which consent may be withheld or delayed for any reason. Any attempted assignment not approved by the other Party, as provided in this Section, shall be null and void.

b.   Notwithstanding the requirements of Section D.3.2.a above, a NetJets Party may assign, after providing advance written notice but without having to obtain Owner's prior written consent, NetJets' rights and obligations under this Agreement, in whole or in part, to an affiliate.

c.   Subject to the foregoing, the terms and conditions of this Agreement shall be binding upon and inure to the benefit of each Party and its respective successors and permitted assigns.

**D.3.3   Confidentiality.** The Parties agree (on behalf of themselves and each of their respective affiliates, stockholders, directors, members, partners, officers, managers, employees, and agents) to keep confidential the terms of this Agreement and any nonpublic information supplied to it by another Party pursuant to this Agreement, provided that nothing herein shall limit the disclosure of this information (a) to the extent required by law or to carry out a Party's obligations under this Agreement, (b) to a Party's counsel, accountants, or auditors, (c) to a third party providing services at NetJets' direction, (d) in connection with any litigation involving a Party, or (e) which has been publicly disclosed by someone other than a Party to this Agreement. The protections of this confidentiality provision will extend to all information that NetJets might disclose to Owner during the conduct of any program audit, and Owner will give its auditors notice of this confidentiality requirement.

**D.3.4   Counterparts.** This Agreement may be executed in one or more counterparts, all of which together shall constitute the executed agreement.

**D.3.5   Entire Agreement.** The Agreement and the Exhibits attached hereto contain the entire understanding among the Parties with respect to the subject matter herein and supersede all previous communications, representations, and agreements, whether oral or written, between the Parties. Owner agrees that it has not relied on any statement, representation, or warranty other than those expressly incorporated in this Agreement. Both Parties either have retained or have at least had the opportunity to retain, at their own expense, legal counsel to assist them in the formation of this Agreement. Neither this Agreement nor any provision herein may be construed for or against a Party on the basis of whether that Party proposed or drafted the language.

**D.3.6   Force Majeure.** No Party shall be liable for any failure or delay in performance under this Agreement (other than for delay in the payment of money due and payable hereunder) to the extent said failures or delays are proximately caused by events or conditions beyond that Party's reasonable control and occurring without its fault or negligence, provided that, as a condition to the claim that a Party is not liable, the Party experiencing the difficulty shall give the other prompt written notice, with full details following the occurrence of the cause relied upon.

**D.3.7   Further Assurances.** Each Party hereto shall execute and deliver all such further instruments and documents as may reasonably be requested by the other Party in order to fully carry out the intent and accomplish the purposes of this Agreement as well as to comply with any change in any applicable law.

**D.3.8   Indemnification.**

a.   Subject to the limitations set forth herein and to the extent permitted by applicable law, NetJets and Owner each will indemnify the other and hold the other harmless from and against any claim, damage, injury, or expense (including reasonable attorney's fees) that the indemnified Party or its respective affiliates, stockholders, directors, members, partners, officers, managers, employees, and agents may incur by reason of any breach by the indemnifying Party of any of its representations, warranties, covenants, or obligations set forth in this Agreement.

b.   In the event any claim for indemnification hereunder arises on account of a claim or lawsuit by a third person against the indemnified Party, the indemnified Party shall notify the indemnifying Party promptly after the receipt of notice by the indemnified Party that such third-party claim or lawsuit has been initiated. The indemnifying Party shall be entitled to participate in the defense of any such claim or lawsuit by counsel of its own choosing. If the indemnifying Party participates in the defense of the third-party claim or lawsuit, the claim or lawsuit may not be settled by the indemnified Party without the prior written consent of the indemnifying Party (which consent shall not be unreasonably withheld), unless prior to the opportunity for settlement the indemnifying Party denied or failed to confirm after written request the other Party's right to indemnification.

**D.3.9    Notices.** Any notice, request or other communication to either Party by the other hereunder shall be sent to the addresses set forth in the signature block of the Agreement, and shall be deemed given on the earlier of (i) the date the same is personally delivered, (ii) the date the same is emailed, if an email address is specified therein, or (iii) the next business day after delivered to a reputable courier for delivery to the address as set forth in this Agreement. The place to which notices or copies of notices are to be given to either Party may be changed from time to time by such Party by written notice to the other Party. No Party may object to any method of providing notice that is actually received by such Party.

**D.3.10    Relationship of the Parties.** The relationship between NetJets and Owner is that of an independent contractor and customer, except insofar as this Agreement contemplates NetJets acting as Owner's agent for the purpose of providing or arranging services for Owner. There is no partnership or joint venture intended between NetJets and Owner or between owners or lessees participating in the NetJets Program.

**D.3.11    Severability.** In the event that any one or more of the provisions of this Agreement shall for any reason be held to be invalid, illegal or unenforceable, the remaining provisions of this Agreement shall be unimpaired, and the invalid, illegal or unenforceable provision shall be replaced by a mutually acceptable provision, which, being valid, legal and enforceable, comes closest to the intention of the Parties underlying the invalid, illegal or unenforceable provision.

**D.3.12    Survival.** The following provisions of this Agreement shall survive the termination of this Agreement: Section 4; Section A.2.3; Section A.3.5; Section B.4.12; and Section D.2.3.

**D.3.13    Third-Party Beneficiaries.** Except as contemplated by the Fractional Dry-Lease Aircraft Exchange Program Terms and Conditions set out in Exhibit C, there are no third-party beneficiaries to any part of this Agreement.

#   #   #